IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

In re the Application of:

DOMINIK KUFNER
Stefanieweg 11
82335 Berg-Mörlbach, Germany

Petitioner,

vs.

TINA KUFNER
Gut Racherbach
82407 Wielenbach, Germany

Defendant (Respondent).

Case No. 07-46S

**MEMORANDUM IN SUPPORT OF DOMINIK KUFNER'S: (1) EMERGENCY PETITION FOR A WARRANT IN LIEU OF A WRIT OF HABEAS CORPUS (2) REQUEST FOR AN EXPEDITED HEARING; AND (3) OPPOSITION TO RESPONDENT'S MOTION TO MODIFY THIS COURT'S ORDER**

## I. General Principles

The Hague Convention on the Civil Aspects of International Child Abduction,[1] as implemented through ICARA,[2] was created for the stated purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."[3] The Hague Convention was designed to restore the pre-retention status quo and to discourage parents from

---

[1] Art. 2, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.M.T.S. 89, reprinted in 51 Fed. Reg. 10, 494 (March 26, 1986).
[2] International Child Abduction Remedies Act, 42 U.S.C. §11601 – 11611 (2001).
[3] The late President Reagan, in a letter to the United States Senate, further explained that the Convention reflected "a worldwide concern about the harmful effects on children of parental kidnapping and a strong desire to fashion an effective deterrent to such conduct." See 51 Fed. Reg. 10493, 10495.

crossing international borders in search of a more sympathetic forum. Gitter v. Gitter, 396 F.3d 124, 129-130, (2nd Cir. 2005) (citing Paul R. Beaumont and Peter E. McLeay, *The Hague Convention on International Child Abduction* 1-3 (P.B. Chartered 1999). To dissuade family members from removing children to jurisdictions perceived to be more favorable to their custody claims, the Hague Convention attempts to "deprive [their] actions of any practical or juridical consequences". Gitter, 396 F.3d at 130.[4]

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim. See Hague Convention, supra Art. 16; 42 U.S.C. §11601 (b)(4); Dioroniu v. Mezitis, 237 F.3d 133, 140 (2nd Cir. 2001). The merits of any custody case are of no concern to a Hague Convention case. See Blondin v. Dubois 189 F.3d. 240, 245 (2nd Cir. 1999) citing Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993); Hague Convention, supra Art. 19: "Put differently, the court's inquiry in a Hague Convention case is not 'the best interest of the child,' as it is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country other than the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence." Hazbun Escaf v. Rodriquez, 200 F.Supp.2d 603, 610-11 (E.D.Va. 2002).

ICARA, enacted in 1988, establishes procedures for the implementation of the Hague Convention in the United States. ICARA allocates the burdens of proof for various claims and defenses under the Convention. See 42 U.S.C. §11601- 11611 (2005).

[4] As the Convention's official Reporter, Eliza Perez-Vera states in her explanatory report: "[s]ubstituting the forum chosen by the abductor for that of the child's residence would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration." As quoted in Blondin v. Dubois, 189 F.3d 240, 246 (2nd Cir. 1999).

Specifically, ICARA requires that a petitioner establish, by the preponderance of the evidence, that the children whose return are sought have been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. §11603(e)(1)(A). In this respect, the Convention reflects "a strong presumption favoring the return of a wrongfully removed child." Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002). If a petitioner makes out a *prima facie* case of wrongful removal or retention, the court must return the children unless the respondent can establish one of the Convention's enumerated defenses.

To establish a prima facie case, a petitioner must show by a preponderance of the evidence that: (1) the habitual residence of the children immediately before the date of the alleged wrongful retention was in a foreign country; (2) the retention is in breach of custody rights under the foreign country's law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention. See 42 U.S.C. §11603(e)(1)(A); Gitter, 396 F.3d at 130-31.

If the petitioner satisfies this burden, then the children must be returned to their state of habitual residence unless the respondent can establish one of the following affirmative defenses: (1) the proceeding was commenced more that a year after the removal of the children; (2) the person seeking return of the children consented to the removal; (3) there is a grave risk that the return of the children would expose them to physical or psychological harm; or (4) the return of the children would not be permitted under the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. See Blondin, 189 F.3d at 245-46; Furnes v.

Reeves, 362 F.3d 702, 712 (11th Cir.2004). The last two affirmative defenses require **clear and convincing evidence**. Blondin, 189 F.3d at 245-46 (emphasis added).

It is absolutely clear from ICARA that these affirmative defenses are meant to be narrow. Blondin, 189 F.3d at 246. Indeed these defenses "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, [they] remain within the purview of the court with plenary jurisdiction over the question of custody." Id. To view the defenses more broadly would frustrate the core purpose of the Hague Convention -- to preserve the status quo and deter parents from seeking custody of their children through forum shopping.

## II. There Is No Dispute That Dominik Kufner Has Established A Case Of Wrongful Retention; and Respondent Has No Clear and Convincing Evidence Of Grave Risk To The Children

The habitual residence of the children immediately before the date of kidnapping was Germany; the Respondent herself brought the custody action in Germany; and the German court prohibited their removal: this is all undisputed. It is further undisputed that Dominik Kufner was to exercise his custody rights on Thursday, January 25, 2007; but the children were already illegally kidnapped and hidden by Respondent.

### A. The German Court, Department of Youth and Family, and Psychologists Found No Harm

Therefore, the only remaining inquiry is whether Respondent can meet her burden, by clear and convincing evidence, that there is a grave risk that the return of the children would expose them to physical or psychological harm. Her outrageous claim that the children's father has "engaged in deviant acts with them" has been thoroughly and

resoundingly rejected three times. After careful investigation, the court in Germany, having jurisdiction over the custody of these children, found no abuse and, in fact, increased the number of days the father was to have custody. This decision was based on an extensive investigation by the Department of Youth and Family that concluded no danger to the children. Also, a court appointed psychologist, working in tandem with an English speaking psychologist, concluded the same. Thus, the father has undisputedly satisfied his burden, and the children must be returned unless Respondant can, by clear and convincing evidence, establish that the children will suffer a grave risk of physical or psychological harm. This is something she could not convince her first choice of courts (the German Family Court), the court appointed psychologists, nor the German Department of Youth and Family.

**B. These photos have been known to Respondent since October 2005**

What is even more compelling is the Respondent's timing of this wretched claim. First, the pictures in question were taken (in the presence of the au pair) in September 2005. They were voluntarily shared with the Respondent in October 2005. Not once in this time period did she even think to make this claim or restrict the children's time with their father. Next, after having the innocent family photos shared with her only, she picks out the most "offensive," and has her lawyer send them to the father's lawyer on February 21, 2006. All this time she allows unsupervised overnight visitation to continue unabated.

Court proceedings continue in March 2006, with no mention of the photos. Then, Respondent took the children to the United States for one week in April, contacted American lawyers in Rhode Island, and afterwards voluntarily returned to Germany.

Although totally aware of the photos, she felt no need to defy German law and kidnap the children, obviously because there was never any truth to the claim of inappropriate behavior, as Respondent herself surely knows.

Then, again submitting herself to the German jurisdiction, she writes to her husband, in May 2006 that she thinks he has been a "good husband and father" and she has experienced a "mostly wonderful life" with him. The Department of Youth Services made its finding to the court in July 2006 that the father has a "sustainable and good relationship" with the children and has the "prerequisites and aptitudes for raising and caring for" his children.

**C. The German authorities thoroughly investigated the outrageous claim**

Nevertheless, in August 2006, Respondent files in the German court (not American) the outrageous claim of pedophilia, all supported by one evening of playing children and an affidavit from an inexperienced, naïve au pair of age 19. The German court, taking any claim of child abuse seriously, immediately appointed a court-selected psychologist to thoroughly investigate the matter. The court also engaged the services of the Department of Youth Services. Extensive interviews were had with the father, the children, and the father's home was thoroughly investigated. The only person who refused to cooperate in the investigation was the Respondent herself. Even though she spoke German (after living there for 12 years), the court appointed an English-speaking psychologist to be involved, for her convenience. However, the Respondent refused to attend any sessions with the psychologist. Instead, she began a tactic of firing and hiring lawyers: she literally had nine (9) different English speaking lawyers represent her in Germany since February 2006. All this was part of her plan to avoid a finding that there

was no merit to her outrageous claim. It was also an effort to avoid a final order by the German family court.

The Department of Youth and Family officially reported to the court on September 20, 2006 that "sufficient evidence for the suspicion of the contact between the father and the children does not exist" (emphasis added). In fact, the report recommended that the custody time be increased (unsupervised) because of the close relationship between the father and the children. On September 28, 2006, the court appointed psychologist found no basis to the outrageous claim. The German court then followed with its order of October 18th increasing the custody of the father with his children to the 6 day/8day arrangement.

Respondent complied willingly with these opinions, and the children continued to stay with their father on this increased basis. There is nothing in Respondent's Certification other than these old, defeated ideas. The tragedy is that the Respondent is once again attempting to use these family, private photos in a public and despicable manner. After 3 ½ months of compliance, she abruptly kidnaps and hides. This is clearly a case of wrongful retention and the children should be restored immediately to their father.

## III. Father's Emergency Petition For A Warrant To Obtain Emergency Custody Of His Children Should Be Granted

The father has shown through uncontroverted evidence that his children and he are permanent residents of Germany, as is the Respondent. He has also shown that the Respondent commenced court proceedings in Germany resulting in a joint custody order with the father having custody 6 days and the mother 8 days out of each 14 day period.

He has also shown that the mother has lived permanently in Germany since November 1994, over 12 years. He has shown that both of his children have been born and reared in Germany and are presently enrolled in school in Germany. Further, he has shown that the Respondent has illegally removed the children from their school, their friends, and their family, with the full intention to hide them not only from their father but from the valid court in Germany that she requested to handle this matter. Therefore, a warrant should be issued to return the children to their father in compliance with the Hague Convention and ICARA.

## IV. The Children Deserve An Expedited Hearing

The objectives of the Hague Convention under Article 1(a) are to secure the ***prompt*** return of children wrongfully removed to or retained in any Contracting State; and under Article 1(b) to ensure that rights of custody and access of one Contracting State are **effectively respected** in the other Contracting States (emphasis added). Both the Hague Convention and ICARA require courts considering petitions to do so expeditiously. Choi v. Kim, 404 F. Supp. 2d 495 (S.D.N.Y.2005).

The United States District Court in Kim literally granted the petitioner temporary custody of her child on the very day the petition was filed. Id. at 497. After entering an order and issuing a warrant directing the U. S. Marshalls to remove the child from the respondent's custody, the court scheduled the hearing on the petition for the next business day.

In a case from the First Circuit, Currier v. Currier, 845 F Supp 916 (D.N.H. 1994), the court issued an *ex parte* order temporarily returning custody of the children to the petitioner four days after it was filed. The final hearing was held six days later.

In Friedrich v. Thompson, 1999 WL 33954819 (M.D.N.C. 1999), the court granted the motion of the father petitioner for expedited hearing in accordance with the Hague Convention, and conducted the hearing within four days of his filing of the action. The court also granted his petition to return the child to his custody in Germany, after the mother wrongfully abducted the child. Therefore, an expedited hearing is essential so that the children can return to their home, their school, their friends, and their family.

Here, counsel for Respondent contends that his work schedule is hectic and that he cannot appear at an evidentiary hearing on this Petition prior to April, 2007. This contention should be rejected. At least one federal court has refused to delay a hearing under the Hague Convention when it was a *court* that had a heavy schedule. Lops v. Lops, 140 F.3d 927, 944 (11th Cir. 1998). In the Lops case, the Eleventh Circuit Court of Appeals upheld the decision of a federal district court to refuse to abstain from hearing a Hague case involving a child abduction. The district exercised its discretion to decline to defer to the state court in South Carolina which could not expedite a hearing due to the "apparent heavy schedule" of the court. Id.

In upholding the determination of the district court, the Eleventh Circuit noted with approval that "[t]he district court acted because the federal law in issue contemplates an expedited hearing but the South Carolina court was failing to act expeditiously." Id. Certainly if the heavy schedule of a court will not obviate the right of a Hague Petitioner to an expedited hearing, the heavy schedule of a lawyer should not do so either.

The Hague Convention and ICARA are worded in such a way as to address remedies for the "Petitioner" or "Applicant," and "the spirit of the law is to protect the parent who has been wrongfully deprived of custody of a child." Id. at 3, fn.2. Here, these powerful international federal laws are meant for the protection of parents like Petitioner and provide for expedited hearings as a matter of course. The dilatory tactics of Respondent, based on the purported heavy work-load of her attorney, should not be permitted to obviate these rights.

## V. Respondent Has Shown Her Flagrant Disregard for the Rule of Law By Intentionally Commencing Divorce And Custody Proceedings In Germany And Then Flouting Both German And American Law By Kidnapping The Children

Respondent's intention was never to be discovered, and it was only because the children's German school had "caller i.d." that this action is even pending at the present time. Respondent called to continue perpetrating the prevarication that her children were "sick." When the school administrator offered to send homework to the children at the number on the caller i.d., Respondent abruptly hung up. The school administrator then contacted the German Police, who then discovered the fugitive's whereabouts.

The Respondent is also the person who engaged in reckless behavior in "losing" the private investigators with her children in the back seat of the vehicle in which she was riding. Once again, she has shown her desire, through her actions, to hide the children and herself from both the German and American courts. Creating a "1000 foot buffer" and allowing her to travel to Massachusetts will only increase her ability to disappear with the children.

There is absolutely no evidence of any kind of harassment or improper behavior on the part of the investigators. On the contrary, when Respondent was served with this Court's order she, along with her mother and father, came to the door and verbally abused the process server. This was all done in the presence of a Cumberland County Police Officer. Then they defiantly refused to take the papers, which remained on the porch of the home overnight. Such continuous contempt for proper court procedures should not be rewarded in giving the Respondent the ability to disappear with the children.

## VI. **Respondent Should Not Be Allowed To Conduct Unnecessary Surgery On Matthias**

Matthias Kufner is now seven years old. His mother intended to have Matthias's tonsils removed in 2006. Prior to this attempt, Matthias's father had him examined by the highest qualified doctors in Munich, who said the surgery was unnecessary. Therefore, the German medical system would not allow the surgery to go forward without the father's consent. This attempt by Respondent to have this unnecessary surgery done in Boston while the children are held captive is another example of her egotistical need to be in control. There is absolutely no reason for Matthias to have his tonsils removed, and this new attempt to avoid previous court orders should be denied.[5]

Due to the failure of the Respondent to cooperate, and also her failure to pay her rent on her home with the children, the father went to court in December 2006 requesting an order prohibiting the Respondent from leaving the country with the children. At the hearing, Respondent agreed to surrender her American passport, along with the passports

---

[5] Of course, if there is a medical necessity for surgery, from a qualified doctor (rather than elective), the father would certainly consider it.

of the children, to the U.S. Consulate. She also agreed she would not leave the country with the children. The U.S. Consulate then issued a letter confirming that they were holding the children's passports and would keep them until January 30, 2007. Respondent, in complete defiance of the court order and her agreement, illegally obtained the passports and fled Germany to hide in America.

All of the above supports the absolute necessity for this father to be reunited with his children, and the illegal actions of the Respondent must not be rewarded during the pendency of this action.

## VII. CONCLUSION

For the foregoing reasons, Petitioner Dominik Kufner respectfully requests this Court to exercise its authority to order an expedited hearing so that these matters may be determined posthaste for the benefit of the children and their return home to Germany.

Respectfully submitted,

February 5, 2007

Charles A. Tamuleviz, Esq. (Fed. Bar #6115)
TAMULEVIZ, HULTQUIST, & BIANCHI, LLP
144 Westminster Street
Providence, Rhode Island 02903
401.490.2939
401.490.2940 (fax)

OF COUNSEL:

Bradford Neal Martin, Esq. (Fed. Bar #3310)
BRADFORD NEAL MARTIN & ASSOC. PA
75 Beattie Place Suite 910
Greenville, South Carolina 29601
864.552.9990
864.552.9992 (fax)

I certify that I have read and join in the foregoing motion, and acknowledge and agree to observe the requirements of LR Gen 204 in its entirety and as it relates to the participation and responsibilities of local counsel.

Dated ______________________

______________________________
Charles A. Tamuleviz Bar No. 6115
Tamuleviz, Hultquist, & Bianchi, LLP
144 Westminster Street
Providence, Rhode Island 02903
Tel. No.: 401.490.2939
Fax No.: 401.490.2940
E-Mail: cat@thbrilaw.com

CERTIFICATION OF SERVICE

On this 5th day of February 2007, I caused the instant Memorandum in Support of Dominik Kufner's (1) Emergency Petition for a Warrant In Lieu Of A Writ Of Habeas Corpus (2) Request For An Expedited Hearing; And (3) Opposition To Respondent's Motion To Modify This Court's Order to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic Notification:

Neville J. Bedford, Esquire
321 South Main Street, 5th Floor
Providence, Rhode Island 02903

/s/ Charles A. Tamuleviz
Charles A. Tamuleviz, Esquire
Tamuleviz, Hultquist, & Bianchi, LLP
144 Westminster Street, Suite 302
Providence, Rhode Island 02903
Telephone: 401.490.2939
Facsimile: 401.490.2940
E-mail: cat@thbrilaw.com