*Certified translation*

Certified Copy

Gabriele Westhaus
Attorney

Att. G. Westhaus, Jahnstr. 29, 82319 Starnberg

Jahnstr. 29, 82319 Starnberg
Telephone: 0 81 51 / 2 11 78
Facsimile: 0 81 51 / 1 44 52

Postbank Munich
Account no. 515602-806
Sort code: 700 100 80

Tax no.: 146/14467

Local Court of Weilheim
Alpenstr. 16

82362 Weilheim

LOCAL COURT
FEB 8, 2007
WEILHEIM
UPPER BAVARIA

Starnberg, date:
February 7, 2007
47/06 W

RECEIVED

FEB 14, 2007

ULSENHEIMER & FRIEDERICH
ATTORNEYS

Kufner vs. Kufner
File no. 2 F 139/06

In the case of

Kufner v. Kufner
for parental care
Here: Temporary order for provisional transfer of the right to determine the place of abode and surrender of US passports

We submit the following motion in the name and on behalf of the respondent:

The petitioner's motion shall be rejected.

It is correct that the respondent is currently staying in the USA. For this reason a lawsuit is pending at the district court in Rhode Island. Therefore it is moved that all lawsuits pending at the Local Court of Weilheim for parental care (2 F 139/06), access (2 F 552/06) and motions for temporary orders, i.e. also the petitioner's motion of January 26, 2007, be suspended until the District Court for the District of Rhode Island has passed a decision.
This lawsuit will involve an investigation against the petitioner for child pornography.

The photographs are by no means harmless pictures of little children in the nude, taken while romping around and getting prepared for bed, as witness Neues claims in her declaration in lieu of an oath. These photographs were rather produced in such a large number (over 100) that the respondent was deeply worried. Neither are these normal nude photographs but unusual shots of the children's genitalia.

Evidence: Photographs of the children have already partly been submitted to the court.
Declaration in lieu of an oath by witness Astrid Zimmermann, of 02.07.2007

The photographs were definitely not taken by the children themselves. For example, on photograph no. we can clearly see the petitioner's foot while he is leaning over the scene in order to photograph the child's bottom and genitalia.

Evidence: Photo no.

Additionally, the children appear together in most of the photographs. The children clearly display defensive behavior by hiding behind objects or covering their faces with their hands. On photograph no.  Matthias is holding his fist up to the camera, on photo no. Matthias is trying to run away. On photo no. we can clearly see an injury on Josef's neck. The petitioner's behavior was abnormal, the children are upset but this does not stop the petitioner from taking further pictures against the children's will. Au-pair Alexandra Kain, who witnessed what happened, also experienced the situation as very unpleasant. In her declaration in lieu of an oath witness Kain even uses the word "perverted" to describe this behavior.

Evidence: Declaration in lieu of an oath by witness Alexandra Kein, of 10.22.2006
Translation of the declaration in lieu of an oath of 10.22.2006

Contrary to the petitioner's statements and the court's opinion, the respondent did not already know about the photographs in October 2005. In January 2006 the respondent first discovered some of the images on her computer, which had been given to her by the petitioner and which he himself had loaded onto the respondent's computer. This probably happened by accident, as the images were on the same chip card as the photographs of Josef's birthday party, which had been taken in Wielenbach in September 2005 and which the respondent had requested from the petitioner. The petitioner probably did not know at the time that these photographs were on the same chip card.
Through the respondent's then counsel, Attorney Liebl, a statement was demanded concerning these photographs in a letter dated 02.21.2006. Due to the change of legal counsel in February 2006 and the fact that the petitioner had taken the children with him for more than one week without the respondent's knowledge or consent, and without discussing this with the respondent or informing her about it, these photographs became less important.

Evidence: Declaration in lieu of an oath by witness Astrid Zimmermann, of 02.07.2007
Astrid Zimmermann, Alexander-Schmorell-Str. 1a, 82031 Grünwald
Britta Wilkinson, Alte Bahnhofstr. 8, 82343 Pöcking

- as witnesses –

However, the respondent still demanded an explanation after this date, as can be seen from the petitioner's letter of 05.07.2006 in reply to corresponding inquiries of the respondent.

Evidence: Petitioner's letter of 05.07.2006

This topic was already to be clarified in a meeting between the attorneys and the parties in early August 2006, however the petitioner did not appear at this meeting.

Evidence: Attorney Meyer, Wittelsbacherplatz 1, 80333 Munich - as witness

Only in mid-August 2006 did the respondent discover the full extent of the photo series. When the respondent checked the "trash can" on her computer on 08.17.2006 further photographs fell into her hands. In total, there were more than 100 photographs numbered 2727 to 2828. Due to her discovery, the motion for a change in the right of access was submitted to the court by a pleading of 08.22.2006.
The respondent found out on her computer that the photographs had been taken in September 2005. Also, the respondent only then discovered that somebody had witnessed them being taken, as photographs of the witness were also to be found in the trash can (photograph showing witness Kain, among others). Witness Kain, who was present when the images were being shot, specified the exact date and confirmed that the photographs were taken by the petitioner and not by the children.

Evidence: Declaration in lieu of an oath by Alexandra Kein

The already submitted letter of witness Kain was not – as the opposing party claims – authored by the respondent but is a completely unbiased statement by witness Kain.

Evidence: Letter dated 08.22.2006 in officially certified form

On 01.23.2007 both children were sick and in bed, running a temperature. The respondent therefore called the school to notify it of her children's absence. Neither were the children well enough to go back to school during the following days and therefore stayed at home. Both children told the respondent on 01.24.2007 that they had recently seen the "naked skin" photographs – nude photographs – of themselves on their father's computer screen while he was sending an e-mail. This behavior and the fact that the images are obviously still on the petitioner's computer, alarmed the respondent to such an extent that she spent the following days thinking of how to protect the children. As, due to frequent visits to the USA, the respondent and her children have very close ties with the maternal family, the respondent felt the understandable need to visit her family where she would find a shoulder to cry on and be able to restore her energy for a few days before having to face the dispute with the petitioner again back in Germany. As the children had to stay away from school due to their sickness anyway, a temporary stay in the USA would not be of any harm. The respondent had called the petitioner to informed him of the children's sickness and therefore necessary interruption of access. On Friday, 01.26.2007 the respondent again called the school to notify it of the children's continued sickness. This is the standard procedure at MIS.
In addition, the children's sick note was faxed by their doctor Dr. med. Mira Dorcsi-Ulrich directly to the school.

Evidence: Dr. med. Mira Dorcsi-Ulrich, Elisabethstr. 9, 80796 Munich

- as witness

Due to the avalanche that was triggered by the petitioner's measures, i.e. in particular by involving the police and German Border Guard, the respondent then contacted an attorney at home in the USA, to discuss how to proceed correctly. Due to the lawsuit and the scheduled hearing in Rhode Island the respondent needs to wait for the outcome before she can return to Germany. Therefore it can be ruled out that the respondent wanted to make off to the USA with the children, in order to deprive the petitioner of the children.

It is correct that the respondent was hard to reach during the children's sickness. However, it would be far-fetched to construe this as an attempted kidnapping.

Rather, since early 2006, the petitioner has seen every single move of the respondent as an alleged attempt to leave Germany permanently. In 2006 the respondent already visited the USA twice with the petitioner's consent. If she had really intended to leave Germany for good, even against the petitioner's will, she could have already done so long ago. However, she returned every time. On the other hand, the petitioner has already been spreading word among the parties' friends and acquaintances since February 2006 that he fears the respondent could "make off" to the United States. And that he would take hard measures to prevent it. He declared this in a telephone conversation with witness Yeomans in early April.

Evidence: Margit Yeomans, b.b. - as witness

Witness Alycia Setlin-Piper was also informed of this by the petitioner.

Evidence: Alycia Setlin, Melchiorstr. 15 a, 81479 Munich - as witness

Incidentally, it should be pointed out that the memorandum of a telephone conversation with witness Yeomans submitted by the petitioner completely misrepresents the contents of the conversation.

Evidence: Margit Yeomans, b.b. - as witness

The petitioner attributes actions to the respondent that he would probably do himself in her place but that have nothing to do with reality. For example, witness Zimmermann observed that the petitioner's sister mentioned that the petitioner was being portrayed as pedophile by the respondent. However, this was not true, as the respondent had never made such a suggestion. She had only expressed her concern about the photographs.

Evidence: Declaration in lieu of an oath by witness Astrid Zimmermann, of 02.07.2007

This behavior was also clearly registered by witness Käs.

Evidence: Declaration in lieu of an oath by witness Norbert Käs

This assessment corresponds exactly to the petitioner's behavior, who himself had the children with him in February 2006 for ten days without the respondent's knowledge or consent, and even contrary to a written agreement, and neither told the respondent where he was staying nor enabled the respondent to talk to the children briefly on the telephone. When the children returned, they were in a very strange condition. Matthias was utterly exhausted, Joseph completely overexcited in a way that witness Zimmermann had never experienced before. As the respondent did not want to be at home alone in her great anxiety during this time, she stayed with witness Zimmernann who accompanied her to Wielenbach for the children's return and therefore witnessed the entire incident with her own eyes.

Evidence: Declaration in lieu of an oath by witness Astrid Zimmermann, of 02.07.2007

*Certified translation*

This behavior also clearly shows that the petitioner is not fit to look after the children, exercise parental care over them or have the right to determine their place of abode, but that the respondent clearly shows a much greater commitment.

Due to these false allegations and resulting hard measures against the respondent the situation had reached a point where she suddenly felt she had to go home to restore her energy.
The respondent phoned the undersigned on the morning of 01.23.2007, as the holiday ruling for the imminent skiing holidays was pending, for which purpose the undersigned had sent a request to the opposing party in a letter of 01.23.2007, asking him for his consent to the holiday ruling.

Evidence: Letter of the undersigned dated 01.23.2007

If the respondent – as the petitioner alleges – had long planned to vanish to the USA for good, she would have not been interested in regulating the skiing holidays anymore.

The respondent did in fact collect the passports from the American consulate before 01.31.2007, but this is no evidence of a permanent escape to the USA.

It is wrong to claim that the respondent is delaying everything as another indication of the respondent's intentions to flee the country. It is correct that the respondent consulted the undersigned for a first meeting on 12.28.2006, however the undersigned could take no further action, as she was on holiday immediately after that until 01.08.2007. Only in the late afternoon of 01.16.2007 was the undersigned able to collect the files from the court and then had to familiarize herself with the bulky file contents. On 01.22.2007 the undersigned had a detailed talk with the respondent. The respondent was therefore by no means inactive but the undersigned was unable to take action earlier.

The intended meeting with the GWG was not delayed by the respondent but it was simply difficult to find a date. As a date 12.28.2006 was suggested to the respondent, but this was inconvenient for Ms. Hertkorn. Ms. Hertkorn then suggested 01.25.2007, which was inconvenient for the petitioner.

Neither is it true that the situation for the children was intolerable at their mother's place. The fact that the respondent was visited by her brother cannot be turned into an accusation that she was therefore planning to escape to the USA. Even the petitioner himself calls this an unprovable assumption. But then he should refrain from such untenable diatribes.

It is contested that a loud argument took place between the respondent and her brother.
It is also wrong that the children were not at home on 01.23. and 01.24.2007. They were sick in bed and were therefore not to be seen outside the house. It is also an outrageous accusation to claim that the respondent constantly makes the wrong medical decisions. Matthias' operation was urgently recommended by several doctors, as were the glasses for Joseph. Witness Zimmermann had also stopped consulting Dr. Felkel, as she no longer agreed with his medication.

Evidence: Declaration in lieu of an oath by witness Zimmermann, of 02.07.2007

Therefore, it can by no means be concluded that the respondent is incapable of exercising parental care. In fact, the children are very well looked after by the respondent and not mainly dumped in front of the television or computer. As evidence for the respondent's capability the declarations in lieu of an oath by witnesses Käs, Lucas, Hellerich, Dufford, Hansen, Buckley, Miller, Hernandez, Leitner, Frystacki and Austin are submitted and their contents declared an object of the proceedings in their entirety and referred to, in order to prevent repetitions.

Evidence: Declaration in lieu of an oath by Norbert Käs of 02.03.2007
Declaration in lieu of an oath by Maria Lucas of 01.25.2007
Declaration in lieu of an oath by Liane Hellrich of 12.05.2006
Declaration in lieu of an oath by Jasmin Dufford of 01.23.2007
Declaration in lieu of an oath by Ilka Hansen of 01.20.2007
Declaration in lieu of an oath by Katrin Buckley of 01.24.2007
Declaration in lieu of an oath by Leigh Miller of 10.27.2006
Declaration in lieu of an oath by Ingrid Hernandez of 10.18.2006
Declaration in lieu of an oath by Ursula Leitner of 09.13.2006
Declaration in lieu of an oath by Irina Frystacki of 06.21.2006
Declaration in lieu of an oath by Anette Austin of 09.13.2006

The psychologist Inge Wacker also confirms that the respondent's relations with the children were excellent during the two home visits she made; hence the respondent is by no means incapable of exercising parental care.

Evidence: Opinion of expert witness Inge Wacker of 11.16.2006

Neither is the settlement concluded before the Regional Court of Munich II a reason to confirm that the respondent wishes to leave the country. The respondent rather accepted the settlement in order to avoid the further continuation of the lawsuit possibly even into the second instance and to calm down the matter. The respondent by no means intended to use up the money, however the petitioner suggested this to her repeatedly.

Evidence: Letter from the petitioner

Neither did she sell the Mercedes for 30,000 euros, as the car was no longer nearly worth that value. Of course, the respondent would have much preferred to achieve such proceeds from the sale.

The respondent notified the petitioner that the children were ill and that access had to be interrupted. The children were sick in bed, which was confirmed by telephone to the undersigned by the respondent's brother who was in the house on 01.25.2007.

But the petitioner obviously wants to have the children in his custody, and any means to slander the respondent are good enough for him. In this context, he is "generous" enough to grant the respondent visiting rights for 14 days, which is much less than he has been claiming for himself since March 2006.

Due to these incidents the petitioner's fitness for exercising the right to determine the children's abode or of parent care must be disputed.

The respondent is very concerned about the children's well-being, but they are now completely confused and no longer know where they belong. In particular, the ruling of spending the days from Thursday to Tuesday with their father every two weeks does not allow for a daily routine.

The children are always tired when they return from their father's, as they go to bed very late there, often around 10 p.m., which is definitely too late for children of that age. Constant playing of computer games and television watching is not good for them either. On the days the children spend with their father, their homework is often left partly or completely undone. This happened during the entire last year in periods which the children spent with their father.

Evidence: Declaration in lieu of an oath by Anette Austin, of 09.13.2006

In addition, the petitioner is trying to discredit the respondent to the utmost by alleging that the respondent is incapable of looking after the children and giving them stability. Moreover, he claims that the respondent has a liking for alcohol, neglects her home and children, and endangers them by keeping a dog.

This is very far from the truth.

Instead, these are unfounded accusations with which the petitioner only intends to show the respondent in such a bad light that the court will assign parental care to him.

By no means an alcoholic, the respondent only committed one act of drunken driving, which was brought to an end immediately after she had exited the underground garage. To prove that the respondent is not an alcoholic, we submit the following

Evidence: Examination results of Argirov Internal Clinic of 11.14.2007 plus diagnosis
Margit Yeomans, b.b - as witness
Declaration in lieu of an oath by Astrid Zimmermann, of 02.07.2007

In fact, the respondent drinks very little alcohol, which cannot be said of the petitioner. Even on normal working days the petitioner very much likes to imbibe alcohol, and consumes large quantities at parties. In these instances alcohol is never consumed on the respondent's initiative but always on that of the petitioner only.

Evidence: Declaration in lieu of an oath by Norbert Käs
Declaration in lieu of an oath by Maria Lucas
Declaration in lieu of an oath by Astrid Zimmermann
Margit Yeomans, Lochhamerstr. 11, 82166 Gräfeling - as witness

Furthermore, the petitioner claims that the respondent neglects her home and children, which is also untrue. Again we refer to the declarations in lieu of an oath of all witnesses, which prove otherwise.

For this reason, it is currently unnecessary to assign the right to determine the children's place of abode to the petitioner and surrender the passports.

In the event that a hearing is scheduled, we request that it should not take place in the week from 02.19. to 02.23.2007, since the undersigned will be on holiday during this term.

Gabriele Westhaus
Attorney

Certified
*Signature*
Attorney
G. Westhaus



*This is to certify that this is a true and complete translation of the German document into English.*
*Bonn, 2007-02-17*

*Alison Dobson-Ottmers*

*Certified translation*

Declaration in Lieu of an Oath:

I, Maria Lucas, resident in Tegernseerlandstr. 129, 82024 Taufkirchen, born on 03.30.1964 in Munich, having been instructed of the punishable nature of false allegations, hereby make the following declaration in lieu of an oath for submission to court:

I have known Ms. Tina Kufner for approximately 5 years. We got to know each other in my shop for garden accessories, interiors and greenhouse rentals. In the year 2002 or 2003 Tina organized a big farewell party in one of my greenhouses for her friend Dorothe Lucci, who was moving back to America.

Due to her friendly open manner we very soon became friends. Also, because we both have two sons of around the same age. Ms. Kufner was soon adored by my sons and I often heard them say: “Mum, we’d like to go and play at Tina’s again.” Her birthday parties were the best we’d ever attended. They were a special experience for children, imaginative and very child-friendly. She looked after her own children and the little guests with the greatest care and attention. The staff were only in charge of background work. The children always wanted to be by her side. My children still talk of this today!  I know nobody, me included, who made such an effort to give the children a wonderful day. I experienced her husband Dominik at these parties only in the late afternoon, when he came home from work, greeted the guests and children, poured himself a drink from the fridge and vanished. I never set eyes on Tina Kufner’s parents in law at the children’s birthday parties or at any other time.

I would like to mention that Dominik never spoke German with his wife Tina and the children. I mostly spoke German with Tina. I had the impression that he found it very chic to speak English with his wife and children in the presence of friends and acquaintances.

Every time I experienced how much Tina’s boys loved their mother. In my opinion, Tina is the person the children relate to most. I very often heard them say to their mother: “Mummy, I love you.” And I’d like to point out something very important: I never saw Tina without her children. The little ones were always with her when she came to visit me at home or in my shop. The little ones were never dumped somewhere! And she was responsible for everything concerning the household and family. She is the one who looks after everything that has to do with school, swimming, visits to the doctor, and anything else that arises in a household with two children.

I remember one of the children’s rooms where Tina painted a whole wall with a beautiful landscape of the bottom of the sea, full of plants, seashells and lots of fish and underwater creatures.

About the house I'd like to say that it was very tastefully and exclusively furnished. It was absolutely spotless and always looked like something out of a home interior magazine. Everything was clean and tidy. No matter when you visited, you had the feeling you could eat your meals straight from the floor anywhere in the house.

I'd like to single out one more experience, because it made such a great impression on me. In a greenhouse of my gardening shop, which is also used for parties, Tina organized a Christmas party for her children's classmates, where Santa Claus made an appearance. As always at such parties, the mothers wrote little notes that they secretly slipped to Santa Claus, who would then read out the children's little misdemeanors. All mothers mentioned that the children should do their homework with care, tidy up their room, not argue so much, etc. … When Santa Claus read out the note about Tina's children, which she had written and slipped to him, he said what wonderful children they were, how good they were learning at school, that they played so well together, and that they should not forget how much their Mummy and Daddy loved them. I remembered that because Tina always pointed out the good things about her children. I'd also like to mention that her husband Dominik was never present at these parties.

I never had the impression that Tina's children were untidy, dirty or that they wore inappropriate clothes for the season. On the contrary, they were very well-dressed and their clothes always well-groomed.

I'd like to mention one more incident: Tina called me about a year ago in a very desperate state and asked me for children's clothing for her boys that didn't fit my sons anymore, because her au pair had taken all the children's clothing with her when the boys went to visit their father with the au pair. When she asked Dominik to give back the children their clothes, he said she should go and buy some. However, Tina had no money at this point, which he was well aware of.

After that he claimed that Tina didn't dress the children properly.

In my opinion, Dominik Kufner is staging a terrible slander campaign against his wife with the help of his attorneys, which was planned long in advance and was and is being conducted systematically.

Until the time of their move, Tina was convinced that her marriage was functioning and that they would move into the new home together. During a family holiday in July and August 2005, a transport company was commissioned with the relocation to Gut Rauchenberg. When the holiday was over and they wanted to move in together, her husband informed her that he needed distance and would not be moving in.

Since this date Tina Kufner has been living completely alone in this isolated farmhouse without public transport connections, cut off from her former social environment.

To her completely uncomprehending question "why" this was happening he only admitted that he was having an affair. And seeing that she was shattered he only gave her the following, seemingly altruistic, advice among friends: "Why don't you just go out to a pub with a friend. That'll take your mind off things." She told me this on the day she wanted to meet a friend and had no time for a telephone conversation with me.

The next day she called me, in absolute despair, telling me that when she had left the underground garage on her way home, she was checked by the police for alcohol, and that she had drunk too much. In what a desperate situation Tina Kufner must have been to drink alcohol, which was completely opposed to her usual behavior. What a strange coincidence!

It is very important to point out that Mrs Kufner never drank alcohol in my presence if she had to drive later. I was invited to Mr. Kufner's birthday party at P1, a disco in Munich. Mr. Kufner was completely drunk, Tina and myself drank no alcohol because we still had to drive home. And even otherwise Tina drank very little alcohol.

Dominik Kufner makes allegations that are completely untrue.

The sudden impoverishment of Dominik Kufner, for whom money was strangely no object until last year, is not really believable. For example, at his birthday party at P1 in May 2005 he was still slipping several banknotes into the cleavage and waistband of a lady who was dancing in front of him!!!!

I implore the court not to believe the accusations of this man, because Mrs Kufner's behavior is so completely different from what he is alleging. I am absolutely shocked by Mr. Kufner's statements and these allegations are utterly incomprehensible to me, because my experience of Tina Kufner is completely different.

Tina Kufner is a wonderful, loving, caring and concerned mother. She values good manners and social behavior very highly in her children. She makes great efforts to protect them from television consumption, gameboy and computer games.

Taufkirchen, 01.25.07

*Signature*

Maria Lucas

*This is to certify that this is a true and complete translation of the German document into English.*
*Bonn, 2007-02-17*

*Alison Dobson-Ottmers*

*Certified translation*

Norbert Käs Tegernseer Landstr. 129 82024 Taufkirchen

**Declaration in Lieu of an Oath**

I, Norbert Käs, born on 03.11.1963 in Ulm, resident in Tegernseer Landstr. 129, in 82024 Taufkirchen, having been instructed of the punishable nature of false allegations, hereby make the following declaration in lieu of an oath for submission to court:

When I heard that Mr. Kufner was making every attempt to achieve care and custody of the children in his divorce suit, I was literally shocked by the allegations he made about his wife to support his claim.
I have known Mr. Kufner for almost 5 years now. The Kufner family and our family were often together at children's birthday parties and other family celebrations. The most recent event was an invitation to celebrate Mr. Dominik Kufner's birthday party.
First, I would like to add something about myself: I have been working as head art therapist and lecturer in the department for dependence and addiction disorders of Isar-Amper Clinic Munich-East (formerly Haar District Hospital) for over 16 years.
Simultaneously, I have been working as a lecturer for the aesthetic expression and therapy course at the Academy of Graphic Arts in Munich for the same period of time. It is important to mention this, as my following observations are strongly influenced by my professional work:
I would like to describe and comment on Mr. Kufner and his behavior as I perceive it.
The children of the Kufner family were always very well-dressed and had a very well-groomed appearance, which was striking. Mrs Kufner was always accompanied by the children, first as a customer of Alte Gärtnerei, our gardening shop, and later when paying private visits as a friend to our home, which is on the same premises as Alte Gärtnerei. Mr. Kufner only appeared there very rarely. I got to know Mr. Kufner at the Kufner family's home. Mrs Kufner organized these invitations very skillfully, with a lot of taste, and very attractively. The food was well-chosen and the home decorated with flowers and elegant accessories in a strikingly beautiful manner, arranged by Mrs Kufner with great attention to detail. Mr. Kufner was often absent at the start of the invitation and only appeared later or even towards the end, while the first guests were already leaving.
The striking thing was that he immediately poured himself a drink after greeting his wife and children. Liquor and alcoholic drinks of all kinds were and are not discernible on Ms. Kufner to date. But very often on Mr. Kufner and they were one of his characteristics. When invited out to dinner and for subsequent visits to discotheques, like P1 in Munich, Mr. Kufner indulged in downright alcohol excesses in a very particular and isolated manner. In this context, it was particularly embarrassing to witness his blatant and uninhibited harassment of other discotheque guests.

Once, after taking photographs of Mr. Boris Becker with his mobile phone, he got into a fight with Becker's escort. Incidents of this kind happened often and in many variations, but always connected to an excessive intake of alcohol. Mrs Kufner always remained sober and chauffeured her husband. As for discrediting Mrs Kufner and accusing her of having a serious drink problem, of not looking after her home, neglecting her children, etc., this is – in our professional jargon – a classic projection on Mr. Kufner's part. Mrs Kufner alone took credit for organizing and regulating the family. Mr. Kufner was classically cast in the role of breadwinner, who was entitled to being served. His whole appearance was marked by inferiority complexes which he tried to offset by waving banknotes, check cards and similar attributes. I never experienced Mr. Kufner without alcohol, no matter at what time of day.
It is mere speculation whether Mrs Kufner's drunken driving and being checked by the police was staged by Mr. Kufner or not or was a chain of unfortunate circumstances, but it was an absolute exception to her entire prior behavior. Alcohol and pills are rather her husband's passion and would definitely be demonstrable even for a long term by drug screening and hair samples. These are grave accusations which I make purely subjectively due to my profession and can only prove by the observations I have made.
To me, Mr. Kufner's demand that he should keep the children at all is absolutely horrific, as I know that the incidents as related by Mr. Kufner are so far from the truth. I implore the court to carefully examine and consider in which hands to place the children of the Kufner family. I assume that Mr. Kufner is not really so much concerned about the children's well-being but rather about averting, for him unnecessary, monetary claims from his wife, by whatever means. It was inevitable that he would resort to the allegations that he is now making, as his behavior was always characterized by a certain aggressive potential in other respects, as well. Mr. Kufner treated Mrs Kufner in an inconsiderate manner that she definitely did not deserve. Despite her husband's very blatant escapades she was always loyal to him and took his side, as is the case in hundreds and thousands of alcoholic families in Germany. She protected and safeguarded the children and ensure that interhuman relations were maintained, which is often part of the disease for alcoholics that they only have very few; and only as long as there is still money offering financial and private benefits.
Mrs Tina Kufner is a highly decent and in this case unfortunately very naïve woman, who does not deserve having so much suspicion cast on her and all her good qualities.

Signature
Norbert Käs, 2.3.2007

*This is to certify that this is a true and complete translation of the German document into English.*
*Bonn, 2007-02-17*

*Alison Dobson-Ottmers*

*Certified translation*

**Inge Olivia Wacker**
**Dipl.-Psychologin**
**Psychological Psychotherapist**
Individual, Couple, Family and Sexual Therapy
Group services: family reconstruction and constellations, transition to parenthood

**Magnetsried 35**
**82402 Seeshaupt**

**Tel.: 08801/912 466**
**Fax: /912 467**
Email: olivia.wacker@gmx.de

Inge Olivia Wacker Dipl-Psych.Magnetsried 35 82402 Seeshaupt
Mrs. Tina Kufner
Gut Rauchenberg 5
82402 Wielenbach

November 16, 2006

**Family visits to the Kufner family**

On 05.19.06, on 10.09.06 and on 10.24.06 I visited Mrs Kufner and her sons Joseph and Matthias at their home. The atmosphere was relaxed and pleasant. The children made a friendly and open impression. Their relations with each other were characterized by mutual care and affection.

Yours sincerely,

Signature

*This is to certify that this is a true and complete translation of the German document into English.*
*Bonn, 2007-02-17*

*Alison Dobson-Ottmers*

Having been instructed of criminal prosecution ensuing from false declarations in lieu of an oath, I, Astrid Dalberg-Zimmermann, Alexander-Schmorell-Str. 1a, 82031 Grünwald, born on 08.20.58, declare in lieu of an oath, that I have made the following declaration in my own hand to the best of my knowledge and belief:

## Declaration

I am a friend of Tina Kufner's and have known her since the time before she gave birth to her children Joseph and Matthias. Over the years we have met time and again at irregular intervals. In 2005 we hardly had any contact. When I met Tina in February 2006 I realized that she was going through a difficult phase of her marriage after Dominik had moved out. As a friend, I offered her my support. It took a while for Tina to realize that this separation was not an attempt to save the marriage, as Dominik had allegedly told her, but was to be a permanent separation.

Tina asked me to accompany her to a meeting with her then attorney Mr. Liebl. Besides various topics and questions, which they discussed, she showed Mr. Liebl some nude photographs of her children which she had discovered on her computer. She asked Mr. Liebl to ask Dominik through his attorney when and by whom the photographs were made. As the photographs also showed intimate details and close-ups of the genitalia, she was very shocked and worried. As Tina told me, Dominik never gave her a clear explanation for this but claimed that the photographs had been taken by their then au pair.

Some time later, when Tina was out with me one afternoon, I noticed that Dominik and Tina were sending each other text messages. She let me read some of the messages. They could not agree whom the children were to spend their carnival holidays (MIS Ski Week) with. As she had to collect her children from school, we parted before she knew who would be keeping the children. Later that day Tina phoned me and told me Dominik had come to her house unannounced to pick up the children for the coming weekend, the weekend before the holidays. She was very worried that Dominik would not bring the children back on the Sunday, but would keep the children, as they still hadn't agreed on whom the children would be spending their holidays with. She said Dominik had signed a document in which he confirmed that he would take the children back home on the following Sunday. After Dominik failed to return the children on the Sunday, as promised, Tina showed me and my husband this document. In the days that followed Dominik refused to tell Tina where he and her children were. Tina told me this herself and I could see this from the telephone calls she made in my presence and the text messages between the two, which she let me read. After a few days Tina reported that she could finally talk to the children but that they couldn't tell her where they were either. Dominik kept the children during the holidays.

Tina was extremely upset and told me she had never been separated from her children in this manner before. As it was a difficult time for Tina and she was at home alone, I offered her to stay with me and my family until her children returned home. When Dominik finally brought the children home to Tina after several days, I was with Tina. Matthias was totally exhausted and already asleep, so that Tina had to carry him inside. Matthias cried when she tried to wake him. Joseph, in contrast, was very much awake and ran around the house in an overexcited manner. As I had had the children with me quite often, I found this kind of behavior very unusual, both Joseph and Matthias had never behaved this way before. Tina was very upset about the state in which Dominik had left the children. Tina was always very concerned about her children being well looked-after and having enough rest.

I accompanied Tina to her first hearing at the Family Court in Weilheim, because she asked me to look after the children while she was in the courtroom with Dominik. Dominik had brought his sister Tanja. Tanja and I sat on the bench while the two children were sitting next to us and playing, and we started talking. Suddenly Tanja claimed that Tina was trying to portray Dominik as a pedophile. I was shocked to hear this, after I had never heard Tina say anything like this despite our being together so often. I was also shocked that Tanja was saying such things in front of the children.

Tina had already told me of further nude photographs that she had coincidentally found in deleted files on her computer. In Tina's opinion it was obvious that Dominik had taken the pictures himself, as the au-pair, of whom Dominik had allegedly told Tina that she had made the pictures, also appeared in some photographs. In my opinion these images were not nude photographs of little children like you take on the beach or in the bathtub but also unusual nude images of the genitalia.

I was also present when Tina had to submit her sons' US passports to Attorney Meyer, because Dominik accused her of wanting to leave the country with the children and not come back. At no time did Tina ever express or suggest such an intention towards me.

Tina went to the same pediatrician, Dr. Felkel, whom I had consulted for my children when they were the same age as her sons. Tina told me that she had noticed that Dr. Felkel often prescribed antibiotics and that she had decided to change to another pediatrician. My children are now 18 and 14. When they were small, we often consulted Dr. Felkel, as my son was frequently ill at the time. Dr. Felkel very often prescribed antibiotics. As my husband, whose brother is a doctor, considered this unnecessary and inappropriate, we changed to another pediatrician at the time.

In 2006 I spent a lot of time with Tina. In these difficult times Tina stayed with me and my family on her own or with her children on and off for several days at a time, as already mentioned. Tina is a very loving and caring mother, for whom the children always come first and foremost.

Tina told me that Dominik claims she was neglecting her home and children. I never observed this in all my many visits to Tina's house. I never saw any trash or even dog dirt lying around nor noticed dirty or smelly toilets, as Dominik alleged. Dominik claimed that Tina was an alcoholic, according to what I heard from Tina, her attorney and my husband. In all these difficult times I never saw Tina drunk or even nearly drunk, although we often went out together.

According to Tina, Dominik claims that her dog is a danger to the children. I experienced her dog, Sonica, both at Tina's house and here in our home. Sonica was always very affectionate and playful; I never felt threatened. Her children and my children often played and romped around with her. Everybody likes the dog, who never made an aggressive impression.

Grünwald, February 7, 2007
*Illegible signature*

*This is to certify that this is a true and complete translation of the German document into English.*
*Bonn, 2007-02-17*

*Alison Dobson-Ottmers*