## I. ASSESSMENT PLAN

Ms. Gehri, Judge at the District Court in Weilheim – Family Court – has ordered by Decree of August 2, 2006 the creation of an expert psychological assessment in the case of **Tina Kufner** v **Dominik Kufner, Nr. 002 F 00139/06** (Filed with the GWG on August 4, 2006).

The Court's Order reads:

**"To recover a family psychological assessment in association with the arrangement of parental custody."**

The Court's formulation of questions is carried out according to the following criteria: Development related initial basic situation of the children; subjective relationship experiences of the children; the children's wishes and desires; parents' childrearing and child guidance capabilities and competence, preparedness and competence of the parents to take over parental responsibilities, the parents' ability to cooperate; socio-economic background.

The expert assessment is based on aspects that are recorded with the examination procedures listed under II. Methods. The diagnostic process proceeded according to the Court's formulation of questions. Within the framework of the diagnostic process solution possibilites were considered. The efforts of the experts were according to KJHG and valid child law, to strengthen the persons raising the children as much as possible in their taking on of the responsibility for child raising and to give them the appropriate support.

As arranged with Judge Hausladen , who meanwhile ahs taken over the responsible department of the Family Court (telephone call of February 12, 2007 and written Decree of February 13, 2007), an detailed account of the examination report is dispensed with; the rendering of the written expert assessment is in the form of a summary assessment. A detailed account of the individual assessment steps and results can be created later, if necessary.

The summary assessment at hand is understood to be subject to the results of further sessions of the parties involved in the procedure before the Family Court and of results not previously anticipated at the time of the assessment.

## II. PROCESS OF THE ASSESSMENT OF THE METHODS APPLIED

The surrendered court documents were evaluated according to psychological points of view. Relevant aspects of the file analysis were taken into consideration when the data was examined and in the discussion of the criteria in the chapter entitled "Findings".

The parents were sent a letter on **August 9, 2006** by the experts, requesting that they contact them.

Mr. Kufner contacted the experts by telephone on **August 23, 2007** and Mrs. Kufner contacted them by telephone on **August 24, 2006**. The anticipated procedure of the assessment was discussed and appointments were made for the initial meetings.

On **August 30, 2006** and on **September 5, 2006 exploratory conversations** were held with Mr. Kufner.
Besides biographical information and information about family developments, the father's relationship with his sons, their development and the current situation from the father's point of view, as well as the attitude to the court's formulation of questions were explored. The mother's accusation about possible sexual abuse by the father of the two sons was a central theme.
*Mr. Kufner handed us copies of the photos in question, which he had allegedly made and put on his wife's computer. (The copies are appended to the assessment.)*

Mr. Kufner completed the * "*Minnesota Multiphasic Personality Inventory II" (MMPI II, German version by Engel, 2000)* test diagnostic procedure's personality questionnaire.

On **September 11, 2006, September 21, 2006** and **October 10, 2007** [sic; (2006)] consulting expert psychologist, Herr Dipl.Dr. Johannes Streif [Ph.D. Psychology] had an **exploratory** meeting in English with Mrs. Kufner at the Institute of the GWG.
*The mother left numerous documents to be looked at, that were primarily related to her education in the USA, the children's school progress, as well as – in case of a move to the USA – schools to be considered for Joseph and Matthias.*

As arranged with both parents, there was an opportunity to meet both children, Joseph and Matthias on **September 13, 2006** on the campus of their school – the school had made a room available for this purpose. The children were accompanied to the appointment by their aunt on their father's side, Ms. Tanja Kufner, as well as a female friend of the mother, whose name was not known to the expert. In the children's presence a verbal disagreement erupted between the two women.

The expert conducted – in the presence of Dr. Streif – an **exploration** of the children together; data about the current situation in the family, in school and in the social area was examined. The children's ideas about their family's future were investigated. The children were observed in their behavior and their interaction with each other.

After the session the boys were picked up from the school's campus by their mother. In the absence of the children there followed an exploratory discussion with Mrs. Kufner about events in the meantime.
*The mother left numerous documents to be looked at, that were primarily related to the (pre)school development of her children.*

On **9-26-2006** the interaction between the father and the children Joseph and Matthias was observed based on predetermined situations in a structured manner.
*The interaction was videographed and stored on DVD.*

Subsequently Dr. Streif conducted **a supplemental exploration conversation** separately with Joseph and Matthias regarding their opinion of the current situation within the family.
The children worked the **semi-projective procedure**
"*Test of supplementing sentence: The boy" (The questions were presented to the children by the expert in English and their answers were written down literally.)*

The date on 9-29-2006 for the interaction observation between the mother and the children was cancelled by Mrs. Kufner on **9-28-2006** due to illness.

On **9-28-2006** the court was informed in writing about the status. The experts provided a written opinion regarding the settlement of the contact between Mr. Kufner and his sons.

A date agreed on between Dr. Streif and Mrs. Kufner for a supplemental exploration talk on 10-12-2006 was cancelled by telephone by Mrs. Kufner on 10-11-2006. On the occasion of the alternatively agreed pick-up of the children's school records by the mother on 10-12-2006 a conversation of about 15 minutes occurred between the expert and Mrs. Kufner.

On 11-20-2006 an agreed **home visit** of the experts occurred in connection with the contact of the children with the father.

First the family **interaction was observed** in an unstructured and structured play situation.

In the absence of third parties, separate **exploration conversations** were conducted with Joseph and Matthias. They were questioned regarding their current situation in the family, about their ideas regarding the future of the family and regarding suspect moments with a view to sexual transgressions by the father.

As relationship diagnostic the **project method** was performed with both children
* *'Family Relations Test" (FRT; Bene & Anthony).*

Subsequently a supplemental exploration conversation was conducted with Mr. Kufner – in the meantime the children were visited by the aunt vs., Mrs. Tanja Kufner, and her son Henry.

On **11-28-2006** an expert opinion was provided upon the request of the court of 11-22-2006 with regard to the necessity of an interpreter for Mrs. Kufner. The message was that with regard to the scheduled interaction observation the presence of an interpreter would not be necessary, but would probably irritate the children.

On **12-5-2006** and **12-11-2006** a total of three telephone calls occurred upon Mrs. Kufner's initiative with Dr. Streif during which she asked him to allow her and the children a visit in the U.S. during Christmas vacation. The expert could not yet reach an agreement regarding the planned interaction observation.

On 12-18-2006 the court was informed in writing about the status. It was informed that no additional date for the evaluation could be agreed on with Mrs. Kufner because the respective agreed dates were not kept by the mother.

On 1-16-2007 the experts were able to agree with Mrs. Kufner by telephone on an exploration conversation in the institute of GWG on 2-6-2007 and for a home visit on 2-7-2007.

On 1-29-2007 Mr. Kufner called that the mother of the children was in the U.S. – Rhode Island - with the children since the previous week. She terminated the children in the local school without his knowledge and then left the country without his knowledge. According to his knowledge she is staying with her family.

On 2-1-2007 the court was informed in writing about the status. The experts opinioned about the move of the mother.

On 2-6-2007 a written notice from the mother's attorney, G. Westhaus, arrived in the experts' office. Notice was given that Mrs. Kufner could not attend the agreed evaluation dates because she was not in Germany.
Numerous documents were received from both parents in the course of the evaluation, which on the one hand describe the interim course of events from the respective viewpoint, and on the other hand were intended to support the respective position in the custody procedure. Also several telephone calls were made that were not individually listed.

## III. PSYCHOLOGICAL EVALUATION OF THE EXAMINATION RESULTS

In the course of the evaluation, the positions of the parents in the custody dispute increasingly hardened so that in the end hardly any communication between the parents was possible. This development had a detrimental effect on the psychic sensitivity of the children who suffered under the conflict development between their parents.

While during the first encounter the children were able to approach the experts in an open and easygoing manner, their conduct and manner of reaction was blatantly changed during the last meeting within the scope of the evaluation. They were shy, reserved and uncertain so as if they feared to say anything in the presence of the experts which would enforce their experienced conflict of loyalty with regard to the parents.

The position of the mother in the custody case was based on the following arguments:
In the past the father allegedly did not pay sufficient attention to his children and their development because on account of his activity in the family business he did not have time for it, but even the small remaining leisure time was spent mostly on the PC. He was often overseas so that most of the educational burden was on her. According to her allegation, she clearly was the main reference person for the children. Additionally there always existed a rather distant relationship to the father's family; Joseph and Matthias had no emotional relationship to their grandparents and the father's sister. In contrast, both sons were emotionally strongly attached to her family in Rhode Island and frequently asked for contact with Mrs. Kufner's grandparents and brother.

The naked pictures of the children her husband sent her raised the suspicion in her that her husband has pedophile tendencies and was experiencing them during the togetherness with his children. She claims that upon her inquiry, the children made pertinent remarks. Sexualized conduct of the children that appeared within the scope of the separation events had reinforced her suspicion in this regard.

She, so Mrs. Kufner, is convinced that it is in the best interest of the children if they live with her in her home state of Rhode Island and attend school there. Her children clearly have closer attachments to the U.S. than Germany.
She herself, the mother, did not sufficiently integrate in Germany and feels herself at a disadvantage "as foreigner" in the current custody procedure.

The father argues that on account of her psychic condition his wife is not capable to assume full parental responsibility for both children. His wife shows mental susceptibilities that would make it impossible for her to live a normal life. The discontent with life was demonstrated by his wife in "choleric" outbreaks, "contentiousness," psychosomatic complaints and mental overload reactions.

She was not only unable to integrate in Germany and to find "her place" in this country, he is afraid that her life in the U.S. would be similarly restless and unsteady. His wife constantly wanted to move and develop a new home so as if she wanted to run away from herself. He claims that he is convinced that his wife urgently needs psychotherapeutic support.
Currently he is concerned about his children because in the mother's household they are exposed to her whims and discontent. He repeatedly noticed that the wife uses the children in the custody procedure as instruments against him. The breakup of her marriage and the separation put his wife completely off

balance, she is, therefore, fighting with all means.

With reference to the pictures in question, Mr. Kufner stated that they were taken in September 2005 during a visit of the children to his house as they frolicked naked in the living area before going to bed. In part the children took their own pictures. He sent those photos as file "Boys naked in Moeribach" to his wife in October 2005.

Based on his current work situation he would be able to concentrate on the custody of his children. But he considers it very important that the sons have a lot of contact with their mother because Joseph and Matthias are very attached to her.
He hopes to bring the sons to Germany and for the mother to return to be present for the children.

The results of Mr. Kufner's Personality Diagnostic (MMPI-2) are in the normal range. For Mrs. Kufner there was no personality diagnostic as part of the assessment, since an appointment has no longer been possible since September of 2006.

In the observed interactions between the father and Joseph and Matthias, a positive and loving relationship between the father and his children could be seen. The father demonstrated in his behavior that he is focused on his sons, as well as on the interests of each and on their individual needs.

The interactions were filled with good humor and fun and were carefree, with the father giving the children structure and direction and suggestions for activities. Their relating was free of fear and harmonious. The children freely accepted physical contact free of any complications, and they all joked and play-wrestled with each other.

In his child-rearing the father is well-skilled to recognize both the emotional as well as the social needs of the children, to structure and guide their behavior and actions, to set limits for them, and to require them to stay within these limits in an appropriate way, as well as to interact and have physical contact with them in an age-appropriate way for each child. It became clear that Joseph and Matthias value their father's presence as well as playing with him, while at the same they respect his fatherly authority and let themselves be guided and steered by him in an appropriate way.

At the time of observing these interactions, there were no indicators of any problems in the father and children's relationship.

The children **Joseph** and **Matthias** were assessed to be apparently healthy children with age-appropriate development.

The boys were lively and active with good personalities. They were interested in active games and playing, but were equally able to concentrate and follow through and be patient while doing quiet activities. A great playful fantasy and creativity were evident. Both children demonstrated a friendly and balanced personality as well as a positive self-image. Socially, they quickly interacted freely and naturally with the experts, in an age-appropriate manner; with neither of the children there was any shyness of insecurity evident in this interaction. In the cognitive area, both children – Matthias especially, in a direct comparison with his older brother – were far-advanced; the good encouragement and support of the children's capabilities and talents were revealed.

Both children said that they were happy in their current school (the Munich International School in Starnberg) and that each was satisfied with their grades and how they were doing in school.

Both said that they had numerous good friends at school and were each able to name a number of them. Outside of school, however, according to both the statements of the children's as well as the reports of both parents, there was almost no contact with children of their same ages.
In their leisure time both children pursue age-appropriate interests; among others both love to play soccer.

In the course of the assessment over the ensuing three sessions an increasing emotional burden of the children because of the parents' conflicts became apparent, which has obviously brought both children into an increasingly intense conflict of loyalty.

In his verbal statements, **Joseph**, eight years old at the time of the assessment, described himself as having a positive and emotionally important relationship with each of his parents.

Joseph however constantly and unambiguously expressed the desire to go on to living with his mother in Germany and to regularly visit his father. He wanted because of school, and of his friends and of social contacts there to continue to live in Munich.

He wants to "persuade" his mother to stay here. He said that, namely, she wants to move to The United States because her friends live there.

The first time Joseph was asked, he answered clearly that if his mother were to move to the US, he wanted to stay with his father. He said he hopes that his parents will live together again in the future. He is sad that his parents are separated.

About the visits at his father's house, Joseph didn't express, even when asked again, where he wants to live and go to school in the future. His indications about this remained evasive and indifferent.

When asked about the nude photos at the house in Moerlbach, Joseph said that he could not remember: "I don't remember that anymore".

When asked about the meaning of a "Pee-Pee Dance", Joseph explained obviously ashamed, that he and his brother had danced naked, and when they danced, their genitals had shaken. They had thought it was funny and had laughed.

He said he told his mother about it, but he couldn't remember how she had reacted. He had not told his father anything about the "Pee-Pee Dance".

In the semi-projective procedure called *FRT*, the mother is shown as the person to whom Joseph relates most, to whom many positive feelings are assigned, which indicates an emotionally workable relationship. Three out of eight so-called "dependency items" that reflect the quality of the care and emotional nurturing experienced, were assigned to the mother; the father, on the other hand, was assigned four. In his inner being, Joseph regards both parents as persons to whom he relates, from whom he experienced in the past equal care and attention.

In the procedure called *"Sentence Completion Test"*, Joseph indicated about the person of the father that he would love to go to a toy store with him every day and that in general fathers are "nice"*. [*Translator's note: the use of an asterisk here and to follow indicates that these words were spoken in English as is.] The sentence that began with the words *If my father** was completed by Joseph with the words *"would be nice I would like him"**. Joseph added, "He lies to my mom"* and continued to explain that after separating his father had said that he and their mother would be back living together in a year at the most; his mother also told him that his father lied. To the question of whether he himself wanted to be like his father when he grew up, Joseph replied: "No because he lies."* According to Joseph, if he were a father himself, "I would make my children be nice people"*. And at the same time he would not treat his children the way his father treats him: "I don't lie!"* However, to the question of whether he, if he could have

chosen a father for himself, he would have picked a different father, he answered: "My father!"* Further, Joseph declared that he is able to be proud of father.

About the person of the mother, he indicated on the "Sentence Completion Test" that he wished she "is together with his Dad"*. At the expert's question, why his parents are separated, Joseph said he does not know; but in his opinion both parents are responsible for it. The sentence starting with *He experienced that his mother** was completed by Joseph with the statement "that they fought but I don't want them to fight"*.*If his mother* "would fight then I won't like it".* *He often thought that his mother*" would go to my Dad's house."*

"similar to the sentence completion for the father, Joseph said that most mothers are "nice"*. If he himself were a mother, he would "teach my children to be nice people"*. To the question, whether he could imagine someday marrying a woman like his mother, Joseph replied: "I won't do that. I want a different one."*

He elucidated further, that he wanted a wife who will stay with him. Nevertheless– again, like with the person of the father – even in a case where he had the option to choose, he would again choose his mother. Likewise he answered yes to the question of whether he can be proud of his mother. He said he loves his father and mother equally.

In the conversation accompanying the testing, Joseph stated that he really wants to spend more time with his father; He said he could picture living one week at a time with his mother and then alternating living for one week with his father.

To the question of what he thought his mother would say to this wish of his, the boy stated, visibly downcast: "She would say no because she wants me to go to America."* In that case he said he would rather stay with his father in Germany. But the best would be if the parents were "back together, no fighting"*.

**Matthias**, who was six years old at the time of the assessment, demonstrated a positive relationship with both parents. He clearly expressed his wish, that both parents and his brother would stay together with him for always.

Matthias explained for all the questions that he was satisfied with the status quo, i.e. to live with both parents virtually equally in each of their homes and to continue to attend the International School. He articulated clearly: "Things should stay the way they are now." If he were to live in America, he was sure that he would miss his father.

Asked about the nude photos taken in the house in Moerlbach, Matthias explained that "Daddy"* had taken their pictures, "maybe three or four pictures". They, the brothers, did not take them of each other. It was "really funny". He and his brother, Matthias said, had gotten the idea of taking their clothes off, on their own, and they had laughed and laughed.

Asked about the meaning of a "Pee-Pee Dance", Matthias first said that he did not know what that could be, but then corrected himself and said that "Pee-Pee Dance" meant, hiding your private part between your legs and then dancing around. It had been Joseph's idea, which they then tried out together. He said it was really funny.

He and his brother had told their mother about it and she had thought it was "a little funny" too. He, Matthias, had also told his father about it and he had "thought it was funny too."

In the semi-projective procedure called *FRT*, in Matthias's experience as a child his brother Joseph unambiguously has the position of the person to whom Matthias relates most; a total of thirteen items out of fourteen were assigned to Joseph. The father received seven and the mother six, each item referring to positive feelings and "dependency-items". While Matthias sees his parents as both virtually equally important

and experiences a positive and workable relationship with both parents, the strong representation of his brother in the relationship-bonds-graph pictured by the FRT does point to an emotional insecurity in the child's life – presumably caused by the parental conflict, but doubtlessly severely aggravated by it.

In the procedure called *"Sentence Completion Test"*, Matthias indicated about the person of the father that the father "plays with him"*, as he has already experienced, that the father buys him things. *He thinks of his father often because** "I like him"*, fathers are "nice"*; when he was little his father used to be "nice"* too. If he were a father himself, he would "play with my children"*. To the question of whether he wants to be like his father some day, Matthias answered spontaneously: "No, I think I don't know."* If he should have children himself some day, he wants to treat them the same way if father treats him. Even if he could choose, he would again choose "that father"*. He said he loves both his father and his mother equally.

In the conversation accompanying the testing, Matthias said that he would love to spend one extra day per week with his father. When asked how he thought his mother would react to this wish, the boy believed, after thinking about it for a bit, that his mother will probably ask him why he wants that. Further,

he said: "I feel like my Mommy and Daddy are pulling me."* Asked about this, whether each parent then would call the other one "stupid", he said no.

In conclusion, within the framework of the assessment encompassing three examination sessions in the course of two months, there were, despite increasingly emotional tension and irritation, solid statements by the children regarding their with to spend (more) time with their father as well as to stay in Germany.
Joseph's statements, especially, in the Sentence Completion Test suggest an immediate deciding opinion-shaping influence by the mother on the boys' attitude towards their father, when the boys accused him, that he had lied, when the parents separated, about the prospects of him returning to the family.

Both children knew at the time of the assessment about their mother's intention of returning to the US, and they were afraid that their mother would not give any consideration to their (the children's) wish to stay in Germany, to live near their father and also especially to stay at their familiar school, that they were so used to.

## IV. RESPONSE TO COURT QUESTIONS

The evaluation made clear that both children Joseph and Matthias were able to develop a positive and emotionally valuable relationship to both parents during their family development.
It can be assumed that the development of the parental attachment was secure.
The data obtained provide no indications of a dysfunction of the parent-children relationship. On the contrary, both children wished to continue to live in the future with both parents and to maintain regular and unencumbered contact to the separately living parent (here the father). Joseph had a stronger relationship to the mother, Matthias a somewhat stronger relationship to the father.

The evaluation further showed a strong attachment between the siblings marked by mutual respect and love.

In the past the parents managed to offer their children a family reference system in a positive manner so that they were able to develop in an unencumbered and easygoing manner. It also became apparent that the children were supported in their abilities and talents. The living conditions that were offered to them in the past with regard to this (in particular family and school) led to a favorable cognitive and social-emotional development of the children.

This positive basis of the family socialization was substantially disturbed by the separation of the parents in 2005. The initially mutually agreed separation of mother and father led in the course of 2006 to an intensified open escalation of the massive marital conflicts, in the course of which the children were substantially unsettled in their family relationships.

In particular the positive relationship of the sons with the father was put into question by the mother. Among other things, she alleged that the father neglected his parental responsibility and accused him of sexual abuse of the children. The latter allegedly culminated in the targeted preparation of naked pictures of the children against their will to sexually arouse the father. Against this background the mother demanded a discontinuation of the contact between the father and the children.

However, the father as well as the children denied a sexual assault vis-à-vis the experts. There were no indications within the scope of the evaluation of any conduct by the father that had a negative effect on the children. Moreover, the conduct of Joseph and Matthias in the contact with the father during the interaction observation and the home visit did not indicate an impairment of the positive emotional attachment between father and children, which was expressed by the declared wish of both to spend more time in the company of the father.

In this context the mother shows an absence of attachment tolerance in the custody dispute that medium- and long-term is necessary for the maintenance of an emotionally positive and socially favorable relationship between the father and the children. In particular the mother is apparently unable to properly evaluate and recognize the emotional importance of the father for the joint children Joseph and Matthias and to guarantee a corresponding contact of the father with the children in the best interest of the children.

In separated families, in which children previously developed comparable stable positive attachments to both parents, the ability and willingness of the parents to adequately recognize and satisfy the needs of the children for active maintenance of the contact to the mother and father is of great importance. In this context the attitude vis-à-vis the former partner has an important influence on the extent to which the child is allowed the important emotional freedom to openly acknowledge the attachment to mother and father beyond allowing the contact as to time and place. The respective needs of the child must be seen and accepted by both parents in a manner understandable by the child (concept of so-called attachment tolerance).

Within the scope of the evaluation, Mrs. Kufner made it unmistakably clear that it would be in the interest of the children to live with her family in the United States in the future. She alleged that according to her point of view the relationship of the children to the father was neither in the past nor in the presence of such importance for the children that they cannot grow up separated from him.

Mrs. Kufner followed this view in February of this year and she separated the children, to their surprise and without opportunity of a goodbye from the father and his family familiar to them, from their customary social environment outside the family (among other things the school) in which almost the entire social life – positively experienced by the children – had occurred in the past. The unprepared separation of the children from the social network of the Munich International School weighed all the more heavily because the school had become a place of security and stability for the children during the time of the family break-up, where the children could develop unburdened by the parental conflicts that started to be carried into the school as well.

From an expert point of view it must be assumed that Mrs. Kufer pursued exclusively her own interests and needs with this step and disregarded the situation of her children.

Under the aspect of lack of attachment tolerance and neglect of the needs of the children for maintenance of an unburdened relationship to both parents, the educational ability of the mother is noticeably restricted.

**From an expert point of view, the step to leave Germany unprepared with the children was detrimental to the children Joseph and Matthias.**
**The mother, who principally has the necessary educational and advancement competence, was, from an expert point of view, no longer capable on account of the separation to satisfy her parental responsibility for the welfare of the children.**
**The evaluation provided no indication that the father is not in a position to assume the parental responsibility for the children Joseph and Matthias.**

**Against this background it is at this time recommended from an expert point of view to transfer the right to determine the children's place of residence to the father.**

I certify that the above psychological short opinion is impartial and based on my best knowledge.

Munich, 2-22-2007

sd. Christine Hertkorn
Certified Psychologist
stamp