UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Case No. CA 07-046 S

DOMINIK KUFNER,
Petitioner,

v.

TINA KUFNER,
Respondent.

# PETITIONER'S MEMORANDUM ON ARTICLE 13b AND ON CONSIDERATION OF THE CHILD'S PREFERENCE IN PROCEEDINGS UNDER THE HAGUE CONVENTION CASES

## I. Preliminary Statement

This memorandum reviews the cases which have addressed the Convention's Article 13b defense to a requested return of children to their habitual residence; and, as well, the case law on taking and evaluating the preference of a child's preference.

This case was filed by Petitioner, Dominik Kufner (Husband/Father) because is wife, Respondent, Tina Kufner (Wife/Mother) brought their two minor children to Rhode Island without either his permission or consent or the approval of the court in Germany.

The parties have, for some time now, been embroiled in

a highly contested divorce, custody and visitation case in Munich Germany, where the parties lived throughout their entire marriage and where their children lived throughout their entire life.

Prior to marriage, Wife signed a pre marital agreement. That agreement provides a formula for alimony in the event of the parties' divorce in an amount which is fair and reasonable. In Germany, there is no deduction for alimony payments to a spouse or former spouse. Therefore, calculations of alimony are made upon the wage earner's net, after tax salary. In addition to the alimony, Wife was also receiving, what is called in Germany, "child alimony

Since starting grade school, both boys have been in private school. The school, with supportive teachers and countless friends, their soccer teammates and so on and so forth has been a safe haven for the boys during their parents' divorce case. The Wife, by removing the children from Germany has separated them from the only home they have known and, as well, for the one place that was free of parental stifle.

By way of summary, Wife has churned her way through eight or nine lawyers in Germany in her attempt to get the pre marital agreement declared void or unenforceable. The

Husband has been advised, the court in Germany will probably rule the agreement is enforceable.

At about the time Wife realized the pre marital agreement would be enforced she went on a campaign to use the children against Husband. Among other things she often threatened to remove the children to the USA without Father's or the court's permission. And, by way of summary, that is just what she did, which is why Husband filed this case, seeking an order he be given temporary custody of the children for the purpose of returning them to Germany.

Also, by way of summary, in Germany Wife made numerous claims against father, all of which are detailed in the report of the German court-annexed psychologist dated February 22, 2007, the date on which it is to be filed in that court. The expert psychologist has been involved in this case for about a year, met with the parties, the children, the children's teachers, and numerous other persons. Father was administered psychological testing. Each parent was interviewed with the children. Home visits were made.

During much of this time, Wife has been trying to brainwash the children by telling them they are going to be moving with her to Rhode Island - something which upset the

children greatly. Even now, why just last evening, one child asked Father if it was true he was going to buy a house in Rhode Island to live near to them - thus showing, even now Wife has not let up in her campaign. Mother is trying to ensure the children will tell the Guardian ad Litem appointed by this court, and, perhaps as well, the judge, that they want to live in Rhode Island.

Father hopes the Guardian ad Litem and this Court will conclude that the children are not of an age or maturity to express their desire, such that it should be accepted as a reason to deny an order returning the children to Germany.

In that regard, Father has pulled together what he believes is relevant case law for consideration by the Court as it undertakes this challenging case.

## II. Overview of the Hague Convention

Under the second paragraph of Article 13b of the Hague Convention on the Civil Aspects of International Child Abduction (Convention / Hague Convention) a child who has reached a sufficient degree of age and maturity is permitted to voice objections[1] to being returned to the child's

[1] California vests courts with the power to protect a child

habitual residence.

However, the Convention does not give the child a veto against an order that the child be returned to his or her habitual residence.

Along with the child's wishes, the court also considers all other factors and retains absolute power to decide if the child should be returned.

## III. Case law on Child's Preference

The cases discussed below show how courts have analyzed the wishes of the children in making a decision on whether or not a child should be returned to his or her habitual residence. Not surprisingly, courts have often concluded that brainwashing plays an important part in the abducting parent's plan to get the child express a wish to remain in the abducted country.

In a recent case, Yang v Tsui, --- F.Supp.2d ----, 2006 WL 2466095 (W. D. Pa) the Court concluded that the

---

by preventing the child from testifying. In addition to the requirements of . . . the Evidence Code, the court shall control the examination of the child witness so as to protect the best interests of the child. The court may preclude the calling of the child as a witness where the best interests of the child so dictate and may provide alternative means of obtaining information regarding the child's preferences. Calif. Family. Code 3042(b).

Article 13 "wishes of the child exception" permits a court, in its discretion, to refuse to order the return of the child, in contrast to the mandatory directive "shall" which appears in Article 12. In considering this matter, the court further opined that, like the "grave risk of harm" provision, the "age and maturity" exception is to be applied narrowly." England v. England, 234 F.3d 268, 272 (5th Cir.2000).

The Yang court found that any objection that Raeann may have to returning to Canada was a direct result of Tsui's wrongful retention. Mr. Tsui (father) produced no evidence that Raeann wanted to move to Pittsburgh to live with him prior to either Yang's (mother's) illness or his wrongful retention of Raeann. Raeann's attachment to her living conditions and family in Pittsburgh occurred as a result of the passage of time during while the case was pending.

The Convention would be rendered meaningless if a court refused to return children based upon their preferences developed after the abduction or while waiting for the wrongful removal and retention lawsuit to be decided. Even worse, refusals based on such facts would reward the malfeasant parents and encourage others to

elongate litigation to gain such an advantage.

At the direction of the President of the United States of America, the USA State Department submitted a legal analysis of the Convention, codified at 51 FR 10494-01, which discussed the wishes-of-the-child exception. "This discretionary aspect of Article 13 is especially important because of the potential for brainwashing of the child by the alleged abductor. A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." 51 FR 10494-01, Section III.I(2).

The Yang court laid out a two-step process. First, the court had to be satisfied that Raeann reached an age and degree of maturity at which it is appropriate to take her views into account. If so, then second, the father had to prove Raeann's objections were grounded in her own mature opinion and are not merely the conduit for the opinions of others. On that record, the Yang court refused to let the child's preference, to stay in the USA, control the outcome and ordered Raeanne returned to her habitual residence.

In Garcia v. Angarita, 440 F.Supp.2d 1364 (S.D.Fla.

2006), dealt with three children, Alonso (age 11), Julio (age 9), and Luis (age 7) who were brought from Columbia to the U.S.A. The court held that the only child who may arguably be of sufficient age and maturity was Alonso, who clearly objected to being returned to Colombia and wanted to stay in the United States. Based upon testimony of an expert, Dr. Firpi, who evaluated Alonso and the court's own consideration of Alonso's testimony, the court concluded Alonso's views should not be taken into account. Despite Alonso being an impressive, well-mannered, and articulate eleven-year old, the burden was not met proving he was of sufficient age and maturity. Therefore, the court refused to order a return based upon Alonso's evoked preference. See Hazbun Escaf v. Rodriquez, 200 F.Supp.2d 603, 615 (E.D.Va.), aff'd 52 Fed. Appx. 207 (4th Cir.2002), cert. denied, 538 U.S. 1000, 123 S.Ct. 1911, 155 L.Ed.2d 827 (2003) (return ordered despite objection of 13-year old); Giampaolo v. Erneta, 390 F.Supp.2d 1269 (N.D.Ga.2004) (return ordered despite consideration of views of ten-year old).

## IV. Return of the Children Would Not Expose Them to the Grave Risk of Harm Contemplated by the Convention

Pursuant to Article 13b of the Convention and 42 U.S.C. § 11603(e)(2)(A), a Court may decline to return a child if Respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" (grave risk of harm). Courts construing this defense have held that it applies only in extraordinary cases when the grave harm contemplated by the Convention is directed at the child in question. In Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir.1996), the Court narrowly construed this exception to apply only in two circumstances:

> [W]e believe that a grave risk of harm for the purposes of the convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute- e.g., returning the child to a zone of war, famine or disease. Second, there is a grave risk of harm in cases of serious dependence, when the court in a country of habitual residence, for whatever reason, may be incapable *1382 or unwilling to give the child adequate protection.

In Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir.2000), cert. denied, 531 U.S. 1159, 121 S.Ct. 1113, 148 L.Ed.2d

982 (2001) (footnote omitted), the Court provided the following guidance:

> The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. *See* Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir.1995). Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. *See* Hague Convention, art. 1. For example, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another"; otherwise, the goals of the Convention could be easily circumvented. *Re A. (a Minor) (Abduction)* [1988] 1 F.L.R. 365, 372 (Eng.C.A.); see also Friedrich, 78 F.3d at 1067-68; Re C, (Abduction: Grave Risk of Psychological Harm) [1999] 1 F.L.R. 1145 (Eng.C.A.); C. v. C. (Minor: Abduction: Rights of Custody Abroad) [1989] 1 F.L.R. 403, 410 (Eng.C.A.). Courts are not to engage in a custody determination, so "[I]t is not relevant ... who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home ... and terminate her marriage." Nunez-Escudero, 58 F.3d at 377; *see also* Department of State, Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed.Reg. 10,484, 10,510 (1986) ("[Article **13(b)** ] was not intended **to be** used by defendants as a vehicle to litigate ... the **child's** best interests.")

Similarly, in Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir.2001), the Court characterized the exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Accord Baxter v. Baxter, 423 F.3d 363, 373 (3rd Cir.2005).

In Garcia v. Angarita, supra, 440 F.Supp.2d at 1382-83, there was no credible evidence of a threat of physical harm if the children were ordered to return; and no evidence of any psychological harm to the younger children, Julio and Luis. Respondent provided some evidence, based on Dr. Firpi's evaluation, that Alonso would suffer some psychological harm if he was ordered to return to Colombia. However, Dr. Firpi also opined that risk of harm is reduced by the close relationship that Alonso has had with his paternal relatives, and the support system he has in Colombia. Significantly, Respondent was in a position to

greatly reduce this risk, if she so chooses, by discontinuing the activities which Dr. Firpi believes have resulted in a degree of parental alienation toward Petitioner, and if Respondent returns with the children to Colombia. Although the court had concerns regarding the psychological well-being of Alonso if he is ordered to return, the objecting parent failed to establish by clear and convincing evidence that the risk is sufficiently grave to warrant a denial of return. **In this regard, the Court noted that the goals of the Convention would be frustrated if an abducting parent were permitted to thwart a return by causing, or refusing to ameliorate, psychological harm to the child.**

Finally, the Garcia court noted that the absence of a grave risk of harm was underscored by the fact that while both parties resided in Colombia, the children spent significant periods of time with their father and grandmother; and this practice continued with respect to their extended visits with their parental family in Miami. Therefore, Respondent failed to establish this defense.

In Mendez Lynch v. Mendez Lynch, 220 F.Supp.2d 1347(M.D.Fla.,2002) the court ruled that:

> The parties stipulated that at age six Brandon has not attained an age or degree ***1362** of maturity to make it appropriate to take his views into account. The Court finds that at age nine, in light of the undisputed testimony, Dylan has attained an age and degree of maturity sufficient to take his opinion into account. The testimony is uncontradicted that Dylan wants to stay in the United States and does not want to go to Argentina. Dylan loves and wants to see his father, but in Florida. Dylan's concerns are with the country of Argentina, not with his father.
>
> [But] Dylan's opinion on return to Argentina is not conclusive. His memories of Argentina are those of a six year old, he has been in the virtually exclusive custody of his mother in the United States since his removal from Argentina, and his mother has articulated a desire not to return to Argentina since almost the beginning of her arrival in Florida. The Court finds that return of Dylan to Argentina would further the aims of the Hague Convention, and therefore will exercise its discretion to so order despite Dylan's view.

Clearly the cases follow the Convention in not letting the child have the right to decide if he or she should be returned to the habitual residence.

In the case at bar, before their removal from Germany, the children spent substantial time with Husband. Before being brought here by Mother, they did not express a desire to go live permanently with Mother in the USA. They would go only if Father also moved to be nearby. The Germany

court-annexed psychologist, who has been involved for a long time with this family, concluded that the Husband should have the children's sole legal custody (i.e, the right to determine where they live). Even so, Wife would have a right to access (visitation), as may be determined by that court. That report was just filed and Wife has the absolute right to fight in the German court against such a result. Wife ought not to be permitted to side step the courts in Germany by coming here and making claims and again trying to make a mountain out of a grain of sand in a molehill. The Germany authorities thoroughly and properly investigated Mother's claims and found there was no basis to conclude anything bad or wrong or negative had happened to the children. If any such thing had been found, the Department of Youth was obligated to and would have, as its reports shows, referred the case to the proper authorities for prosecution. And, this department also had the right to remove the children from a home in which they were in danger, if any such conclusion had been reached - which it most certainly was not.

Here and now, the children in the case at bar have been wrongfully retained in Rhode Island and should be returned to their habitual residence of Germany. The short

time that they are here and the possible brainwashing and influence which the mother had effected on these children, should not be a reason to refuse their return to their home.

## V. How Courts Obtain Evidence of a Child's Preference

The provision in the Convention, permitting a child to express his or her preference, raises issues familiar to courts which routinely hear family law matters. While a court may legitimately receive evidence concerning a child's wishes or preferences, the first question that arises is how to best receive that information without traumatizing the child.

There are at least four possible ways in which to receive evidence concerning a child's wishes. The first is by allowing the child to testify in open court upon direct and then subject to cross examination. Second, the court can interview the child in chambers with most courts who follow this procedure having a court reporter present to take down what is said, with or without the parents and/or counsel, and, as well, sometimes, permitting counsel to ask questions. Third, the child can be evaluated by a court-appointed

psychological professional who would, in turn, provide a written report and be available for cross examination. Fourth, the court can appoint an attorney for the child so long as it is clear that person remains in the role of advocate - not spokesperson.

Many believe that having the child testify is the least desirable of all the alternatives and that it should never happen.[2] Nevertheless, parents caught up in the vortex of

---

[2] In Sheikh v. Cahill, 546 N.Y.S.2d 517 the court chose to interview a 9 year old child in chambers. The court noted as follows from that experience: The court interviewed Nadeem in camera. Nothing in that interview or in the papers presented to the court on plaintiff's motion or in plaintiff's offer of proof indicated that Nadeem's return to the United Kingdom would pose a grave risk of exposure to physical or psychological harm or that he would be placed in an intolerable situation. In addition, this court finds that Nadeem has not attained an age and degree of maturity to warrant this court to take account of his views so as to avoid his return to London. He is only 9 years old. The in camera interview revealed that Nadeem did prefer to stay in the United States. However, this appeared to be very much the result of his being wooed by his father during the visitation. Given Nadeem's age and maturity, this reaction to the summer vacation is to be expected. Id., 546 N.Y.S.2d 517, 521-522. See also Caro v. Sher, supra, 296 N.J.Super. 594, 687 A.2d 354, (Court refused to interview the child for reasons which are reflected above. In noting that the court was not required to take into consideration the children's wishes the court stated: "Finally, the certification of the respondent makes clear, if accepted, the emotional trauma the children, ages seven through thirteen, have experienced in this continuous struggle between the parties over the last three years. The court will not add to their discomfort as argued by the petitioner, and test to what

emotions which constantly reside within family law matters will sometimes insist that the court listen to the child's views. If required to testify, the child-witness is in a lose-lose situation. The child is surely to be asked to state a preference of residence and, in effect, to have to choose between parents.

The second method, examining the child in chambers, also has several negative aspects, not the least of which is that the court's interview is typically inconclusive and unsatisfactory. Initially one must reflect upon the fact that the judge is not likely a professional child psychiatrist or child psychologist; and thus not trained to ask the right questions or to best understand the answers. By definition, the judge will spend little time with the child in one interview. The professional would spend hours of time in several interviews over time. Therefore, it is, at best difficult for a judge-interview to be a good basis on which to determine whether the child has been coached or is expressing a genuine, reasoned preference.

And, just meeting with a judicial officer for the

---

degree their present views simply reflect the emotional upheaval and their desire, finally, for normalcy and permanency, here if not in Spain.")

purpose of expressing a preference between parents can, in and of itself, be a traumatic experience with serious adverse psychological repercussions for that child. Further, if the chambers-proceeding is reported, then the parents are entitled to a transcript of the discussion on appeal. Should this occur, then the child's possible expectation of privacy has been betrayed, and the child will have been found out. If no record is to be made of the chambers proceeding, then the court should first obtain a valid waiver from the parties. If the court considers the child's wishes, absent a record of what the wishes were, that issue effectively becomes non-appealable.

The third method of obtaining a child's preference is to appoint a psychological professional to examine the child and report to the court. Some feel this method serves to insulate the child from the pressures of answering questions in court while permitting the professional to determine whether the child has been "brainwashed" by one parent or the other. The fourth possibility is to appoint counsel to represent the child.[3] Then counsel will be burdened by a need

---

[3] In and unreported case, <u>Renovales v. Roosa,</u> 1991 WL 204483 (1991 Conn. Super.), the court appointed counsel to represent the children. Counsel interviewed both parents,

to determine, for him or herself, if the child has a sufficient age and emotional maturity to direct the lawyer.[4] But, the third and fourth methods do not address a parent's constitutional right, in this fundamental issue, to confront those who would give evidence against them - even if that person is their own child.

At bar, the children involved are 7 and 8 years of age. It is believed testimony will disclose that Wife started priming the children back in March or April 2006, when she allegedly came to Rhode Island with the boys during a school vacation to spend quality time with her family. However, it is believed, she spent a great deal of time seeking out the opinions of lawyers on whether she could just stay in the USA and not go back to Germany. Further, as the report from the German court-annexed psychologist discloses, the mother has spent a fair amount of time telling the children that they will be moving with her to Rhode Island.

---

and viewed them with the children. The attorney was also an active participant in the hearings, and provided a report to the court. See also Navarro v. Bullock, 15 Fam.L.Rep. (BNA) 1576 (Cal.Super.Ct.) (Sept. 1, 1989).

[4] See, e.g. "Representing Children: Standards for Attorneys and Guardians ad Litem in Custody and Visitation Proceedings," American Academy of Matrimonial Lawyers, Chicago, IL (1995).

On another point, based upon what has been said by Wife's current USA counsel, she will argue that courts in Germany have allowed children of young ages to express their preference which, in turn, has resulted in their remaining there. But, almost all of those are early Convention-related decisions, each made by one trial court judge with no known appeal by either party. More important is the fact that the thinking, as expressed in those early cases, has been rejected by more recent cases in both trial and appellate courts in Germany.

This case involves a recent abduction. The mother's attempt to prove a great risk of harm, Article 13b defense to an order of return and try to prove, as well that the children want to stay here with her is, at best, suspect. In any event, in deciding the children's wishes, this Court must use the standard which is in effect here - not something which may or may not be in effect in Germany. This court, in deciding if the children in this case are of sufficient maturity and age, is bound to follow guidelines drawn from American jurisprudence.

Respectfully submitted,

February 21, 2007 /s/ Charles A. Tamuleviz

Charles A. Tamuleviz, Esq.
(Fed. Bar #6115)
TAMULEVIZ, HULTQUIST, & BIANCHI, LLP
144 Westminster Street
Providence, Rhode Island 02903
401.490.2939
401.490.2940 (fax)

Gerald L. Nissenbaum, MABBO 372400
160 Federal Street, 24th floor
Boston, MA 02110

Bradford Neal Martin, Esq.
(Fed. Bar #3310)
BRADFORD NEAL MARTIN & ASSOC. PA
75 Beattie Place Suite 910
Greenville, South Carolina 29601
864.552.9990
864.552.9992 (fax)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATION OF SERVICE

On this 21st day of February 2007, I caused the instant Plaintiff's Opposition to Defendant's Motion to Quash Her Deposition or Alternatively: Plaintiff's Motion to Compel Defendant's Deposition for Next Tuesday Morning to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic Notification:

Neville J. Bedford, Esquire
321 South Main Street, 5th Floor
Providence, Rhode Island 02903

/s/Charles A. Tamuleviz
Charles A. Tamuleviz, Esquire
Tamuleviz, Hultquist, & Bianchi, LLP
144 Westminster Street, Suite 302
Providence, Rhode Island 02903
Telephone: 401.490.2939
Facsimile: 401.490.2940
E-mail: cat@thbrilaw.com