UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DOMINIK KUFNER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) C.A. No. |
| | ) 07- 046 S |
| TINA KUFNER, | ) |
| | ) |
| Respondent. | ) |
| ---------------------------- | ) |

DEPOSITION OF ALEX WEINTROB

New York, New York

Monday, March 19, 2007

Reported by:
Michelle A. Cox
JOB NO. 192672

March 19, 2007

3:06 p.m.

Deposition of ALEX WEINTROB, held at the offices of Office of Alex Weintrob, M.D., 372 West 97th Street, New York, New York, pursuant to Notice, before Michelle A. Cox, a Notary Public of the State of New York.

A P P E A R A N C E S:

BRADFORD NEAL MARTIN & ASSOCIATES, PA
Attorneys for Petitioner
75 Beattie Place, Suite 910
Greenville, South Carolina 29601
BY: BRADFORD NEAL MARTIN, ESQ.

VISCONTI & BOREN
Attorneys for Respondent
55 Dorrance Street
Providence, Rhode Island 02093
BY: RICHARD BOREN, ESQ.
(By telephone)

IT IS HEREBY STIPULATED AND agreed, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

A L E X W E I N T R O B, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. MARTIN:

Q. Dr. Weintrob, please state your name and tell us what you do for a living, please, sir?

A. I am Alex, A-L-E-X, Weintrob, W-E-I-N-T-R-O-B, M.D. I am a child and adolescent psychiatrist. I have practiced child adolescent and forensic psychiatry. I've been in practice for very close to 40 years now.

Q. All right. And could you give us your educational background quickly, sir.

A. I attended college at Harvard, and then medical school at the University of Pennsylvania. I then took internship and residence -- interrupted by two years in the Army. I took a residency in general psychiatry and a fellowship in

Weintrob

child and adolescent psychiatry.

Q. Can you give us some of your experience as a child psychiatrist?

A. I have, as I've said, practiced as a child psychiatrist for close to 40 years now. I am board certified in child and adolescent psychiatry and general psychiatry, and in forensic psychiatry. I have for the first 20 years in addition to private practice, I was a clinical director of a residential treatment center, and I'm currently attending at Lenox Hill Hospital, New York Hospital, Cornell and New York University Hospital.

Q. And you did say you are board-certified in both general psychiatry, child psychiatry and adolescent psychiatry and forensic psychiatry?

A. What are called added qualifications in forensic psychiatry. I am also in the faculty of Cornell Medical School and New York University Medical School. I'm an associate professor in

both of those.

Q. And do you have any professional memberships, Dr. Weintrob?

A. I am a fellow of the American Academy of Child and Adolescent Psychiatry, and life fellow of the American Psychiatric Association. A member of the American Academy of Psychiatry and The Law, and some other national and international psychiatric organizations.

Q. All right.

A. In addition I was a member of the group called the National Interdisciplinary Colloquium on Custody Law for many years.

Q. Is that custody law for children?

A. Custody law regarding children, yes.

Q. And have you had any publications?

A. My publications have been in a variety of fields, most recently involved with a book regarding family law and

Weintrob

mental health, that was a textbook to be used by judges.

Q. And have you had professional presentations, workshops, symposia and lectures that you have conducted?

A. I have numerous lectures, symposia at a -- in a number of settings; the annual meetings of the organizations I've mentioned, plus lectures at local pediatric and child psychiatric organizations and hospitals.

Q. I would like to move at this time that Dr. Weintrob be declared an expert in the fields of child psychiatry and child forensic psychiatry.

MR. MARTIN: And I don't know if, Mr. Boren, you want to do any voir dire right now?

MR. BOREN: No.

BY MR. MARTIN:

Q. All right. Dr. Weintrob, I would like to ask you if you have formed any opinions with respect to the issues in the case of Kufner v. Kufner that is

Weintrob

pending in the district court of Rhode Island?

A. I have.

Q. Can you tell me your opinion first, and the bases for your opinion, please sir.

A. Yes. My opinion is that these children appear to have been exposed to considerable distress and are likely to have experienced and continue to experience distress as a result of their current, as well as past -- particularly recent past situations.

Number two, based on that, I believe that these children's optimal development will be best served by achieving some level of stability in their environments; that is, home environment as well as school environment.

Number three, my opinion is that continuing in the current environment runs risk of further compensation or further hindrance to their development.

Weintrob

And that it would certainly appear that a return to a previous environment: school again, home, country and culture would likely be in their best interests.

What is my opinion based upon: I have reviewed numerous documents, which have reported extensively on the behaviors of these children, as well as the behaviors of both of their parents. If I can digressive just briefly, child psychiatrists view children in an overall developmental fashion; meaning, we look at children and their behavior from a biopsychosocial viewpoint; I will expand upon that, as well as a developmental level.

The developmental level involves developmental tasks at particular ages; developmental tasks for children of the ages in question involve learning, number one. A good part of their time is spent in school. The expectations are that they have some ongoing cognitive development. A second task, which is

Weintrob

partly related to schooling is socialization, that the task of children at this age is to develop relationships with peers, and to feel comfortable.

Developmental task number three is the ongoing development of a close and supportive relationship with each of their parents, ideally -- particularly in the case of parents who are divorced or divorcing in an environment that involves each parent's ability to support the children's relationship with the other parent.

The biopsychosocial framework, which I will be more specific about. When we look at children biologically, we look at obviously their age. We look at their genetic constitution. We look at their level of sexual development. We look at their cognitive ability, which is also a biological issue.

In the case of these children, they -- their sexual identity issues, which are partly psychological, partly

Weintrob

social, I believe there is reason to have concern about their development of their biological sexual identity in view of what they have been exposed to in terms of the allegations made against their father.

I believe that biologically their cognitive development has been jeopardized, to put it mildly. These children apparently has been told -- or at least the actions of their mother has, in my opinion, caused very likely a significant sense of confusion. Why do I say that --

MR. BOREN: I move to strike the last portions of the doctor's answers.

MR. MARTIN: Okay.

BY MR. MARTIN:

Q. Now, Doctor, you say the actions of the mother have negatively impacted the children.

What specific information do you have about the actions of the mother that

you think has negatively impacted the children and why?

MR. BOREN: Objection.

MR. MARTIN: And the grounds?

MR. BOREN: It's going to be based purely on hearsay. There's no foundation for his response. And I think the question was not asked in such a way that it would elicit an answer based on reasonable degree of medical certainty.

MR. MARTIN: Okay. Well, under Rule 703, the hearsay objection doesn't apply.

BY MR. MARTIN:

Q. What -- maybe we should take a minute to ask you, Doctor, what documents have you reviewed in order to form your opinion?

A. I was sent a number -- a large number of documents, which I reviewed. They included photographs of the children. They included --

Do you want me to list each one?

Weintrob

Q. Well, we are going to --

A. They included information -- I'm sorry.

Q. What we would do and we would like to have marked as Plaintiff's Exhibit 1 is your Curriculum Vitae.

MR. MARTIN: Is there any objection to that, Mr. Boren?

MR. BOREN: No.

(Petitioner's Exhibit 1, Curriculum Vitae, marked for identification as of this date.)

BY MR. MARTIN:

Q. And as No. 2, your forensic psychiatric opinion of February 21, 2007 as No. 2.

Any objection to that, Mr. Boren?

MR. BOREN: Yes. The best answers are the doctor's testimony.

MR. MARTIN: Okay. We will mark that.

(Petitioner's Exhibit 2, Document Entitled "Forensic Psychiatric Opinion," marked for identification

Weintrob

as of this date.)

BY MR. MARTIN:

Q. And, Doctor, you have listed I think on Page 3 of that report 20 items that you reviewed.

Tell us whether or not you have reviewed those items, and have you received any additional items that you reviewed in forming your opinion since you wrote your opinion.

A. I did receive additional documents. I received a report from Dr. Jenny. I received a notice of the -- what's called the GWG web site. I had previously reported -- I reviewed the GWG report. I've received Mr. Kufner and Mrs. Kufner's statement to Dr. Jenny. I've received a temporary custody order, I think of February 16th, the judge's order --

Q. From Germany?

A. I'm sorry. The temporary custody order from Germany, as well as -- I'm sorry, that was February 16th. As well

Weintrob

as the March 15th temporary order of custody of the Rhode Island District Court.

Q. Okay. And are the items listed from 1 through 20 on Page 3 of your forensic psychiatric opinion documents that you reviewed?

A. I did.

Q. And did you also review the DCYF complete report, which was Exhibit 10 in the trial?

A. I did.

Q. Okay. And did you also review a report by Ms. Strawn, S-T-R-A-W-N?

A. I apologize. Yes, I did review that report.

Q. Okay. All right. And based on what you reviewed, Doctor, let's go back to your first opinion, which was I believe, that the children appear to have been exposed to distress and continue to experience distress.

Tell us what in those documents have led you to that conclusion.

Weintrob

A. Those documents have revealed to me a history until approximately a year ago, of the children having ongoing contact with their father while their residence was with their mother.

Then approximately one year ago these children were involved, as a result of their parents, in a court ordered evaluation. There was an allegation on the mother's part that the father had taken photographs of the children, some of which as she considered to be pornographic.

There were indications that she was clearly suggesting, if not overstating, he was a danger to the children. There was, from my point of view, an extensive evaluation by what is referred to as GWG, which essentially found that the children -- the children's father appeared to be supportive, from what I understand. Mrs. Kufner declined participation in the GWG evaluation. The children were seeing -- the children had

Weintrob

expressed to the neutral evaluator that they wanted to remain in their current school, that they did not want to come to the United States, that they knew their mother wanted them to come to the United States. One of them said essentially, if she moves, I really want to stay here and be here with my father.

The report indicated that the photographs that the mother claimed were suggestive of some kind of grossly inappropriate behavior on the father's part were not considered to be such, that was -- it appeared to me an evaluation that was more than accurate, and went according to the methodology that is generally used in this country for evaluations.

The distress then was the -- well, excuse me. There was reported concern that the mother would, in any case, take the children out of the country. According to the documents, she was asked to turn her passports over

Weintrob

around the Christmas vacation to the U.S. consulate.

Q. Her passports or the children's passports?

A. I'm sorry. I apologize, the children's passports.

In late January, without informing the father of -- the children's father of her intention, without apparently giving the father any input into what and why, she abruptly, it would appear, removed the children from the environment they had been raised in and brought them to this country; at which point, in terms of distress to the children, she made a claim of physical and likely sexual abuse, requested a temporary restraining order, such that the children who had had a seemingly -- according to reports, settled relationship with their father, were now presented with their time with their father having been supervised.

She as a result, the

Weintrob

Department or Youth and Family, or Family and Youth were involved, so the children were subject to another evaluation.

Q. Doctor, if I could stop you for one second.

A. Sorry.

Q. You told us that the children had a life in Germany and they were abruptly removed from that life.

How would that affect them negatively, to be, let's say, in school on a Monday and taken out on a Tuesday and never to return and sent to another?

Teach us why -- what is it about little children at this age to be a distressful situation?

A. These children in particular -- children in general, appear to do best and to function best psychologically, scholastically, socially with a maximum level of continuity and stability in their environment. Obviously, that is not always possible, but to the degree it is possible, children like -- of this age

Weintrob

in particular, like continuity in their life; something they can depend upon, that isn't going to be suddenly pulled out from under them. That's children of this age in general. Children of divorce, in particular -- children kind of have an idea that they have two parents. And that their two parents are going to put the children's interest above their own, and get along. That's their kind of idea. That's true despite whatever divorce rate we have, that children have the idea that they will have two parents. That is thrown into that idea, and safety and security is thrown into question when their parents divorce. When the parents divorce and are able to support each other, that minimizes the dangers to the children's development. When the parents argue and fight over custody, that increases the likelihood of disruptions to the children.

When allegations are made

Weintrob

particularly, and particularly allegations that are not supported, that seriously affects -- as a potential of seriously affecting a child's relationship, not just with the accused parent, but also with the accusing parent. And children at this age are left in a state of not knowing which end is up; whom do I believe. This is likely to cause significant disruption, and I would use the word "confusion." In a child's mind of this age in particular, it goes like this, you know, I have this guy, he is my father, and he seems to be okay with me. And I like being with him. And all of a sudden, I'm told essentially, if not verbally, but by behavior and numerous evaluations, Hey, you know, this may be a guy that you got to be afraid of. And this clearly shakes any child's confidence in his previous ability and security in thinking he can assess his reality.

MR. BOREN: Okay. Move to strike

Weintrob

that portion of the doctor's opinion pertaining to allegations not supported as pure speculation, particularly on a forensic report.

MR. MARTIN: Okay.

BY MR. MARTIN:

Q. Now, Doctor, what bases do you make these opinions?

What factual bases do you have to show that the mother has, indeed, created an environment where the children's relationship with the father would be disturbed, as you have testified to?

A. Most recently the mother requested, and was granted, supervised visitation of the children's time with their father, number one. Number two --

Q. And what would that tell the child, if you have supervised visitation with the father?

What, in your opinion, would be the effect on the child to suddenly be with the father, but it has to be supervised by someone?

Weintrob

A. Number one, what the hell is going on. Number two, do I have some reason to question my own reality, which is that this is somebody that I love and was safe to be with; no matter how anybody says or why or reasons given for supervision, it is an unnatural situation for children, particularly of this age who have developed already a relationship with a parent whom they consider to be safe and supportive.

Q. What would be the effects of secretly removing the children from their life-long home and hiding the residence and location of the children from the father?

What would be the impact on the children of such behavior?

MR. BOREN: Children in general, or these children in particular?

MR. MARTIN: Children in general.

A. Children of this age have antennae. They pick up what's going on. They are now exposed to rather complete

Weintrob

disruption of their ongoing environment, in which they appeared to have, by report -- or children in general, if they are doing well, hey, things are going okay, all of a sudden, not only are they taken away from that, but it's done with some secretiveness. It's done -- you know, this is an emergency. Clearly, we have to get away from this man. Messages to children -- and when I say "antennae," they are not stupid, excuse me. And you know, we're not telling anybody. What does that mean? And they sometimes can make sense of it, but often they make no sense; leaving them rather discombobulated and bewildered about what's going on.

BY MR. MARTIN:

Q. Specifically, from the records, were you aware that these children were removed from Germany without the father being told where they were going or where they would be?

A. Yes.

Weintrob

Q. Do you know how many days it was that the father had no contact with the children?

A. I believe it was for at least six days. I don't know exactly.

Q. And if the children were supposed to, let's say, see their father for a visitation from Thursday, January 24th to Tuesday, January 28th, and they did not see their father for that period of time, but were instead taken to America, what impact would that have on the children with respect to their relationship with their father?

MR. BOREN: Objection. There's a forensic report or forensic opinion without having seen the children or talked to the children. I don't believe that this doctor can testify. There's no foundation. It's pure speculation on the part of the doctor.

BY MR. BOREN:

Q. Okay. Is it pure speculation on

Weintrob

your part, Doctor, to give an opinion?

And if not, why not?

A. I'm certainly aware of what Mr. Boren says. At the same time, I consider it far from speculation when I have read numerous documents, and particularly documents of neutral court appointed people; so that my opinion can be based on a review of the reports and upon the effects upon children of reported actions, and particularly actions and comments that are reported by neutral experts. Therefore, I feel this is not speculation, but a reasonable basis for forming an opinion.

Q. And, Doctor, as a board-certified forensic child psychiatrist, do you base your opinion on records in other instances?

Is that an appropriate way to issue opinions, in your experience?

A. If one is offering an opinion about what one reads, it appears to me that that is not uncommon, in general.

Weintrob

In forensic psychiatry in general, people are asked to, for example, in medical malpractice they are asked to review records. They do review records. They attempt to review records with objectivity and then to report on their review of the records.

Q. Based on your records that you reviewed, and your experience as a forensic psychiatrist, do you have an opinion as to whether or not a mother who removes the children from school after a Monday, and takes them to another country without informing the father, and the children miss their visitation with the father that they expected on Thursday to the next Tuesday, what impact, if any, would that have on the child?

MR. BOREN: Same objection. Still speculation. I still think there's no foundation. And I certainly think that some of the documents that I may have relied upon were not documents that psychiatrists

Weintrob

would reasonably and customarily rely upon to form opinions.

BY MR. MARTIN:

Q. Subject to his objection, you may answer.

A. I'm sorry. Could you repeat -- the impact -- the impact of missing and suddenly being removed, leaves children -- speaking of speculations -- only to speculate what is this about. I don't know. Nobody's talked about it. I certainly haven't asked the children, but what do they speculate?

But they certainly have been presented with an unnatural situation. And in this case, then -- seriously, in my opinion, aggravated by the following -- not the following, the then consequent and subsequent experiences.

Q. Okay. And what would the effect of the children's stability be if they were removed in this manner that we have just spoken of, and then actually placed in a whole different school?

Weintrob

MR. BOREN: Objection. Again, in a forensic report, it's pure speculation with respect to these children in particular.

MR. MARTIN: Under Rule 703, you can base your opinion on facts that are in the case. And as we all know, and I think it's undisputed, that these children were removed from their school in Germany, where they had been their whole lives, and placed in Cumberland, Rhode Island.

BY MR. MARTIN:

Q. So my question to you, Doctor, is: What impact would that have on the children with respect to their stability?

A. There are two aspects to this: One is change, which I have commented upon.

Children -- particularly children of divorce where there are changes back and forth, generally, don't like change. And it has the potential of interfering

with their learning. But more importantly, in fact, in terms of impact is the context of the change.

So, obviously, children change schools frequently, that has some impact; has more impact probably on children of divorce. But when the change is unexplained, and in fact succeeded by evaluations related to father's behavior towards them, that's even more of an impact, and has even more of a possibility of interfering with their development.

Children, you know, they have friends. They like to keep their friends. They have a school. This is a new school, new friends. Sure, they may adapt and adjust. It doesn't mean it is a good thing. It's as potentially -- interfering with their development.

Q. Now, Doctor, are you aware whether or not the children are examined with respect to these allegedly --

MR. BOREN: I move to strike that

Weintrob

portion of the doctor's opinion that relates to possibility of interfering with development.

A. Likelihood, is that better?

Excuse me.

BY MR. MARTIN:

Q. Dr. Weintrob, are you aware of whether or not the children were examined with respect to the allegations of sexual abuse and the photographs when they first came to Rhode Island?

A. My understanding is that there was a report, and as a result, the Department of Family and Youth performed an evaluation.

Q. Do you know if they discussed the photographs with the children?

A. I believe -- right. This was the second time I think the children had been asked about the photographs.

First time, as I recall, they said, Well, we are fooling around and having a good time. And the second time I think one of the children, at that

Weintrob

point said, Well, yeah, it was fun, but it stopped being fun. That was reported to the evaluator.

Q. In Rhode Island?

A. In Rhode Island, as far as I know.

Q. If the children are suddenly removed from their life-long home in Germany, and from their school and their friends and their relatives, and their first experience is to be evaluated by some public official, and have these photographs discussed, would that have any impact on the children?

And if so, what would it be?

MR. BOREN: Objection. First it is a compound question. Second, it's pure speculation.

BY MR. MARTIN:

Q. Based on your education, training, and experience as a forensic psychiatrist, especially dealing with children, what would the impact of being confronted with these pictures and the

Weintrob

allegations of sexual abuse, and naked pictures with strangers in Rhode Island have upon these children, if you have an opinion?

A. I have an opinion.

This was the second time. The first time they were with their father, and their mother and they answered questions. The second time, the context was, in my opinion, quite different. They had been removed and -- here we go again. You know, these photographs -- and now I'm being asked again about them. I can give an opinion about what happens to children who are asked repetitively about such photographs.

But again, it makes children anxious. These are not fun times to be asked, What about your father? And look at these pictures. And what did they mean? What did he do? And what do they show?

I'm sorry to make it sound silly like this. It's not fun times. But

Weintrob

these are things -- or not things, but experiences which lead, again, I can say to children questioning their prior experience, and now to increase their level of distrust. Children cognitively at this level, begin to think, Well, gee, you know, I thought I knew what was happening. And somebody saying, you know, what do you think of these pictures, eventually it's been shown, the children will alter their views, and say, oh, yeah, yeah, this is what he did, because they ask so many times. And they think, Well, I answered the first time, that doesn't seem to satisfy anybody.

So the impact is discombobulating to their sense of security, their sense of -- their cognitive ability as to what's real and what's not, and certainly their relationship with at least one parent.

Q. Okay.

MR. MARTIN: By the way, Mr. Boren, is anyone with you at this

Weintrob

deposition?

MR. BOREN: No.

BY MR. MARTIN:

Q. Dr. Weintrob, how would the removal of the children in this sudden manner affect their socialization in your opinion?

A. Again, it's the issue of continuity and change and disruption. I can certainly make an argument that it's good for children to begin to make new friends. That could easily be said.

But again, we are dealing with context. And the context in this situation is, they have been removed from stable social -- allegedly stable social situation, and placed in a new situation. And the second part of the context is, why are we in this new situation, and how does that affect social issues. And I can say one minimizes the disruption to children in that situation if their new school is not involved in the dispute. And if the

children are allowed a neutral setting in a school in which they can make friends and learn. If that doesn't happen, that's a further contextual difficulty.

Q. Dr. Weintrob, are you aware of whether or not the new school in Cumberland, Rhode Island has been compromised with respect to being a "safe haven" for the children?

MR. BOREN: Objection.

MR. MARTIN: On what ground?

MR. BOREN: Again, pure speculation on the part of the doctor.

MR. MARTIN: Well, I asked him if he knows.

MR. BOREN: He has not met the teachers; he has not met the two children.

MR. MARTIN: All right.

BY MR. MARTIN:

Q. Do you have any information, Dr. Weintrob, that the environment with the school has been compromised in

Cumberland, Rhode Island?

And if so, what is that information that you have?

A. I was informed that Mrs. Kufner took the nude photographs of the children to the school. I am not speculating. I am only saying, if that is true, I believe that it borders on an understatement to suggest that she has seriously compromised their welfare at school, and exposed them to the distinct likelihood that when and if -- when others learn this information, and in my experience of 40 years, with schools and parents taking their difficulties to schools, I don't know that I've heard of any situation in which somehow this didn't get into the community. That is -- makes it unlikely that children having made a change already and having stabilized that change can continue that change.

And even on the unlikely situation that nobody finds out, it

Weintrob

states and suggests something very important; that is, schools in these situations as I said, need to remain neutral. Parents need to refrain from involving the school in any way.

To do so, clearly, suggests that a parent puts his or her own needs, own wishes -- own wishes -- I'm sorry, above the child's.

Nobody can say that a parent interfering in any way or affecting the school with this kind of information is acting in the child's interest.

Q. Dr. Weintrob, what would the sudden removal of the children from their home, school and life-long environment have on their development of their relationship with their father?

A. New people are the attorneys. But to repeat, if somebody whom I've trusted, in this case my mother, now says you can't be with your father, we have to take you away. You have to have your time with him supervised. Goes to

Weintrob

school -- if, assuming again, that that is what happened, exposes the children to another evaluation or evaluations, the message is clear. I don't think you have to write it. It's written on the wall. You don't have to put it in writing or interview children or anything to say that the message is that your father is not a person with whom you can feel safe. And what does that do on the impact on a child's relationship with his father? Well, we so far think that children like to have a positive relationship with a parent. It affects their development ongoing.

Q. Are you aware of any facts that would lead you to believe that either one of these parents is not supportive of the relationship of the other parent with the children?

A. I had been in the -- I have reviewed the reports, which have stated repeatedly that the father is supportive of the children's relationship with their

Weintrob

mother.

On the other hand, the mother by her behavior clearly is not only supportive of their -- children's relationship with their father, but I can't think of an appropriate word, the extreme opposite -- alienate might be used.

But without that, essentially said your father is a bad man.

Q. And what do you base that opinion on?

What specific facts have you reviewed that you base that opinion on?

A. The facts that are reported in the GWG report; the latest fact that the mother brought the children here and then alleged abuse. That is a fact as far as I know, a police document or whatever it was, temporary restraining order can be accepted as fact that that was an allegation. Dr. Jenny reported that -- things that had been said to be harmful, abusive, whatever, pornographic, not so.

Weintrob

That behavior speaks for itself.

MR. BOREN: I'm going to move to strike any opinion of the doctor that is based upon Dr. Jenny's report, because now we have two forensic reports. And one is basing one opinion upon another opinion, where neither doctor has either met the children or made any type of examination.

So to the extent that the doctor relies upon anything of Dr. Jenny's, I move to strike.

BY MR. MARTIN:

Q. Dr. Weintrob, are you aware of any behavior on Sunday night by Mrs. Kufner that would show that it would tend to disrupt the relationship of the father with the children?

A. I have been informed that once the children went to the father, she made repeated telephone calls. I don't know what exactly the nature of them were, some were critical of the father.

Weintrob

The concern is not just the telephone calls. The concern is the persistence of Mrs. Kufner's attempts to interfere with the children's positive relationship with their father.

Q. Are you aware of an attempt that Mrs. Kufner made after the Germany courts found no basis for their claims, where she removed the children to America?

A. Yes.

Q. And are you aware that in America, she opened an investigation by the DCYF of Rhode Island?

A. Yes.

Q. And are you aware that the federal court stated any action by the family court of Rhode Island?

A. Yes, I have been informed of that.

Q. And you are aware that despite that, Mrs. Kufner again went to the family court to try to get restraining orders?

A. I believe I was informed of that,

Weintrob

yes.

Q. Are you aware that she, despite being ordered to do any further evaluations of the children, brought them to the Hasborough Hospital for a sexual abuse evaluation?

A. Yes.

Q. What impact, if any, would those actions have upon these children?

MR. BOREN: Objection. Pure speculation.

BY MR. MARTIN:

Q. You may answer.

A. Assuming what I've read and what you've said are true, I don't see that it is a speculation; that if I have reports of ongoing persistent determination to open and subject these children to repeated evaluations based upon her belief. That belief having been challenged by neutral party. And in terms of challenge, I read that report carefully. It didn't just say, this is so and so. So I can evaluate reports.

Weintrob

The persistence is very, very troubling because not infrequently, when a parent has either a firm belief or for whatever reasons, is determined to take one action after another, that's very troubling for children because there is no sign of where it would end. And further, as I said, if you keep telling a child, this is what's happening, this is it, this is it, at some point you may affect a child's thinking and a child's mind, and a child begins to believe what a parent is telling him.

Q. Dr. Weintrob, you said that your second opinion was that the optimal development of these two children would be best served by having them in an environment that was stable, both at home, at school and with family.

What is your opinion as to where that should be for these children, and what is the bases of your opinion?

A. The opinion is that the children should return to Germany quickly.

Weintrob

The basis -- the bases for that opinion are at least two-fold; number one, that was a settled environment for them, despite the ongoing disputes between the parents, that was reported was a settled environment. One, which I believe it was Joseph said, by report, I want to continue.

Number two, is that the environment currently appears to be increasingly toxic as a result of persistence on their mother's part to demonstrate to them that their father is essentially a bad person. That persistence now affecting, not only their psychological well-being, but their social well-being, their biological cognitive well-being in terms of learning. Those are the bases.

Q. Okay. And how soon do you think these children should be returned to their safe environment, in your opinion?

What would be optimal for their health?

Weintrob

A. Had there not been the presence of the persistence of challenges, evaluations, information being given, I would feel less -- the return be less urgent.

I would, by the way, say in contrast to Mrs. Kufner's behavior of abruptly removing them; I wouldn't say, Hey, tomorrow, let's all get on a plane, let's get out of here. I would not say that.

But continuing for more than a relatively short time of their having -- if their mother is not going to return with them, I have no idea about that -- some opportunity to part, to separate. But certainly sooner rather than later. And in particular if later is going to involve, in my opinion, further evaluations.

I do not think evaluations, even neutral evaluations, even another psychiatrist coming in to interview the children, that's not harmless, definitely

not harmless to children.

So that would lead me to say a quicker rather than a slower.

Q. Okay. And assuming that these children have lived in Germany their whole lives and have spent between four and six years of their schooling in one school, the Munich International School, and have now been away from that environment for six weeks, what is your opinion as to when they should be returned to the more stable environment?

MR. BOREN: I object to the hypothetical question. I don't think the facts support the question that they have lived in Germany all their lives.

MR. MARTIN: Well, you're new to the case. But certainly we can -- that fact is undisputed until now.

BY MR. MARTIN:

Q. But go ahead and answer, sir, based on that hypothetical.

A. Based on the hypothetical, based

Weintrob

on the significant disruption of their day-to-day life, I believe -- excuse me, based in particular on recent developments in the past six weeks, it would be, Hey, guys, okay, maybe we ought to go back home. And let's get going and put an end to this; whatever degree possible.

Q. So what is your opinion as to how soon they should return to their environment in Germany?

A. Soon. I couldn't give a number of days. As I said, not tomorrow; giving the children some time to adapt to another change, even though it's a change to stability, I would say, you know, one week. Something in the realm of days, not months, or even weeks.

Q. And what would be the positive effect, in your opinion, if they were returned to their environment of their home in Germany?

A. They could go on with their lives with minimum continuing disruption, and

Weintrob

address themselves to at least the developmental tasks, psychologically of feeling, okay, I'm all right. Socially back to friends, and basically to a learning environment relatively uncluttered by parental environment.

Q. What potential benefits do you see of returning these children to Germany?

A. Basically what I said. There were two areas: One is return to what has been biologically, psychologically and socially their environment that has been stable. And two, removal from an environment -- Germany is not perfect. I know what was going on in Germany for evaluations. But removal from this environment, which in the past six weeks, has had ongoing parental interference or disruption.

Q. What specific affect, in your opinion, would the return to Germany have on the children's relationship with the father, especially in the light of the

allegations that have been raised in this case?

A. Assuming what I have read by evaluators, if the father is a supportive, loving person, they could begin to repair, if it's been affected, their relationship with him, in terms of concerns or, you know, what's he really like. And they could, again, feel safe that they had at least one person who was supportive of them. And I should add, that I should have before, and not hopefully denigrating of the other parent.

Q. Dr. Weintrob, I understand that you have previously testified in a GWG report that Joseph expressed a desire to remain or stay in Germany, and not move to America with his mother.

And I believe you also stated that when he was -- a second evaluation occurred at the DCYF in Rhode Island, that there was some difference in that opinion.

Weintrob

What is your professional opinion relating to a child's stated preference in that second subsetting, if you have one?

What is the reason for your opinion?

A. The -- two elements here: One is in terms of what I had said earlier, psychologically developmental tasks. Autonomy, a child's ability to affect what happens to him or her. The child says, This is what I want, and somebody says, no, you're not right. You don't have it. He says, once, this is what I want. He says it to a person who's asking about his father's, his mother, I gather, when he comes here, and living with a parent who demonstrates a particular position has an effect on a child. As I've said, the child begins to question what he says, he questions what happened before. And after awhile, and particularly with time with a parent who may be denigrating the other parent, will

Weintrob

say, Oh, well, gee, maybe, you know, maybe that's not so good. Maybe I should rethink.

So I think preference has to be seen within the context. And on that basis, I would raise questions about the stated preference on the second occasion.

Q. Do you have an opinion as to whether or not putting a child in the middle of a dispute between both parents is good or bad for the child?

And if so, what's the basis of that opinion?

A. It's well-recognized by, I think, child psychiatrists, psychologists, social workers, supported by extensive social literature that children do best when allowed to accomplish their developmental tasks. And they do best with support of two parents.

We know that's not always possible or ideal, but it is completely accepted. And judges put this in their reports all the time, Do not badmouth the

Weintrob

other parent.

What is the impact? It challenges a child's sense of, I want two parents, and I want two parents who love me. And I don't want to have to begin to question it all the time by one parent telling me the other is not good. Leave me alone. Give me some peace. Let me accomplish my tasks in life.

We believe it is highly detrimental to children's relationship with both parents. That's what I said before. Both the parent putting the child in the middle, and the other parent. And it appears to have long-term effects. High conflict is demonstrated to have long-term negative effects on children's learning, on children's self-esteem, on children's future relationships. You name it.

Q. Tell us, Doctor, did you see anything in the reports and all the information that you reviewed that any one of the parents were not supportive of

Weintrob

the relationship with the other?

And if so, what would those facts -- what would those effects have on the children?

MR. BOREN: Objection. Asked and answered.

A. The -- what I said, the mother -- father is reported as being supportive with the relationship with the mother, encouraging that the children see their mother. And the mother has clearly stated that the children's father is a danger to them.

Q. All right. Do you have an opinion as to whether or not this mother will be able to support the relationship of the father with the children?

MR. BOREN: Objection. Speculation.

BY MR. MARTIN:

Q. And you can state --

A. Past history has been suggested to be the best predictor of future behavior. We have known that we can't

Weintrob

absolutely predict, but we can offer an assessment. That is different from a speculation because it's based on information that has been documented.

I see no end. I see only that this is going from one step to the next step, to the next step, to the next step. I can tell you -- I can't say on this situation. In other situations, the parent sometimes takes the last step, and that step is to go into hiding. There some years ago was a network for parents who believed that one parent was not -- was dangerous, and goes through a series of steps with removing the child, with having numerous evaluations; were beginning to allege that the system is wrong, the judicial system is wrong. The evaluation was not appropriate. Every evaluator was biased. The other parent paid off the judges and the lawyers. And therefore I have no out but to take the children and remove them. I'm -- like I said, I don't predict this in

Weintrob

particular. I can say that is a pattern which causes me to have significant worry.

And I can tell you one, two, three, four, five, six, but that's been said.

Q. You mentioned some -- I think there were 24 phone calls made to Mr. Kufner by Mrs. Kufner last night.

Are you aware of the content of those phone calls with respect to this idea of respect for the judge's decision to award custody to Mr. Kufner?

A. I was told there were 24 phone calls. I was given recordings of five of them. They were difficult to understand, but the nature of them suggested that she would persist in her behavior and continue to consider him a bad person.

Q. Okay. Specifically, do you remember if Mrs. Kufner claimed that her lawyers in Rhode Island were paid off by Mr. Kufner?

A. I don't recall being able to hear

Weintrob

that part. I recall certainly something about payoff. And I don't remember who was paid off. There was payoff.

Q. Do you remember anything about whether he improperly influenced the Guardian ad Litem in this case, Sharon O'Keefe?

A. There was a litany of a number of people. I don't remember whether she specifically said O'Keefe or law guardian. But it was a series of people who were now -- she was trying to demonstrate were responsible for what she considered an inappropriate decision.

Q. Now, I'm not asking you to make an evaluation of Mrs. Kufner --

A. Right.

Q. -- but do you have an opinion of her behavior in the last six weeks, that has been exposed in this record, as to whether or not she would be the kind of parent who could provide a stable environment for her children?

MR. BOREN: Objection.

Weintrob

BY MR. MARTIN:

Q. And if so, state the reasons for your opinion.

MR. BOREN: Again, based upon a forensic report with a doctor that has not met with Mrs. Kufner; has not seen her relationship with the children; has not seen either her individually or in any fashion with the children, in any setting, I think it is pure speculation on the doctor's part to give such an opinion.

BY MR. MARTIN:

Q. You may answer.

A. I don't believe it's a speculation that if a mother alleges sexual abuse or sexually inappropriate behavior, and that is unfounded. I don't believe that's speculation.

I don't believe it's speculation if the mother repeatedly states that certain photographs, she considers pornographic, and those photographs are

Weintrob

determined by an evaluator in Germany. Am I basing my report on Dr. Jenny's, I have her credentials, she seems to be an authority on pornography. And so instead of here's pornographic, that's not pornographic. Then there's two findings of such, Mrs. Kufner goes to school and says, Look at this. Again, assuming that she did, that's not speculation, that she has abruptly removed the children from their home that she had impugned -- is an understatement -- their father's integrity. That she has taken them for a second evaluation to a hospital. You know, when you take kids often enough to a hospital, and this Hasborough Hospital doesn't proceed, there are always other hospitals -- and people frequently find them -- and then continues, I worry about that mother's effect or the effect of her beliefs on her parenting, in addition to which, I think, lack of support of the children's relationship with their father raises very serious questions about such

Weintrob

a parent's parenting ability in terms of the welfare of their children.

Q. Doctor, do you have an opinion as to whether or not the evaluation of the GWG in Germany was an appropriate evaluation?

A. I have reviewed that evaluation. I looked at it to determine if it generally met the standards for evaluations in this country, whether there was an appearance of bias. I looked at that. And in my opinion, that evaluation seemed to be quite good, without -- well, period.

Q. And would you agree with their conclusion?

MR. BOREN: Objection.

A. I would say that their conclusions follow upon the data that they offered.

BY MR. MARTIN:

Q. Okay. Have you reviewed the report of Dr. Jenny?

A. I have.

Weintrob

Q. Do you have an opinion as to whether she followed standard procedures in doing her evaluation?

A. She was asked to view the photographs. She had, not a stated protocol, certainly her way of looking at them, and looking at them she seemed, in my opinion, from her report on how she based her conclusions, to have done a very good job.

Q. And do you have an opinion as to whether or not her conclusions passed what I would call peer review?

A. I would think that they would clearly --

MR. BOREN: I think it's fair to say that this doctor can't give an opinion based upon the report and opinions of another doctor who may not necessarily be in the same field, the identical field.

I don't think there is any foundation for this doctor to give such an opinion.

Weintrob

BY MR. MARTIN:

Q. You may answer.

A. Well, you can read back the question. I'm sorry.

(Record read.)

A. Well, you can stip. to peers being only child -- only pediatricians with subspecialties in abuse, or you can talk about peers who have experienced evaluating children in their environments.

So I'm not a pediatrician. I am a child psychiatrist, who does evaluate the data that he receives or reads. So Dr. Jenny's approach and her conclusions, again, I did not see indications of bias, I saw indications of objectivity. I saw indications that she had some standards that she used. And based upon that, it appeared that she presented a certainly credible report.

Q. Now, Doctor, do you have an opinion as to whether it would be more appropriate for the children to be living

Weintrob

in homes in Germany that are homes, or whether living in a motel with their mother?

What would be more beneficial for their well-being?

MR. BOREN: Objection.

MR. MARTIN: On what ground?

MR. BOREN: I don't think there's any basis that the mother's living at any hotel or motel.

MR. MARTIN: Well, again, I don't think that's disputed. And I know you're new to the case --

BY MR. MARTIN:

Q. But assuming, Doctor, Mrs. Kufner is living -- was living with the boys in a motel with the children, do you have any opinion as to whether that environment would be more or less appropriate than being returned to their homes in Germany?

A. Yes. Once, again, I would have to say context. If their house burned down and they moved, that's one thing.

Weintrob

Q. Right.

A. So it has to do with the context and why, but this is another disruption. And no matter how fancy the motel or the hotel, there's no place like home. And particularly when one's home has been changed so frequently.

Q. Doctor, do you have an opinion as to whether or not the returning of these children to Germany would create a grave risk of harm to those children?

MR. BOREN: Objection.

MR. MARTIN: And your grounds, sir?

MR. BOREN: Legal opinion.

MR. MARTIN: Okay. Well, Rule 705 says that an expert can give an opinion on the ultimate issue in federal case.

MR. BOREN: I'm well aware of that. It's beyond the scope and kin of this doctor's ability to give that opinion. My objection stands.

MR. MARTIN: All right.

Weintrob

A. I guess I wonder, because maybe I changed the word "harm"; psychological risk to development. Is there a grave risk to their development, I think I can opine upon that based upon all the information that I have been given. And again, two bases: One, Germany has been a stable home, assuming they have not been exposed to danger. And that has been already evaluated.

So not only do I see no grave risk to return to home, rapid return, let's say, but I do see -- and I am opining on this, I think, with reasonable certainty, based upon what I've been given, that there is some risk in not returning.

Q. Do you see any grave risk of harm for the children to be in the custody of their father in Germany?

MR. BOREN: Again, same objection.

A. Based upon what information has been given to me, reported to me,

Weintrob

documented, the answer is no.

BY MR. MARTIN:

Q. Do you have an opinion as to whether or not these pictures, that have been alleged to be pornographic, are in fact so?

And if you do have an opinion, what's the basis of that opinion?

A. Without being flip, I think it was Justice Potter Steward, who said, I don't know what the definition is, but I know it when I see it. That's not a legal standard. I did observe the pictures. I -- taken within the context of all the pictures, and the overall relationships, I did not see that these pictures were pornographic in the sense that they are designed to illicit sexual arousal or any other arousal.

Q. And what is your opinion as to what would be in the best interests of these children, Dr. Weintrob?

A. Based on everything reported to me, and with the reservation that I have

Weintrob

not seen these children and therefore can't offer, in my opinion, an ultimate opinion about custody, there are multiple indications that these children need the stability, and lack of instability -- stability that would be present with their father in Germany, in contrast to the lack of stability of their current situation, or even of they're being with their mother, assuming that the behaviors that have been reported are accurate.

MR. MARTIN: Thank you, Doctor.
Answer any questions Mr. Boren will have.

THE WITNESS: Can I take a short break and have some water?

(Recess taken.)

EXAMINATION BY
MR. BOREN:

Q. Doctor, can you tell me your age, please.

A. 72.

Q. Doctor, have you ever testified for or prepared a report for Mr. Martin

Weintrob

before?

A. No.

Q. Have you ever prepared a report for Mr. Nissenbaum?

A. No.

Q. When were you first contacted in regards to your report?

A. I believe it was the middle of February.

Q. Middle of February?

A. Yes.

Q. Would that be around the 15th?

A. Could be the 12th, could be the 15th. I'm not sure.

Q. How were you contacted; was it by telephone call, by letter, e-mail, could you tell me, please?

A. Certainly. Mr. Martin's -- I don't know if it's his assistant, Mr. Fugel, F-U-G-E-L called me.

Q. What did Mr. Fugel say?

A. He stated that he had gotten my name from a Dr. Herman, and would I be willing to evaluate a matter in which his

Weintrob

two children had been brought here from Germany?

Q. Did Mr. Fugel send any letter to you requesting what he was seeking, either Mr. Fugel or Mr. Martin?

Did he give you any parameters, in other words?

A. No. I think he -- I don't remember when I talked to Mr. Martin, but he said he would talk to Mr. Martin, and if they were interested, they would send me documents to review.

Q. Did you indicate that you would be interested?

A. I said I would be glad to, yes.

Q. When did you first receive any documents?

A. I think several days later, a letter which stated that documents would be sent to me by e-mail.

Q. Were the documents in fact sent by e-mail?

A. They were.

Q. Did the letter that you received

Weintrob

offer any opinions or editorialized in any fashion?

A. The letters did not, no.

Q. The e-mail?

A. E-mails did not. They were just the documents that I reported.

Q. Were all of the documents you received then by e-mail?

A. I can't recall. It may have been sent, one of them by regular mail. I'm not sure. It's possible that one or two might have been sent by regular mail.

Q. Did you also receive the photographs by e-mail?

A. I received -- I'm sorry, thank you for reminding me.

I received the photographs by e-mail. I stated that it was difficult to -- to read them or look at them or whatever. So I was sent a copy of the photographs that had been originally sent by e-mail.

Q. The -- if your first conversation was February 12th to 15th, how long after

Weintrob

that did you receive the documents by e-mail?

Was it one day, two days, three days? Could you tell me please.

A. I could go look. Probably several days. Maybe, I think, around February 18th.

Q. Did you receive all the documents at the same time other than the clear photographs?

A. No.

Q. Did you receive them in different days?

A. I received one set of about 20 documents on one day, and then one set of other documents, more recent ones, I was sent on a different day. That would be on March. Probably -- well, I think I was sent some on March 14th and then one on March 15th or 16th.

Q. In your -- you provided a report to Mr. Martin, did you not, an initial report?

A. I did.

Weintrob

Q. And that report is entitled "Forensic Psychiatric Opinion"?

A. Yes.

Q. Could you tell me, please, when did you first start to review the documents that you initially received?

A. I can probably tell you because it was on a weekend. And if you want, I can check my calendar.

Q. Yes, please.

A. Okay. Sure. The weekend of February 17th.

Q. February 17th was the -- what day of the week?

A. Saturday.

Q. Saturday?

A. Yes.

Q. And you reviewed documents on Saturday; is that correct?

A. Saturday, Sunday and Monday; the 17th, 18th and 19th.

Q. Do you know how many hours you spent reviewing documents on those days?

A. Probably six, seven, eight hours.

Weintrob

Q. And after those six, seven or eight hours, during that three-day period you produced a forensic psychiatric opinion dated February 21, '07; is that correct?

A. Yes.

Q. Now, Doctor, I presume you've been paid for the preparation of your report?

A. I have been paid for my time in reviewing the documents and preparing a report.

Q. First, could you tell me please, who has paid you?

A. Mr. Kufner.

Q. So this report was in fact prepared for Mr. Kufner?

A. No.

Q. Pardon?

A. No.

Q. Right. Mr. Martin's office contacted you, but Mr. Kufner retained your services, correct?

A. Mr. Martin contacted me, asked me

Weintrob

to review documents and issue a report, which I sent to him.

Q. Right. And Mr. Kufner paid for that report, correct?

A. I don't mean to -- it's all about language. But nobody pays me for a report.

Mr. Kufner paid me for my time.

Q. What has Mr. Kufner paid you to date for your time?

A. He gave me an advantage retainer of $20,000, which I informed him would be billed according to my time. And whatever was -- if it was more than that, I'd bill him. If it was less than that, I would return it.

Q. Before you performed any work, you received a retainer of $20,000; is that correct?

A. That is incorrect.

Q. What did you receive initially?

A. I only received one payment.

Q. And that one payment, was that $20,000?

Weintrob

A. Correct.

Q. Have you returned any of that $20,000?

A. I don't return anything until I finish my work.

Q. Did you receive the $20,000 before you wrote your opinion of February 21st, 2007?

A. Actually, no. I can probably find out when I was paid. But, in fact, I was not paid before.

Q. I note that the report is dated February 21st, 2007, but your No. 20 --

A. Yes.

Q. -- the document that you received is a report dated February 22nd, '07?

A. Yes, that's true. I wondered about that myself. But I simply noted what was stated in that report.

I didn't know where the date came from. I was confused. I don't generally have conversations with people, so I simply wrote down -- I assumed that, obviously, it couldn't have been written

Weintrob

on the 22nd if I got it before then.

Q. Doctor, now this is a psychiatric opinion, not a clinical opinion; is that correct?

A. I'm not sure what distinction -- distinction you're making.

If you're saying a clinical opinion is based on seeing parties, I did not see the parties.

You did not make any observations of Mr. Kufner, correct, physical observations or mental observations?

A. I did not interview Mr. Kufner.

Q. I did not interview Mrs. Kufner, correct?

A. I did not interview Mrs. Kufner.

To save time, I did not interview the children.

Q. So would it be fair to say that your opinion is based upon documents and photographic review?

A. Yes.

Q. Except for one thing that you did testify to today. You said you were told

Weintrob

of a conversation that took place last night; is that correct?

A. Actually, I received an e-mail in reference to a conversation that occurred last night.

Q. Who did you receive the e-mail from?

A. Through Mr. Martin, I believe.

Q. Did you have any conversation with Mr. Martin about the telephone calls that occurred last night?

A. By -- I think he might have asked me if I had gotten the e-mail.

Q. From time to time, since February 1st, 2007, have you had oral conversations with Mr. Martin?

A. Yes.

Q. And has Mr. Martin kept you up to date as to what has been happening in the case?

A. Most of the conversations related to the idea that I was going -- I thought I would be testifying in Rhode Island.

Other than that, I can't recall.

Weintrob

I think he told me that they were -- yeah, in terms of the case, they were -- there was going to be an evaluation, that I wouldn't be needed. And then after he -- I think he might have -- I don't recall exactly what he said. The judge had transferred custody. I don't know whether he told me that after I got that document or before.

Q. Doctor, have you had any conversations at all with Mr. Kufner?

A. None.

Q. Would it be fair to say that the underlining bases for your forensic opinion are in fact documents and photographs?

A. I think I answered that. Yes, it was based on my review of the photographs and documents, and upon my experience as a child psychiatrist.

Q. Right, Doctor. Doctor, would you agree that a forensic opinion could be affected if the documents are not true?

A. Depends on which documents, yes.

Weintrob

Q. Do you agree, Doctor, that the translations are not true of German documents?

A. Again, I can't answer yes or no; it depends upon what is translated or mistranslated, whether they were very substantive issues or not.

Certainly, I would have to say if somebody said -- an allegation of sexual abuse was unfounded, and in fact the German was, We found this man to be a pedophile, yeah, that would certainly be an issue of effectiveness.

Q. Doctor, all of the documents that you did receive, whether they were German documents or documents from the United States, were supplied by Mr. Martin, correct?

A. Yes.

Q. There were no documents supplied by Mrs. Kufner's attorney, correct?

A. No.

Q. Now, I note, Doctor, that in your report you state that -- I think you

reviewed, if I'm not mistaken, 39 photographs. 39 photographs concerning the children that were taken in September of '05.

Would that be correct, Doctor?

A. Those were among the photographs that I reviewed.

Q. I'm just trying to -- I think you testified -- I think in your report you mentioned 39. Yes, on Page 19 of your report, you say these are among 39 pictures which appear to show the boys in a variety of playful poses.

Do you have that in front of you, Doctor?

A. Right. But if you look on Page 3, it says, three sets of photographs in the pornographic content, that was related to only one set of photographs.

Q. Right. And I understand that, Doctor.

A. Okay. Sorry.

Q. One of the documents that you reviewed was a chronology of events with

Weintrob

comments that was prepared by Mr. Kufner, correct?

A. Yes.

Q. Do you know whether Mr. Kufner prepared that document for your benefit?

A. I have no idea whether it was prepared for Mr. Gardner, Mr. Nissenbaum or for me. I don't know.

Q. And you in fact reviewed that document before rendering your opinion of February 29th, did you not?

A. I reviewed all documents, and gave somewhat more attention to some than I did to others, particularly to documents that were reported as neutral.

Q. Doctor, in looking at the -- the documents that was prepared by Mr. Kufner, I note that he says he took 49 photographs, and you received 39 photographs taken in September of '05.

Did you question Mr. Martin or anyone concerning the missing ten photographs?

A. I have to say, I didn't read

Weintrob

Mr. Kufner's chronology carefully enough to see that he was -- it said 49. I don't know. That's an assumption that there was ten missing. I don't know. I was given the ones I was given.

Q. Which chronology of events with comments that was prepared by Mr. Kufner, did you accept as truthfulness?

A. I don't deal with truthfulness or lack thereof. I'm looking at the documents. I certainly am aware that people will present one side; that's why I pay more attention to things that have been submitted, for example, to Dr. Jenny, where I have a statement by both Mrs. Kufner and Mr. Kufner.

So I don't really get into evaluating truthfulness. I pay more attention, as I said, to some documents that appear to be done by an agency that are more neutral, and pay less attention to what some people might consider self-serving documents.

Q. Doctor, did you receive any

chronology events from Ms. Kufner?

A. I did not.

Q. Doctor, do you speak or read German?

A. No.

Q. Do you accept the translations as being accurate?

A. I simply read the translations and reported it on the translations. And as I said earlier, if data was highly contradictory or conclusions didn't support the data, then I might raise some questions.

But I simply read the documents and reported on the documents that I have read. And stated at the very beginning that, in my opinion, they were translations.

Q. Doctor, with respect to the three sets of photographs that you received, one set pertained to the photograph taken by Mr. Kufner in September of 2005, correct?

A. I don't recall the exact date.

Weintrob

They were the photographs of the children naked.

Q. Right. And the second set were approximately 75 photographs of the family on vacation, correct?

A. I'm not sure about the number, but they were the family on vacation.

Q. Okay. And that would have included photographs of Mr. Kufner, Mrs. Kufner and the children?

A. They didn't identify who was who.

They seem to be family photographs. Might have said Mr. Kufner. I know there was a woman in one, I don't know whether that was Mrs. Kufner or not.

Q. Okay. And with respect to those photographs with the family on vacation, you don't recall any photographs where any of the children's private parts were exposed, do you?

When I say "private parts," I presume you know what I'm referring to.

Weintrob

A. As I recall, there were photographs of the children naked, playing in a pool, I think.

Q. I'm asking about in general --

A. I'm trying to answer -- I didn't look specifically to see if the children's penises were showing, if that's what you are asking.

It could have been, they couldn't have been, I saw pictures of naked children.

Q. And with respect to the third set, there were pictures of the father's home, correct?

A. I believe, yes. It was stated they were in the father's home, yes.

Q. You have not seen any pictures of the mother's home in Germany, have you?

A. No.

Q. You haven't received any photographs of the grandparents' home in Rhode Island, have you?

A. No.

Q. Now, with respect to the

Weintrob

chronology that was prepared by Mr. Kufner, I note that he states on Page 2 of 12, that in 2002 to 2005, Tina began to show signs of depression, severe abomination and isolation from friends and family.

Do you recall reading that, Doctor?

A. That she began to show signs of depression, yes.

Q. Doctor, did you have any knowledge that Mr. Kufner was a psychologist, a psychiatrist or served in any mental capacity?

A. I have no information to that effect.

Q. You consider a statement to be self-serving?

A. No, not necessarily at all. I don't think you have to be a psychiatrist or anything. I think the word "depression," -- and I wasn't paying, as I said -- I didn't put particular stress on this chronology of events, but that's

Weintrob

a common word.

But no, I didn't see it as either self-serving or not self-serving or subjective or subject; he made a comment. That was it.

If I had used that comment in my conclusions, then I think I could raise some questions about it. But that didn't -- really as I think -- I can say, that didn't enter into conclusions.

Q. With respect to this 12-page document, again, you understand that that was prepared by the person who paid your retainer, correct?

A. I'm sorry. 12-page what?

Q. 12-page chronology of events.

A. I don't think -- I have to go back and look. I don't recall having the 12-page chronology of events. You may be right. I just don't recall. And my notes indicate -- I just don't know.

I'm sorry, your question was, sir?

Q. That this was given to you by the

Weintrob

person who paid your retainer, correct?

A. No.

Q. Pardon?

A. No. It wasn't given by the person who paid my retainer.

Q. It was written by the person who gave you the retainer.

A. It was, I gather -- and he said this is his chronology of events. He also paid me -- yes, those are two correlations. Yes, I would call those accurate correlations.

Q. This chronology of events prepared by Mr. Kufner gave you a good overview from his perspective, correct?

A. I would characterize it as a good overview of his perspective, no.

Q. Now, I believe you have -- you indicated on direct examination that you have read both the Rhode Island Department of Children Youth and Family's Report, which took place around January 31st of '07, and also the GWG report, correct?

Weintrob

A. Yes.

Q. And I think, if I recall correctly, the question was asked if there's a discrepancy about what the children said, you would normally -- reasonably rely upon what they said in the first occasion, correct?

A. No. I don't think I said that. I said I think that there's an issue of context that has to be considered.

Q. Well, looking at the GWG Report dated February 22nd, 2007, which I guess, first, not just to what occurred on February 22nd, but goes back a long period of time, I note that Joseph stated, described himself as having a positive and emotionally important relationship with each of his parents. Joseph, however, constantly and unambiguously expressed desire to go on living with his mother in Germany, and to regularly visit with his father.

Do you recall reading that, Doctor?

Weintrob

A. If you can -- if that's from my report, it would be helpful to let me know whether that was something said, that I actually said in my report. It sounds familiar. But it's possible -- oh, yes, yes.

Q. And then a couple pages later, the GWG is questioning Matthias, he said he explained all the questions, that he was satisfied with the status quo, i.e., need to live with both parents virtually equally in each of their homes, and to continue to live with both parents and to continue to attend the international school.

Do you recall that, Doctor?

A. Sounds familiar. If it's in my report, it just helps me look at that. But it sounds familiar, yes.

Q. And would it be fair to say that those statements were made by the children while they were still in Germany?

A. Yes.

Weintrob

Q. And, Doctor, with respect to the Rhode Island Department of Children Youth and Family's investigative findings, it appears that on January 31st, an investigator named Paul Ventura met with the mother and met with the children. And he states that Matthias appears bounded to his mom, and showed no fear of her. He stated he was fine, but he would not speak with the investigator. And then the investigator met with Joseph, and he's explaining about living in Germany, sharing the time with each, and that he stated that he liked Rhode Island, that it was more fun, and that he no longer liked being in Germany.

I read that document because I thought he -- again, going back to the issue of context, could you explain that a little further, Doctor, in light of what I just read to you from the two different reports?

A. That at one point he said that he wanted to stay in Germany, and at another

point he said it was fun in Rhode Island.

Is that what you want me to comment on?

Q. Yes.

A. When he was in Rhode Island, right, he could say he would like to be in Rhode Island. What, he's eight years old, nine years old. Prior -- I'm sorry.

I'm not sure what you're asking me about that.

Q. Do you have an opinion, Doctor, whether the statements made to GWG at some earlier time, are the statements made to the investigator in Rhode Island at a later time more reasonably to be relied upon by you as a psychiatrist?

A. To be relied upon, the context has to include that in Germany that's where they were, they were stable and settled. And the context was, after having been brought to the United States and subjected to an evaluation that -- I think that is in context and would have

Weintrob

to -- greater question would have to be raised in view of the context that, Gee, somehow your father's a dangerous man.

Yes, I would think that would somehow be different.

Q. On page 18 of your report, you talk about the need of stability that the two had while in Germany, and talk about the relationship in their school and their friends and the relationship with their father, correct?

A. Yes.

Q. When you wrote the report initially, were you aware that the children had already been enrolled in a private school in Rhode Island, and had been there for a number of weeks?

A. I believe I was told that they had been enrolled in school, yes.

Q. Okay. Are you aware --

A. A number of weeks, I don't know exactly when they had been enrolled in school, no.

Q. Do you know, as you sit here

today, that the children had been in this particular private school for approximately six weeks?

A. I don't know. I trust that if you say they were enrolled in school, they have been. I have no idea. I would accept that, sure.

Q. Now, as you sit here today, are you aware if the children have made any friends?

A. Believe I was informed that they were in school, and that they were adapting.

Q. Are you aware, Doctor, that in Germany the children attended an English speaking school?

A. I believe I was informed that, yes.

Q. Do you know whether the children speak German, to any extent?

A. I don't know. I think I was told they speak German.

Q. Do you know whether it's limited German or whether it's fluent German?

Weintrob

A. I don't know.

Q. On Page 21 you talk about the risk of being with the mother.

And your report of that time, was that basically talking about the alienation of the father?

A. Where do I say this, Page 21?

Q. Yes.

A. That was in terms I stated to be alienating them. That's kind of a -- very -- summary. I didn't, at that point, get into the allegations that had been raised, whether they had been founded or unfounded.

So at that point, I was being very parsimonious to simply misstate alienating. But the statement she made certainly would lead to some estrangement of the children from their father.

Q. And again, you never spoken to Mrs. Kufner; is that correct?

A. That's correct.

Q. And you never saw her interact with her children?

Weintrob

A. That's correct.

Q. And in this report of February 21st, would it be fair to say that you voice no opinion whether Mrs. Kufner is a fit and proper parent to have custody?

A. I did not and would not offer that opinion.

Not that she is or isn't, but that I wouldn't offer an opinion about custody based only on reading documents. I believe I made that clear to Mr. Martin at the beginning.

Q. Okay. So in other words, for you to voice an opinion on custody, I presume you would want to meet with the parents and meet with the children?

A. Barring unusual circumstances, I would be reluctant to. But in view of the past of what I've been told, and reported in the past couple of weeks, I would not be adverse to offering an opinion of risks and benefits of various arrangements. But not an ultimate opinion about custody.

Weintrob

Q. Doctor, have you been to Germany?
A. Yes, I have.
Q. When was the last time you were in Germany?
A. Oh, I don't know, six, eight, ten years ago. I went to the Berlin Film Festival.
Q. Oh, that was not for anything professional?
A. No.
Q. Have you ever been to Germany on a professional basis?
A. No.
Q. You made a comment, Doctor, during direct examination; I just wanted to explore that for a moment. And I may be quoting you wrong, but I think you said, Germany is not perfect. I know what is going on in Germany on evaluations.
Could you tell me, Doctor, whether I quoted you correctly?
And if so --
A. Yes.

Weintrob

Q. Okay. Could you tell me what you meant by that comment, Doctor?

A. Sure. I probably over-spoke.

These children have been exposed to their parents' conflict in Germany, in the United States. That's basically what I was going to say.

Q. Sir, you haven't finished?

A. Yes, I'm finished.

Q. What did you say, Doctor?

A. I said that in reference to, Germany's not perfect, I should simply have said, and what I meant is that the children have been exposed to some of their parental dispute in Germany also.

Q. So you weren't referring to the country of Germany. You were referring about the dispute between the parents?

A. Oh, yes. Oh, yes, yes. Oh, I'm sorry. I have no reason to say things -- right, nothing about the country.

Q. Doctor, to your knowledge, was Mrs. Kufner the primary caregiver of the children during the day while the father

Weintrob

was at work?

A. I was informed that there were some changes in time that the children spent with their parents. And I think there was supposed to be some changes of more time. But in earlier, yes, I don't know this for a fact, but I wouldn't be surprised if the children were with their mother during the day, at the time the father was at work.

Q. Doctor, are you aware that Mr. Kufner's divorce attorney in Germany has filed criminal charges against Mrs. Kufner?

MR. MARTIN: Objection.

BY MR. BOREN:

Q. Are you aware of that, Doctor?

A. I don't know that I have been told that.

Q. Are you aware, Doctor, that criminal charges had been filed against Mrs. Kufner in Germany?

MR. MARTIN: Same objection.

A. No. The only thing that I read

in one of the documents, now that you remind me, is that something to the effect that when she obtained the children's passports from the U.S. consul, she was informed that that would result in criminal proceedings.

That's all I remember about that.

BY MR. BOREN:

Q. Would you agree, Doctor, that the children may well be traumatized if the father takes the children back to Germany, and the children cannot see the mother again for some period of time because of criminal charges?

A. You're asking me to speculate, and I don't think I can speculate on that.

Q. Well, if that's what you call speculation, but your other testimony is not speculation, I presume?

MR. MARTIN: Objection. Argumentative. Don't hector the witness.

BY MR. BOREN:

Weintrob

Q. Doctor, I presume you're most familiar with the State of New York in terms of allegation of child pornography, would that be fair?

A. That I'm only familiar -- I'm sorry.

Q. If allegations of child pornography are present, I'm presuming that your most knowledge is with respect to the State of New York; would that be a fair statement?

A. I don't know that that's accurate. That it's based on New York.

Q. Okay. Let me ask you this, Doctor: Based on your experience that there are allegations of child pornography or psychological trauma to children, are there reasonable protocols used in the evaluation of children?

A. I'm sorry. I think that was like a compound question. Are there protocols for evaluation of child pornography in New York; is that the question?

Q. No. Evaluations of psychological

Weintrob

trauma to children. Like the protocols you would go through?

A. I'm sorry. The question is too broad about psychological trauma to children. I think protocols throughout child psychiatry, there would be certain protocols to evaluate in trauma in children, yes.

Q. Okay. And would the protocols include a trauma evaluation to assess the presence and extent of the trauma reaction?

A. That's -- I'm sorry, that's too vague. Excuse me. A lot of people are saying, well, this is a trauma evaluation. I tend to look at it as an evaluation of a child, perhaps one who has been traumatized. I don't know that there's specific protocols for trauma evaluations. Some people may have them, but child psychiatrists tend to have protocols for evaluating children.

Q. Doctor, I believe you said you learned about telephone calls last night,

Weintrob

correct?

A. I learned today about telephone calls last night, yes.

Q. Okay. Do you know whether the telephone calls pertained to other issues other than what you testified to on direct?

A. You know, I have no idea. I think I said that it was hard for me to -- to -- I think there were 5 -- 4 minutes and 41 seconds of calls. And I simply heard some issues, some I couldn't understand. They may have certainly been other issues, yes.

Q. So you have no knowledge whether any of the telephone calls pertained to changing a doctor's appointment today from 1:30 to 11 a.m., correct?

A. I don't know -- recall anything about changing a doctor's appointment, no.

Q. One minute, Doctor.

I think you said that you would like to see the children return to

Germany as soon as reasonably possible. I think you used the words "approximately a week," correct?

A. I said I can't give any specific number of days. It seemed to me that returning them to what -- there are indications of a somewhat more stable atmosphere.

If they are going to do it, yes, do it sooner rather than later.

Q. And you're giving that opinion without speaking to the children and learning what they would like at this point in time?

A. That is correct. I'd like to explain that just a little bit; that these children have been subjected to numerous evaluations. I independently concur with Dr. Jenny, who stated that further evaluations -- I don't recall her language; I recall mine, which were, if they are not harmless -- or asking these children more -- particularly children this age, I think, is not likely to be

Weintrob

particularly informative and certainly not helpful to them to ask them again to pick sides. I think that was either in Dr. Jenny's or the GWG's report about not asking the children to pick sides.

Q. Doctor, just one or two last questions.

A question was asked -- you were asked to assume that Mrs. Kufner was living in a hotel or had been living in a hotel with the children, motel.

A. Yes.

Q. Did you get that -- did you learn of that through Mr. Martin or anyone else, or is that just answering based on his hypothetical?

A. I believe Mr. Martin said to me that he thought that she had moved to a hotel.

Q. And you were told that before your testimony today; is that correct?

A. Yes.

Q. With respect to the photograph -- a question was asked about photographs

Weintrob

being shown at the school.

Do you recall that testimony?

A. Yes.

Q. Do you know, first of all, the circumstances of the showing of the photographs?

A. No.

Q. Do you know -- no, wait. I'm sorry, I'm sorry, I'm sorry.

I was informed by Mr. Martin that the children were to be picked up by Mr. Kufner at 1:30. And that later that day, Mrs. Kufner appeared at the school and showed them photographs?

Q. Do you know who the photographs were shown to?

A. I believe he told me it was the assistant principal.

Q. Do you know how many photographs were shown?

A. No.

Q. Pardon?

A. No.

Q. Do you know whether any

Weintrob

photographs were left with the assistant principal?

A. No idea.

MR. BOREN: Thank you. I have no further questions.

EXAMINATION BY

MR. MARTIN:

Q. I just have one on re-direct, and it'll be short.

Dr. Weintrob, Mr. Boren asked you about the opinion of Joseph Kufner, that he gave to the DCYF. And I believe he gave that opinion on January 31st. And I believe that in that report, the DCYF said that Joseph had arrived in America on the 26th of January; so that was basically his fifth day in Rhode Island.

Do you think the fact that he had only been there for a fifth day, would have had an impact on his opinion?

A. Not only might that have an impact on his opinion, but we do know that who brings a child to an evaluation, or where the child is living, does have

Weintrob

an impact on the child.

Q. Okay. And do you know whether or not both parents were there at that time, or just one?

A. I don't know for sure. I think it was only -- as you said, I think it was only one. I don't know. I don't have the records.

Q. Didn't the DCYF report say that Mrs. Kufner brought the children?

A. I'm sorry, yes.

Q. Okay. And do you know whether or not the children on the 31st of January had ever been enrolled in school yet?

A. No idea. I don't know that they-- I don't know.

Q. So, if they had five days off of school, would that influence a seven-year-old boy as to where he would like to live, by chance?

A. Certainly that can. I guess within the context of what was said -- excuse me, what was said, it's like -- yeah, it's fun, sure it's fun here. It's

Weintrob

like my father didn't keep his promises. Those kinds of comments can be made when a child -- particularly, when a child is with only one parent.

MR. MARTIN: Okay. That's all I have.

MR. BOREN: Thank you, Doctor.

And with respect to Michelle, I'd like a mini, please.

(Time noted: 5:37 p.m.)

______________________

ALEX WEINTROB, M.D.

Subscribed and sworn to before me

This ____ day of __________ 2007.

______________________________________

C E R T I F I C A T E

STATE OF NEW YORK )
:ss
COUNTY OF NEW YORK )

I, MICHELLE COX, a Notary Public within and for the State of New York, do hereby certify:

That ALEX WEINTROB, M.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of March 2007.

__________________

MICHELLE COX

--------------- I N D E X ---------------


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| ALEX WEINTROB | MR. MARTIN | 5, 108 |
| | MR. BOREN | 68 |


---------- INFORMATION REQUESTS ---------

DIRECTIONS:

RULINGS:

TO BE FURNISHED:

REQUESTS:

MOTIONS:

----------------- EXHIBITS --------------


| PETITIONER'S EXHIBIT | FOR ID. |
|---|---|
| Petitioner's Exhibit 1, Curriculum Vitae | 14 |
| Petitioner's Exhibit 2, Document Entitled "Forensic Psychiatric Opinion" | 14 |

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: Kufner vs. Kufner

Dep. Date: March 19, 2007

Deponent: Alex Weintrob

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |
| __ | __ | ____________ | _____________ | ________ |

_________________________
ALEX WEINTROB

Subscribed and sworn before me

This___day of ______________, 2007.

______________________________________

(Notary Public) MY COMMISSION EXPIRES:3/7/2009