MR. MARTIN:

Q. Dr. Weintrob, please state your name and tell us what you do for a living, please, sir?

A. I am Alex, A-L-E-X, Weintrob, W-E-I-N-T-R-O-B, M.D. I am a child and adolescent psychiatrist. I have practiced child adolescent and forensic psychiatry. I've been in practice for very close to 40 years now.

Q. All right. And could you give us your educational background quickly, sir.

A. I attended college at Harvard, and then medical school at the University of Pennsylvania. I then took internship and residence -- interrupted by two years in the Army. I took a residency in general psychiatry and a fellowship in





child and adolescent psychiatry.

Q. Can you give us some of your experience as a child psychiatrist?

A. I have, as I've said, practiced as a child psychiatrist for close to 40 years now. I am board certified in child and adolescent psychiatry and general psychiatry, and in forensic psychiatry. I have for the first 20 years in addition to private practice, I was a clinical director of a residential treatment center, and I'm currently attending at Lenox Hill Hospital, New York Hospital, Cornell and New York University Hospital.

Q. And you did say you are board-certified in both general psychiatry, child psychiatry and adolescent psychiatry and forensic psychiatry?

A. What are called added qualifications in forensic psychiatry. I am also in the faculty of Cornell Medical School and New York University Medical School. I'm an associate professor in

Weintrob

both of those.

Q. And do you have any professional memberships, Dr. Weintrob?

A. I am a fellow of the American Academy of Child and Adolescent Psychiatry, and life fellow of the American Psychiatric Association. A member of the American Academy of Psychiatry and The Law, and some other national and international psychiatric organizations.

Q. All right.

A. In addition I was a member of the group called the National Interdisciplinary Colloquium on Custody Law for many years.

Q. Is that custody law for children?

A. Custody law regarding children, yes.

Q. And have you had any

publications?

A. My publications have been in a variety of fields, most recently involved with a book regarding family law and



Weintrob

mental health, that was a textbook to be used by judges.

Q. And have you had professional presentations, workshops, symposia and lectures that you have conducted?

A. I have numerous lectures, symposia at a -- in a number of settings; the annual meetings of the organizations I've mentioned, plus lectures at local pediatric and child psychiatric organizations and hospitals.

Q. I would like to move at this time that Dr. Weintrob be declared an expert in the fields of child psychiatry and child forensic psychiatry.

MR. MARTIN: And I don't know if, Mr. Boren, you want to do any voir

dire right now?

MR. BOREN: No.

BY MR. MARTIN:

Q. All right. Dr. Weintrob, I would like to ask you if you have formed any opinions with respect to the issues in the case of Kufner v. Kufner that is





pending in the district court of Rhode Island?

A. I have.

Q. Can you tell me your opinion first, and the bases for your opinion, please sir.

A. Yes. My opinion is that these children appear to have been exposed to considerable distress and are likely to have experienced and continue to experience distress as a result of their current, as well as past -- particularly recent past situations.

Number two, based on that, I believe that these children's optimal development will be best served by achieving some level of stability in their environments; that is, home environment as well as school environment.

Number three, my opinion is that continuing in the current environment runs risk of further compensation or further hindrance to their development.



And that it would certainly appear that a return to a previous environment: school again, home, country and culture would likely be in their best interests.

What is my opinion based upon: I have reviewed numerous documents, which have reported extensively on the behaviors of these children, as well as the behaviors of both of their parents.

If I can digressive just briefly, child

psychiatrists view children in an overall developmental fashion; meaning, we look at children and their behavior from a biopsychosocial viewpoint; I will expand upon that, as well as a developmental level.

The developmental level involves developmental tasks at particular ages; developmental tasks for children of the ages in question involve learning, number one. A good part of their time is spent in school. The expectations are that they have some ongoing cognitive development. A second task, which is





partly related to schooling is socialization, that the task of children at this age is to develop relationships with peers, and to feel comfortable.

Developmental task number three is the ongoing development of a close

and supportive relationship with each of their parents, ideally -- particularly in the case of parents who are divorced or divorcing in an environment that involves each parent's ability to support the children's relationship with the other parent.

The biopsychosocial framework, which I will be more specific about. When we look at children biologically, we look at obviously their age. We look at their genetic constitution. We look at their level of sexual development. We look at their cognitive ability, which is also a biological issue.

In the case of these children, they -- their sexual identity issues, which are partly psychological, partly





social, I believe there is reason to have concern about their development of their biological sexual identity in view of

what they have been exposed to in terms of the allegations made against their father.

I believe that biologically their cognitive development has been jeopardized, to put it mildly. These children apparently has been told -- or at least the actions of their mother has, in my opinion, caused very likely a significant sense of confusion. Why do I say that --

BY MR. MARTIN:

Q. Now, Doctor, you say the actions of the mother have negatively impacted the children.

What specific information do you have about the actions of the mother that





you think has negatively impacted the

children and why?

14

psychiatric opinion of February 21, 2007 as No. 2.

Any objection to that, Mr. Boren?

MR. BOREN: Yes. The best answers are the doctor's testimony.

MR. MARTIN: Okay. We will mark that.

(Petitioner's Exhibit 2, Document Entitled "Forensic Psychiatric Opinion," marked for identification

15

Weintrob

as of this date.)

BY MR. MARTIN:

Q. And, Doctor, you have listed I think on Page 3 of that report 20 items that you reviewed.

Tell us whether or not you have reviewed those items, and have you

received any additional items that you reviewed in forming your opinion since you wrote your opinion.

A. I did receive additional documents. I received a report from Dr. Jenny. I received a notice of the -- what's called the GWG web site. I had previously reported -- I reviewed the GWG report. I've received Mr. Kufner and Mrs. Kufner's statement to Dr. Jenny. I've received a temporary custody order, I think of February 16th, the judge's order --

Q. From Germany?

A. I'm sorry. The temporary custody order from Germany, as well as -- I'm sorry, that was February 16th. As well





as the March 15th temporary order of custody of the Rhode Island District Court.

Q. Okay. And are the items listed

from 1 through 20 on Page 3 of your forensic psychiatric opinion documents that you reviewed?

A. I did.

Q. And did you also review the DCYF complete report, which was Exhibit 10 in the trial?

A. I did.

Q. Okay. And did you also review a report by Ms. Strawn, S-T-R-A-W-N?

A. I apologize. Yes, I did review that report.

Q. Okay. All right. And based on what you reviewed, Doctor, let's go back to your first opinion, which was I believe, that the children appear to have been exposed to distress and continue to experience distress.

Tell us what in those documents have led you to that conclusion.



Weintrob

A. Those documents have revealed to me a history until approximately a year ago, of the children having ongoing contact with their father while their residence was with their mother.

Then approximately one year ago these children were involved, as a result of their parents, in a court ordered evaluation. There was an allegation on the mother's part that the father had taken photographs of the children, some of which as she considered to be pornographic.

There were indications that she was clearly suggesting, if not overstating, he was a danger to the children. There was, from my point of view, an extensive evaluation by what is referred to as GWG, which essentially found that the children -- the children's father appeared to be supportive, from what I understand. Mrs. Kufner declined participation in the GWG evaluation. The

children were seeing -- the children had



Weintrob

expressed to the neutral evaluator that they wanted to remain in their current school, that they did not want to come to the United States, that they knew their mother wanted them to come to the United States. One of them said essentially, if she moves, I really want to stay here and be here with my father.

The report indicated that the photographs that the mother claimed were suggestive of some kind of grossly inappropriate behavior on the father's part were not considered to be such, that was -- it appeared to me an evaluation that was more than accurate, and went according to the methodology that is generally used in this country for evaluations.

The distress then was the -- well, excuse me. There was reported

concern that the mother would, in any case, take the children out of the country. According to the documents, she was asked to turn her passports over



Weintrob

around the Christmas vacation to the U.S. consulate.

Q. Her passports or the children's passports?

A. I'm sorry. I apologize, the children's passports.

In late January, without informing the father of -- the children's father of her intention, without apparently giving the father any input into what and why, she abruptly, it would appear, removed the children from the environment they had been raised in and brought them to this country; at which point, in terms of distress to the children, she made a claim of physical

and likely sexual abuse, requested a temporary restraining order, such that the children who had had a seemingly -- according to reports, settled relationship with their father, were now presented with their time with their father having been supervised.

She as a result, the





Department or Youth and Family, or Family and Youth were involved, so the children were subject to another evaluation.

Q. Doctor, if I could stop you for one second.

A. Sorry.

Q. You told us that the children had a life in Germany and they were abruptly removed from that life.

How would that affect them negatively, to be, let's say, in school on a Monday and taken out on a Tuesday and never to return and sent to another?

Teach us why -- what is it about little children at this age to be a distressful situation?

A. These children in particular -- children in general, appear to do best and to function best psychologically, scholastically, socially with a maximum level of continuity and stability in their environment. Obviously, that is not always possible, but to the degree it is possible, children like -- of this age



in particular, like continuity in their life; something they can depend upon, that isn't going to be suddenly pulled out from under them. That's children of this age in general. Children of divorce, in particular -- children kind of have an idea that they have two parents. And that their two parents are going to put the children's interest

above their own, and get along. That's their kind of idea. That's true despite whatever divorce rate we have, that children have the idea that they will have two parents. That is thrown into that idea, and safety and security is thrown into question when their parents divorce. When the parents divorce and are able to support each other, that minimizes the dangers to the children's development. When the parents argue and fight over custody, that increases the likelihood of disruptions to the children.

When allegations are made





particularly, and particularly allegations that are not supported, that seriously affects -- as a potential of seriously affecting a child's relationship, not just with the accused parent, but also with the accusing

parent. And children at this age are left in a state of not knowing which end is up; whom do I believe. This is likely to cause significant disruption, and I would use the word "confusion." In a child's mind of this age in particular, it goes like this, you know, I have this guy, he is my father, and he seems to be okay with me. And I like being with him. And all of a sudden, I'm told essentially, if not verbally, but by behavior and numerous evaluations, Hey, you know, this may be a guy that you got to be afraid of. And this clearly shakes any child's confidence in his previous ability and security in thinking he can assess his reality.



with the father, but it has to be supervised by someone?

Weintrob

A. Number one, what the hell is going on. Number two, do I have some reason to question my own reality, which is that this is somebody that I love and was safe to be with; no matter how anybody says or why or reasons given for supervision, it is an unnatural situation for children, particularly of this age who have developed already a relationship with a parent whom they consider to be safe and supportive.

Q. What would be the effects of secretly removing the children from their life-long home and hiding the residence and location of the children from the father?

What would be the impact on the children of such behavior?

MR. BOREN: Children in general, or these children in particular?

MR. MARTIN: Children in general.

A. Children of this age have

antennae. They pick up what's going on.
They are now exposed to rather complete



Weintrob

disruption of their ongoing environment, in which they appeared to have, by report -- or children in general, if they are doing well, hey, things are going okay, all of a sudden, not only are they taken away from that, but it's done with some secretiveness. It's done -- you know, this is an emergency. Clearly, we have to get away from this man. Messages to children -- and when I say "antennae," they are not stupid, excuse me. And you know, we're not telling anybody. What does that mean? And they sometimes can make sense of it, but often they make no sense; leaving them rather discombobulated and bewildered about what's going on.

BY MR. MARTIN:

Q. Specifically, from the records,

were you aware that these children were removed from Germany without the father being told where they were going or where they would be?

A. Yes.





Q. Do you know how many days it was that the father had no contact with the children?

A. I believe it was for at least six days. I don't know exactly.

Q. And if the children were supposed to, let's say, see their father for a visitation from Thursday, January 24th to Tuesday, January 28th, and they did not see their father for that period of time, but were instead taken to America, what impact would that have on the children with respect to their relationship with their father?

BY MR. BOREN:

Q. Okay. Is it pure speculation on



Weintrob

your part, Doctor, to give an opinion?

And if not, why not?

A. I'm certainly aware of what Mr. Boren says. At the same time, I consider it far from speculation when I have read numerous documents, and particularly documents of neutral court appointed people; so that my opinion can be based on a review of the reports and upon the effects upon children of reported actions, and particularly actions and comments that are reported by neutral experts. Therefore, I feel this is not speculation, but a reasonable basis for forming an opinion.

Q. And, Doctor, as a board-certified forensic child psychiatrist, do you base

your opinion on records in other instances?

Is that an appropriate way to issue opinions, in your experience?

A. If one is offering an opinion about what one reads, it appears to me that that is not uncommon, in general.





In forensic psychiatry in general, people are asked to, for example, in medical malpractice they are asked to review records. They do review records. They attempt to review records with objectivity and then to report on their review of the records.

Q. Based on your records that you reviewed, and your experience as a forensic psychiatrist, do you have an opinion as to whether or not a mother who removes the children from school after a Monday, and takes them to another country without informing the father, and the

children miss their visitation with the father that they expected on Thursday to the next Tuesday, what impact, if any, would that have on the child?



BY MR. MARTIN:

Q. Subject to his objection, you may answer.

A. I'm sorry. Could you repeat -- the impact -- the impact of missing and suddenly being removed, leaves children -- speaking of speculations -- only to speculate what is this about. I don't know. Nobody's talked about it. I certainly haven't asked the children, but what do they speculate?

But they certainly have been presented with an unnatural situation. And in this case, then -- seriously, in my opinion, aggravated by the following -- not the following, the then consequent and subsequent experiences.

Q. Okay. And what would the effect of the children's stability be if they were removed in this manner that we have just spoken of, and then actually placed in a whole different school?



MR. BOREN: Objection. Again, in a forensic report, it's pure speculation with respect to these children in particular.

MR. MARTIN: Under Rule 703, you can base your opinion on facts that are in the case. And as we all know, and I think it's undisputed, that these children were removed from their school in Germany, where they had been their whole lives, and placed in Cumberland, Rhode Island.

BY MR. MARTIN:

Q. So my question to you, Doctor, is: What impact would that have on the

children with respect to their stability?

A. There are two aspects to this: One is change, which I have commented upon.

Children -- particularly children of divorce where there are changes back and forth, generally, don't like change. And it has the potential of interfering



Weintrob

with their learning. But more importantly, in fact, in terms of impact is the context of the change.

So, obviously, children change schools frequently, that has some impact; has more impact probably on children of divorce. But when the change is unexplained, and in fact succeeded by evaluations related to father's behavior towards them, that's even more of an impact, and has even more of a possibility of interfering with their

development.

Children, you know, they have friends. They like to keep their friends. They have a school. This is a new school, new friends. Sure, they may adapt and adjust. It doesn't mean it is a good thing. It's as potentially -- interfering with their development.

32

BY MR. MARTIN:

Q. Dr. Weintrob, are you aware of whether or not the children were examined with respect to the allegations of sexual abuse and the photographs when they first came to Rhode Island?

A. My understanding is that there was a report, and as a result, the Department of Family and Youth performed an evaluation.

Q. Do you know if they discussed the photographs with the children?

A. I believe -- right. This was the

second time I think the children had been asked about the photographs.

First time, as I recall, they said, Well, we are fooling around and having a good time. And the second time I think one of the children, at that





point said, Well, yeah, it was fun, but it stopped being fun. That was reported to the evaluator.

Q. In Rhode Island?

A. In Rhode Island, as far as I know.

Q. If the children are suddenly removed from their life-long home in Germany, and from their school and their friends and their relatives, and their first experience is to be evaluated by some public official, and have these photographs discussed, would that have any impact on the children?

BY MR. MARTIN:

Q. Based on your education, training, and experience as a forensic psychiatrist, especially dealing with children, what would the impact of being confronted with these pictures and the



allegations of sexual abuse, and naked pictures with strangers in Rhode Island have upon these children, if you have an opinion?

A. I have an opinion.

This was the second time. The first time they were with their father, and their mother and they answered questions. The second time, the context was, in my opinion, quite different. They had been removed and -- here we go again. You know, these photographs -- and now I'm being asked again about them. I can give an opinion about what

happens to children who are asked repetitively about such photographs.

But again, it makes children anxious. These are not fun times to be asked, What about your father? And look at these pictures. And what did they mean? What did he do? And what do they show?

I'm sorry to make it sound silly like this. It's not fun times. But





these are things -- or not things, but experiences which lead, again, I can say to children questioning their prior experience, and now to increase their level of distrust. Children cognitively at this level, begin to think, Well, gee, you know, I thought I knew what was happening. And somebody saying, you know, what do you think of these pictures, eventually it's been shown, the children will alter their views, and say,

oh, yeah, yeah, this is what he did, because they ask so many times. And they think, Well, I answered the first time, that doesn't seem to satisfy anybody.

So the impact is discombobulating to their sense of security, their sense of -- their cognitive ability as to what's real and what's not, and certainly their relationship with at least one parent.

36

BY MR. MARTIN:

Q. Dr. Weintrob, how would the removal of the children in this sudden manner affect their socialization in your opinion?

A. Again, it's the issue of continuity and change and disruption. I can certainly make an argument that it's good for children to begin to make new friends. That could easily be said.

But again, we are dealing with

context. And the context in this situation is, they have been removed from stable social -- allegedly stable social situation, and placed in a new situation. And the second part of the context is, why are we in this new situation, and how does that affect social issues. And I can say one minimizes the disruption to children in that situation if their new school is not involved in the dispute. And if the



Weintrob

children are allowed a neutral setting in a school in which they can make friends and learn. If that doesn't happen, that's a further contextual difficulty.

Q. Dr. Weintrob, are you aware of whether or not the new school in Cumberland, Rhode Island has been compromised with respect to being a "safe haven" for the children?

MR. MARTIN: All right.

BY MR. MARTIN:

Q. Do you have any information, Dr. Weintrob, that the environment with the school has been compromised in





Cumberland, Rhode Island?

And if so, what is that information that you have?

A. I was informed that Mrs. Kufner took the nude photographs of the children to the school. I am not speculating. I am only saying, if that is true, I believe that it borders on an understatement to suggest that she has seriously compromised their welfare at school, and exposed them to the distinct likelihood that when and if -- when others learn this information, and in my experience of 40 years, with schools and parents taking their difficulties to

schools, I don't know that I've heard of any situation in which somehow this didn't get into the community. That is -- makes it unlikely that children having made a change already and having stabilized that change can continue that change.

And even on the unlikely situation that nobody finds out, it



Weintrob

states and suggests something very important; that is, schools in these situations as I said, need to remain neutral. Parents need to refrain from involving the school in any way.

To do so, clearly, suggests that a parent puts his or her own needs, own wishes -- own wishes -- I'm sorry, above the child's.

Nobody can say that a parent interfering in any way or affecting the school with this kind of information is

acting in the child's interest.

Q. Dr. Weintrob, what would the sudden removal of the children from their home, school and life-long environment have on their development of their relationship with their father?

A. New people are the attorneys. But to repeat, if somebody whom I've trusted, in this case my mother, now says you can't be with your father, we have to take you away. You have to have your time with him supervised. Goes to



school -- if, assuming again, that that is what happened, exposes the children to another evaluation or evaluations, the message is clear. I don't think you have to write it. It's written on the wall. You don't have to put it in writing or interview children or anything to say that the message is that your father is

not a person with whom you can feel safe. And what does that do on the impact on a child's relationship with his father? Well, we so far think that children like to have a positive relationship with a parent. It affects their development ongoing.

Q. Are you aware of any facts that would lead you to believe that either one of these parents is not supportive of the relationship of the other parent with the children?

A. I had been in the -- I have reviewed the reports, which have stated repeatedly that the father is supportive of the children's relationship with their





mother.

On the other hand, the mother by her behavior clearly is not only supportive of their -- children's relationship with their father, but I

can't think of an appropriate word, the extreme opposite -- alienate might be used.

But without that, essentially said your father is a bad man.

Q. And what do you base that opinion on?

What specific facts have you reviewed that you base that opinion on?

A. The facts that are reported in the GWG report; the latest fact that the mother brought the children here and then alleged abuse. That is a fact as far as I know, a police document or whatever it was, temporary restraining order can be accepted as fact that that was an allegation. Dr. Jenny reported that -- things that had been said to be harmful, abusive, whatever, pornographic, not so.





That behavior speaks for itself.

MR. BOREN: I'm going to move to strike any opinion of the doctor that is based upon Dr. Jenny's report, because now we have two forensic reports. And one is basing one opinion upon another opinion, where neither doctor has either met the children or made any type of examination.

So to the extent that the doctor relies upon anything of Dr. Jenny's, I move to strike.

BY MR. MARTIN:

Q. Dr. Weintrob, are you aware of any behavior on Sunday night by Mrs. Kufner that would show that it would tend to disrupt the relationship of the father with the children?

A. I have been informed that once the children went to the father, she made repeated telephone calls. I don't know what exactly the nature of them were, some were critical of the father.

Weintrob

The concern is not just the telephone calls. The concern is the persistence of Mrs. Kufner's attempts to interfere with the children's positive relationship with their father.

Q. Are you aware of an attempt that Mrs. Kufner made after the Germany courts found no basis for their claims, where she removed the children to America?

A. Yes.

Q. And are you aware that in America, she opened an investigation by the DCYF of Rhode Island?

A. Yes.

Q. And are you aware that the federal court stated any action by the family court of Rhode Island?

A. Yes, I have been informed of that.

Q. And you are aware that despite that, Mrs. Kufner again went to the

family court to try to get restraining orders?

A. I believe I was informed of that,



yes.

Q. Are you aware that she, despite being ordered to do any further evaluations of the children, brought them to the Hasborough Hospital for a sexual abuse evaluation?

A. Yes.

Q. What impact, if any, would those actions have upon these children?

MR. BOREN: Objection. Pure speculation.

BY MR. MARTIN:

Q. You may answer.

A. Assuming what I've read and what you've said are true, I don't see that it is a speculation; that if I have reports of ongoing persistent determination to

open and subject these children to repeated evaluations based upon her belief. That belief having been challenged by neutral party. And in terms of challenge, I read that report carefully. It didn't just say, this is so and so. So I can evaluate reports.





The persistence is very, very troubling because not infrequently, when a parent has either a firm belief or for whatever reasons, is determined to take one action after another, that's very troubling for children because there is no sign of where it would end. And further, as I said, if you keep telling a child, this is what's happening, this is it, this is it, at some point you may affect a child's thinking and a child's mind, and a child begins to believe what a parent is telling him.

Q. Dr. Weintrob, you said that your

second opinion was that the optimal development of these two children would be best served by having them in an environment that was stable, both at home, at school and with family.

What is your opinion as to where that should be for these children, and what is the bases of your opinion?

A. The opinion is that the children should return to Germany quickly.



Weintrob

The basis -- the bases for that opinion are at least two-fold; number one, that was a settled environment for them, despite the ongoing disputes between the parents, that was reported was a settled environment. One, which I believe it was Joseph said, by report, I want to continue.

Number two, is that the environment currently appears to be

increasingly toxic as a result of persistence on their mother's part to demonstrate to them that their father is essentially a bad person. That persistence now affecting, not only their psychological well-being, but their social well-being, their biological cognitive well-being in terms of learning. Those are the bases.

Q. Okay. And how soon do you think these children should be returned to their safe environment, in your opinion?

What would be optimal for their health?

47

Weintrob

A. Had there not been the presence

if their mother is not going to return with them, I have no idea about that -- some opportunity to part, to separate.

But certainly sooner rather than later.
And in particular if later is going to
involve, in my opinion, further
evaluations.
I do not think evaluations, even
neutral evaluations, even another
psychiatrist coming in to interview the
children, that's not harmless, definitely





not harmless to children.
So that would lead me to say a
quicker rather than a slower.
Q. Okay. And assuming that these
children have lived in Germany their
whole lives and have spent between four
and six years of their schooling in one
school, the Munich International School,
and have now been away from that
environment for six weeks, what is your
opinion as to when they should be
returned to the more stable environment?

A. Based on the hypothetical, based



Weintrob

on the significant disruption of their day-to-day life, I believe -- excuse me, based in particular on recent developments in the past six weeks, it would be, Hey, guys, okay, maybe we ought to go back home. And let's get going and put an end to this; whatever degree possible.

Q. So what is your opinion as to how soon they should return to their environment in Germany?

A. Soon. I couldn't give a number of days. As I said, not tomorrow; giving the children some time to adapt to another change, even though it's a change to stability, I would say, you know, one week. Something in the realm of days, not months, or even weeks.

Q. And what would be the positive

effect, in your opinion, if they were returned to their environment of their home in Germany?

A. They could go on with their lives with minimum continuing disruption, and





address themselves to at least the developmental tasks, psychologically of feeling, okay, I'm all right. Socially back to friends, and basically to a learning environment relatively uncluttered by parental environment.

Q. What potential benefits do you see of returning these children to Germany?

A. Basically what I said. There were two areas: One is return to what has been biologically, psychologically and socially their environment that has been stable. And two, removal from an environment -- Germany is not perfect. I know what was going on in Germany for

evaluations. But removal from this environment, which in the past six weeks, has had ongoing parental interference or disruption.

Q. What specific affect, in your opinion, would the return to Germany have on the children's relationship with the father, especially in the light of the



allegations that have been raised in this case?

A. Assuming what I have read by evaluators, if the father is a supportive, loving person, they could begin to repair, if it's been affected, their relationship with him, in terms of concerns or, you know, what's he really like. And they could, again, feel safe that they had at least one person who was supportive of them. And I should add, that I should have before, and not

hopefully denigrating of the other
parent.
Q. Dr. Weintrob, I understand that you have previously testified in a GWG report that Joseph expressed a desire to remain or stay in Germany, and not move to America with his mother.
And I believe you also stated that when he was -- a second evaluation occurred at the DCYF in Rhode Island, that there was some difference in that opinion.





What is your professional opinion relating to a child's stated preference in that second subsetting, if you have one?
What is the reason for your opinion?
A. The -- two elements here: One is in terms of what I had said earlier, psychologically developmental tasks.

Autonomy, a child's ability to affect what happens to him or her. The child says, This is what I want, and somebody says, no, you're not right. You don't have it. He says, once, this is what I want. He says it to a person who's asking about his father's, his mother, I gather, when he comes here, and living with a parent who demonstrates a particular position has an effect on a child. As I've said, the child begins to question what he says, he questions what happened before. And after awhile, and particularly with time with a parent who may be denigrating the other parent, will



say, Oh, well, gee, maybe, you know, maybe that's not so good. Maybe I should rethink.

So I think preference has to be seen within the context. And on that

basis, I would raise questions about the stated preference on the second occasion.

Q. Do you have an opinion as to whether or not putting a child in the middle of a dispute between both parents is good or bad for the child?

And if so, what's the basis of that opinion?

A. It's well-recognized by, I think, child psychiatrists, psychologists, social workers, supported by extensive social literature that children do best when allowed to accomplish their developmental tasks. And they do best with support of two parents.

We know that's not always possible or ideal, but it is completely accepted. And judges put this in their reports all the time, Do not badmouth the





other parent.

What is the impact? It

challenges a child's sense of, I want two parents, and I want two parents who love me. And I don't want to have to begin to question it all the time by one parent telling me the other is not good. Leave me alone. Give me some peace. Let me accomplish my tasks in life.

We believe it is highly detrimental to children's relationship with both parents. That's what I said before. Both the parent putting the child in the middle, and the other parent. And it appears to have long-term effects. High conflict is demonstrated to have long-term negative effects on children's learning, on children's self-esteem, on children's future relationships. You name it.

Q. Tell us, Doctor, did you see anything in the reports and all the information that you reviewed that any one of the parents were not supportive of

the relationship with the other?

And if so, what would those facts -- what would those effects have on the children?

MR. BOREN: Objection. Asked and answered.

A. The -- what I said, the mother -- father is reported as being supportive with the relationship with the mother, encouraging that the children see their mother. And the mother has clearly stated that the children's father is a danger to them.

Q. All right. Do you have an opinion as to whether or not this mother will be able to support the relationship of the father with the children?

MR. BOREN: Objection. Speculation.

BY MR. MARTIN:

Q. And you can state --

A. Past history has been suggested to be the best predictor of future behavior. We have known that we can't





absolutely predict, but we can offer an assessment. That is different from a speculation because it's based on information that has been documented.

I see no end. I see only that this is going from one step to the next step, to the next step, to the next step. I can tell you -- I can't say on this situation. In other situations, the parent sometimes takes the last step, and that step is to go into hiding. There some years ago was a network for parents who believed that one parent was not -- was dangerous, and goes through a series of steps with removing the child, with having numerous evaluations; were beginning to allege that the system is wrong, the judicial system is wrong. The

evaluation was not appropriate. Every evaluator was biased. The other parent paid off the judges and the lawyers. And therefore I have no out but to take the children and remove them. I'm -- like I said, I don't predict this in



particular. I can say that is a pattern which causes me to have significant worry.

And I can tell you one, two, three, four, five, six, but that's been said.

Q. You mentioned some -- I think there were 24 phone calls made to Mr. Kufner by Mrs. Kufner last night.

Are you aware of the content of those phone calls with respect to this idea of respect for the judge's decision to award custody to Mr. Kufner?

A. I was told there were 24 phone

calls. I was given recordings of five of them. They were difficult to understand, but the nature of them suggested that she would persist in her behavior and continue to consider him a bad person.

Q. Okay. Specifically, do you remember if Mrs. Kufner claimed that her lawyers in Rhode Island were paid off by Mr. Kufner?

A. I don't recall being able to hear



that part. I recall certainly something about payoff. And I don't remember who was paid off. There was payoff.

Q. Do you remember anything about whether he improperly influenced the Guardian ad Litem in this case, Sharon O'Keefe?

A. There was a litany of a number of people. I don't remember whether she specifically said O'Keefe or law guardian. But it was a series of people

who were now -- she was trying to demonstrate were responsible for what she considered an inappropriate decision.

Q. Now, I'm not asking you to make an evaluation of Mrs. Kufner --

A. Right.

Q. -- but do you have an opinion of her behavior in the last six weeks, that has been exposed in this record, as to whether or not she would be the kind of parent who could provide a stable environment for her children?

MR. BOREN: Objection.





BY MR. MARTIN:

Q. And if so, state the reasons for your opinion.

BY MR. MARTIN:

Q. You may answer.

A. I don't believe it's a speculation that if a mother alleges sexual abuse or sexually inappropriate behavior, and that is unfounded. I don't believe that's speculation.

I don't believe it's speculation if the mother repeatedly states that certain photographs, she considers pornographic, and those photographs are



determined by an evaluator in Germany. Am I basing my report on Dr. Jenny's, I have her credentials, she seems to be an authority on pornography. And so instead of here's pornographic, that's not pornographic. Then there's two findings of such, Mrs. Kufner goes to school and says, Look at this. Again, assuming that she did, that's not speculation, that she has abruptly removed the children from their home that she had impugned -- is an understatement -- their father's

integrity. That she has taken them for a second evaluation to a hospital. You know, when you take kids often enough to a hospital, and this Hasborough Hospital doesn't proceed, there are always other hospitals -- and people frequently find them -- and then continues, I worry about that mother's effect or the effect of her beliefs on her parenting, in addition to which, I think, lack of support of the children's relationship with their father raises very serious questions about such



a parent's parenting ability in terms of the welfare of their children.

Q. Doctor, do you have an opinion as to whether or not the evaluation of the GWG in Germany was an appropriate evaluation?

A. I have reviewed that evaluation. I looked at it to determine if it

generally met the standards for
evaluations in this country, whether
there was an appearance of bias. I
looked at that. And in my opinion, that
evaluation seemed to be quite good,
without -- well, period.
Q. And would you agree with their
conclusion?
MR. BOREN: Objection.
A. I would say that their
conclusions follow upon the data that
they offered.
BY MR. MARTIN:
Q. Okay. Have you reviewed the
report of Dr. Jenny?
A. I have.




Q. Do you have an opinion as to
whether she followed standard procedures
in doing her evaluation?
A. She was asked to view the
photographs. She had, not a stated

protocol, certainly her way of looking at them, and looking at them she seemed, in my opinion, from her report on how she based her conclusions, to have done a very good job.

Q. And do you have an opinion as to whether or not her conclusions passed what I would call peer review?

A. I would think that they would clearly --

63

BY MR. MARTIN:

Q. You may answer.

A. Well, you can read back the question. I'm sorry.

(Record read.)

A. Well, you can stip. to peers being only child -- only pediatricians with subspecialties in abuse, or you can talk about peers who have experienced evaluating children in their environments.

So I'm not a pediatrician. I am a child psychiatrist, who does evaluate the data that he receives or reads. So Dr. Jenny's approach and her conclusions, again, I did not see indications of bias, I saw indications of objectivity. I saw indications that she had some standards that she used. And based upon that, it appeared that she presented a certainly credible report.

Q. Now, Doctor, do you have an opinion as to whether it would be more appropriate for the children to be living





in homes in Germany that are homes, or whether living in a motel with their mother?

What would be more beneficial for their well-being?

MR. BOREN: Objection.

MR. MARTIN: On what ground?

MR. BOREN: I don't think there's any basis that the mother's living at any hotel or motel.

MR. MARTIN: Well, again, I don't think that's disputed. And I know you're new to the case --

BY MR. MARTIN:

Q. But assuming, Doctor, Mrs. Kufner is living -- was living with the boys in a motel with the children, do you have any opinion as to whether that environment would be more or less appropriate than being returned to their homes in Germany?

A. Yes. Once, again, I would have to say context. If their house burned down and they moved, that's one thing.



Q. Right.

A. So it has to do with the context and why, but this is another disruption. And no matter how fancy the motel or the

hotel, there's no place like home. And particularly when one's home has been changed so frequently.

Q. Doctor, do you have an opinion as to whether or not the returning of these children to Germany would create a grave risk of harm to those children?

MR. BOREN: Objection.

MR. MARTIN: And your grounds, sir?

MR. BOREN: Legal opinion.

MR. MARTIN: Okay. Well, Rule 705 says that an expert can give an opinion on the ultimate issue in federal case.

MR. BOREN: I'm well aware of that. It's beyond the scope and kin of this doctor's ability to give that opinion. My objection stands.

MR. MARTIN: All right.

A. I guess I wonder, because maybe I changed the word "harm"; psychological risk to development. Is there a grave risk to their development, I think I can opine upon that based upon all the information that I have been given. And again, two bases: One, Germany has been a stable home, assuming they have not been exposed to danger. And that has been already evaluated.

So not only do I see no grave risk to return to home, rapid return, let's say, but I do see -- and I am opining on this, I think, with reasonable certainty, based upon what I've been given, that there is some risk in not returning.

Q. Do you see any grave risk of harm for the children to be in the custody of their father in Germany?

MR. BOREN: Again, same objection.

A. Based upon what information has

been given to me, reported to me,



Weintrob

documented, the answer is no.

BY MR. MARTIN:

Q. Do you have an opinion as to whether or not these pictures, that have been alleged to be pornographic, are in fact so?

And if you do have an opinion, what's the basis of that opinion?

A. Without being flip, I think it was Justice Potter Steward, who said, I don't know what the definition is, but I know it when I see it. That's not a legal standard. I did observe the pictures. I -- taken within the context of all the pictures, and the overall relationships, I did not see that these pictures were pornographic in the sense that they are designed to illicit sexual arousal or any other arousal.

Q. And what is your opinion as to

what would be in the best interests of
these children, Dr. Weintrob?
A. Based on everything reported to
me, and with the reservation that I have

68

Weintrob

not seen these children and therefore
can't offer, in my opinion, an ultimate
opinion about custody, there are multiple
indications that these children need the
stability, and lack of instability --
stability that would be present with
their father in Germany, in contrast to
the lack of stability of their current
situation, or even of they're being with
their mother, assuming that the behaviors
that have been reported are accurate.

83

Q. Which chronology of events with
comments that was prepared by Mr. Kufner,
did you accept as truthfulness?

A. I don't deal with truthfulness or lack thereof. I'm looking at the documents. I certainly am aware that people will present one side; that's why I pay more attention to things that have been submitted, for example, to Dr. Jenny, where I have a statement by both Mrs. Kufner and Mr. Kufner.

So I don't really get into evaluating truthfulness. I pay more attention, as I said, to some documents that appear to be done by an agency that are more neutral, and pay less attention to what some people might consider self-serving documents.



Q. Now, with respect to the





chronology that was prepared by Mr. Kufner, I note that he states on Page 2 of 12, that in 2002 to 2005, Tina began to show signs of depression, severe

abomination and isolation from friends and family.

Do you recall reading that, Doctor?

A. That she began to show signs of depression, yes.

Q. Doctor, did you have any knowledge that Mr. Kufner was a psychologist, a psychiatrist or served in any mental capacity?

A. I have no information to that effect.

Q. You consider a statement to be self-serving?

A. No, not necessarily at all. I don't think you have to be a psychiatrist or anything. I think the word "depression," -- and I wasn't paying, as I said -- I didn't put particular stress on this chronology of events, but that's



Weintrob

a common word.
But no, I didn't see it as either self-serving or not self-serving or subjective or subject; he made a comment. That was it.
If I had used that comment in my conclusions, then I think I could raise some questions about it. But that didn't -- really as I think -- I can say, that didn't enter into conclusions.



Q. Do you have an opinion, Doctor, whether the statements made to GWG at some earlier time, are the statements made to the investigator in Rhode Island at a later time more reasonably to be relied upon by you as a psychiatrist?
A. To be relied upon, the context has to include that in Germany that's where they were, they were stable and settled. And the context was, after having been brought to the United States

and subjected to an evaluation that -- I think that is in context and would have



Weintrob

to -- greater question would have to be raised in view of the context that, Gee, somehow your father's a dangerous man.

Yes, I would think that would somehow be different.



Q. And in this report of February 21st, would it be fair to say that you voice no opinion whether Mrs. Kufner is a fit and proper parent to have custody?

A. I did not and would not offer that opinion.

Not that she is or isn't, but that I wouldn't offer an opinion about custody based only on reading documents. I believe I made that clear to Mr. Martin at the beginning.

Q. Okay. So in other words, for you

to voice an opinion on custody,
I presume you would want to meet with the
parents and meet with the children?
A. Barring unusual circumstances, I
would be reluctant to. But in view of
the past of what I've been told, and
reported in the past couple of weeks, I
would not be adverse to offering an
opinion of risks and benefits of various
arrangements. But not an ultimate
opinion about custody.



Q. You made a comment, Doctor,
during direct examination; I just wanted
to explore that for a moment. And I may
be quoting you wrong, but I think you
said, Germany is not perfect. I know
what is going on in Germany on
evaluations.
Could you tell me, Doctor,
whether I quoted you correctly?
And if so --
A. Yes.

99

Weintrob

Q. Okay. Could you tell me what you meant by that comment, Doctor?

A. Sure. I probably over-spoke.

These children have been exposed to their parents' conflict in Germany, in the United States. That's basically what I was going to say.

104

I think you said that you would like to see the children return to

105

Weintrob

Germany as soon as reasonably possible. I think you used the words "approximately a week," correct?

A. I said I can't give any specific number of days. It seemed to me that returning them to what -- there are indications of a somewhat more stable

atmosphere.

If they are going to do it, yes, do it sooner rather than later.

Q. And you're giving that opinion without speaking to the children and learning what they would like at this point in time?

A. That is correct. I'd like to explain that just a little bit; that these children have been subjected to numerous evaluations. I independently concur with Dr. Jenny, who stated that further evaluations -- I don't recall her language; I recall mine, which were, if they are not harmless -- or asking these children more -- particularly children this age, I think, is not likely to be





particularly informative and certainly not helpful to them to ask them again to pick sides. I think that was either in

Dr. Jenny's or the GWG's report about not asking the children to pick sides.



EXAMINATION BY
MR. MARTIN:

Q. I just have one on re-direct, and it'll be short.

Dr. Weintrob, Mr. Boren asked you about the opinion of Joseph Kufner, that he gave to the DCYF. And I believe he gave that opinion on January 31st. And I believe that in that report, the DCYF said that Joseph had arrived in America on the 26th of January; so that was basically his fifth day in Rhode Island.

Do you think the fact that he had only been there for a fifth day, would have had an impact on his opinion?

A. Not only might that have an impact on his opinion, but we do know that who brings a child to an evaluation, or where the child is living, does have

Weintrob

an impact on the child.

Q. Okay. And do you know whether or not both parents were there at that time, or just one?

A. I don't know for sure. I think it was only -- as you said, I think it was only one. I don't know. I don't have the records.

Q. Didn't the DCYF report say that Mrs. Kufner brought the children?

A. I'm sorry, yes.

Q. Okay. And do you know whether or not the children on the 31st of January had ever been enrolled in school yet?

A. No idea. I don't know that they-- I don't know.

Q. So, if they had five days off of school, would that influence a seven-year-old boy as to where he would like to live, by chance?

A. Certainly that can. I guess

within the context of what was said --
excuse me, what was said, it's like --
yeah, it's fun, sure it's fun here. It's



like my father didn't keep his promises.
Those kinds of comments can be made when
a child -- particularly, when a child is
with only one parent.