UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Dominik Kufner,
Petitioner,

vs. C.A. No. 07-046 S

Tina Kufner,
Respondent.

**OPINION AND ORDER**

WILLIAM E. SMITH, District Judge.

**I. Introduction**

Petitioner Dominik Kufner seeks the return of his two children, J.K. and M.K., to Germany pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980) which was codified by Congress in the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. (ICARA). On or about January 22, 2007, the children were taken by their mother, respondent Tina Kufner, from Germany to Rhode Island. Ms. Kufner contends that the children were not wrongfully removed, and that, in the event that they were, she and the children are entitled to remain in Rhode Island because the children, if returned to Germany, would be subject to a grave risk of harm. As set forth in detail below, this Court has given expedited consideration to this matter consistent with the command of the Hague Convention. See Hague Convention art. 11

(contemplating a six-week time-frame to complete proceedings brought under the act).[1] After considering the evidence and trial testimony developed over seven days of hearing and submitted thorough deposition designations supplementing the record, the Court makes the following findings of fact, conclusions of law and orders.

## II. Findings of Fact

Tina Kufner was born in Cumberland, Rhode Island and is a United States citizen. In 1989, she met Dominik Kufner, a German citizen, in Hong Kong and in 1996 they were married and began to live in Munich, Germany. Munich is also the site of Mr. Kufner's successful family textile business, which he partly manages. On September 3, 1998, two years after they moved to Munich, J.K. was born, and then, on December 9, 1999, their second child, M.K., was born. Both children are dual citizens of Germany and the United States. Although the family lived exclusively in Germany, they made frequent trips to Rhode Island, especially around the holidays, to visit Ms. Kufner's family.

In June or July of 2005, the parents separated, moved out of

---

[1]This goal, while admirable, is in large measure unreasonable in a case such as this. This Court has made extraordinary adjustments to its schedule to expedite the matter, conducted a seven-day trial, held numerous conferences and motions arguments, arranged for the extensive involvement of a Guardian ad litem and a medical expert, and has issued this 50-page opinion all within eight weeks from the filing of the petition; however, with expected appeals, the six-week timetable simply cannot be met.

their house, and by September had acquired two smaller homes. During this separation period, the parents informally agreed to share time with the children. Mr. Kufner traveled frequently, and when he was gone the children resided with Ms. Kufner; when Mr. Kufner returned, the children spent time with him.

In early 2006, however, a number of events caused an escalation in tension between the parents and a breakdown in their relationship. Ms. Kufner testified that in January 2006 she became aware of a number of photographs Mr. Kufner had taken of the children that caused her significant concern.

The photographs (Pet'r Ex. 10) were taken in September 2005 in Mr. Kufner's house. As described below, there is some dispute over how and when Ms. Kufner came into possession of the photographs and which photographs she saw in January. Mr. Kufner testified that the parents had agreed to exchange any photographs taken of the children in the other's absence; consequently, Mr. Kufner either sent Ms. Kufner a disk which contained the images, or brought the disk over to her house and downloaded them onto her computer. The controversial pictures were contained in a folder titled "naked boys in Moeribach." Mr. Kufner testified that this exchange occurred in October 2005, however Ms. Kufner asserted that she first saw the photographs in early 2006, and found additional photographs in August 2006.

A total of 49 pictures were taken during this "event," although only 43 were submitted to the court. (The last six were

apparently pictures of the children eating on the floor "like dogs," but Ms. Kufner did not rely on these photographs for her Article 13(b) defense). The majority of photographs - thirty-nine of them - are relatively innocuous pictures of the children playing and laughing, naked, in the living room of Mr. Kufner's house. One picture of those thirty-nine also shows that the children's au pair, Ms. Cain, was present.

Four of the photographs, however, are significantly more graphic in nature. In one, one of the boys is bent over, looking through his legs at the camera. In this pose, his buttocks and genitals are clearly displayed. In another, one of the boys is bent over a couch with his genitals and buttocks the only visible portions of his body; it appears that he is unaware that the photograph is being taken, although his face is not visible. In a third, one of the boys is pictured lying down, with his buttocks clearly displayed. Finally, a fourth photograph depicts one of the boys bent over the couch again, with his buttocks clearly exposed.

In early February, Mr. Kufner spent ten days alone with the children during "ski week."[2] This vacation caused Ms. Kufner a great deal of anxiety because she was unable to see the children.[3]

---

[2]"Ski week" apparently refers to a week-long holiday in the German schools.

[3]There is no dispute that Mr. Kufner had the children for these ten days, or that Ms. Kufner did not see the children during this time; however, the parties dispute almost everything else surrounding this event. Mr. Kufner testified that this trip was planned and agreed upon in advance, and that during it, Ms.

Then, likely in late February 2006, the children began displaying certain observable physical symptoms, including bed-wetting,[4] nervous eye twitching, sleeplessness and nighttime crying and screaming.[5] In addition, Ms. Kufner claimed that the children played with the foreskin of their penises and engaged in a "pee-pee dance." These symptoms caused both parents significant anxiety, and each blames the other for their onset.

On February 21, 2006, Ms. Kufner's lawyer in Germany sent a letter to Mr. Kufner requesting an explanation of at least two of the photographs, including one of the most graphic, and when she did not receive an adequate response, Ms. Kufner petitioned for sole custody of the children in the Weilhelm Local Court, Domestic Division ("German court" or "court").

In response, and because he feared Ms. Kufner would leave the country with the children, Mr. Kufner sought and received an ex

---

Kufner was able to talk to the children. (In fact, he claims she called the children incessantly, causing hiim to turn off his cell phone.) Ms. Kufner asserted that Mr. Kufner took the children unexpectedly, characterizing it as kidnapping, and then denied her the opportunity to see or talk more than once with them.

[4]Some testimony suggests that M.K. suffered bed-wetting with some frequency before the separation.

[5]The parties vigorously dispute the origin of these symptoms as well as their frequency and intensity. Ms. Kufner contends that the children began to have these symptoms soon after the 10 days spent alone with Mr. Kufner in early 2006, implying that the problems began as a result of some interaction between the children and Mr. Kufner. Mr. Kufner believed that the symptoms were brought about by Ms. Kufner's attempts to manufacture tension between the children and himself.

parte order requiring Ms. Kufner to deposit the children's passports with the court. (Pet'r Ex. 2). The order was by its terms effective until the court made a final determination in the custody matter.

In connection with the custody proceeding, the German court ordered an initial home study to be performed at both parents' homes and scheduled a hearing. On March 1, 2006, the parents attended a court proceeding during which the children were heard by the court in camera. The hearing resulted in a published opinion divided into two relevant sections. The first, under the heading "Order," stated, in full:[6]

> 1. Both parties shall exercise the parental custody jointly.
> 2. The parental custody of both parties shall be restricted to the extent that neither party is entitled to establish for their children a domicile and/or permanent residence abroad without the consent of the other party.
>
> Statement of Reasons:

---

[6]The parties spent considerable energy wrangling over the propriety and legitimacy of offering certain translations of the voluminous record of German proceedings. The Court admitted translated documents (mostly offered by Petitioner) with the proviso that Respondent would be provided the opportunity to confirm the accuracy of the translations and, if necessary, offer evidence to challenge or clarify translated material. No challenges to any translation were received prior to the Court closing the record. Where possible, the Court relies only on translations that bear official certification (either American or German) while recognizing that in Hague Convention cases, a court may take judicial notice directly of the law, and of judicial or administrative decisions, formally recognized in the country of habitual residence without the traditional requirements of proof. See Hague Convention, art. 14. It is also true that authentication of documents is similarly relaxed. See 42 U.S.C. § 11605. The March 1, 2006, English translation of the German court's opinion bears a German court's certification, and is therefore sufficiently reliable.

> The ruling corresponds to the agreement as made by and between the parents. There are no apparent grounds to the contrary, which may arise from the best interests of the children and which may require a deviating ruling.

The second began after stating that "[t]he parties conclude the following," and under the heading "Agreement" stated, in full:

> 1. The Respondent [Mr. Kufner] is entitled to access and contact to his children for the following times:
>
> From 12 March 2006 to 19 March 2006;
> from 1 April 2006 to 3 April 2006.
>
> 2. The parties are in agreement that the Respondent spends the time from 07 April 2006 to 15 April 2006 in Florida, together with his children. On Easter Saturday, 15 April 2006, the children will travel to their maternal grandfather, where they will stay until 23 April 2006 together with the Petitioner [Ms. Kufner].
>
> 3. The Respondent is entitled to access and contact to the children for the following additional times:
> [collecting times]
>
> 4. The parties agree that the Petitioner shall be given the children's US passports and that the Respondent shall be given the children's German passports.
>
> 5. The parties agree to settle further dates of access and contact to their children by mutual consent as early as August 2006.
>
> 6. The cost of the proceedings shall be split.
>
> 7. The parties agree to this agreement settling their access and contact to their children in line with the appropriate provisions relating to the proceedings 2 F 140/06.

The next few months were comparatively peaceful, but in the summer of 2006, due in part to his perception that Ms. Kufner was "poisoning" the children against him, Mr. Kufner petitioned for sole custody of the children. (Pet'r Ex. 7). The court asked

Martina Hofler, a social worker with the Department of Youth and Families ("DYF")[7] to conduct an evaluation of both parents and the children.[8] In a letter dated July 10, 2006, Ms. Hofler recommended that the court not award sole custody to Mr. Kufner, and she expressed significant consternation over the increased conflict between the parents.

Ms. Kufner claims she then became aware, possibly in the middle of August, of a number of additional photographs that caused her even greater concern.[9] After viewing the photographs, she submitted them on August 25, 2006, through her lawyer, to the court in a petition seeking to suspend Mr. Kufner's visitation rights with the children or in the alternative to permit only supervised visitation. Four days later, on August 29, 2006, Ms. Kufner submitted a petition to the court seeking consent to relocate the children to the United States.

Without ruling on either petition, the court ordered an investigation into the photographs. The investigation was apparently supposed to be undertaken by a court-appointed company,

---

[7]The DYF appears to be Germany's social services agency.

[8]Although Ms. Hofler met with both parents and the children, she did not discuss the photographs, likely because she was not aware that they were a concern.

[9]Ms. Kufner testified that, although these photographs had been on her computer since September 2005, she had not seen all of them until she attempted to clean out her computer's files in August 2006. Mr. Kufner refutes this version of events and testified that Ms. Kufner knew of all the photos beginning in October 2005.

but for some reason this company never received the pictures and never performed the investigation. Instead, the "GWG" performed a custody evaluation, including an evaluation of the photographs.[10]

The GWG appointed a certified psychologist, Christine Hertkorn, to conduct individual interviews and evaluations of both parents and the children.[11] After conducting the interviews, Dr. Hertkorn sent a letter, dated September 28, 2006, to the court advising it of her opinion that both parents should retain contact with the children. The letter did not mention the photographs.

The GWG also produced a significantly more detailed report that, although commissioned by the German court in August 2006, was not published until February 22, 2007. (Pet'r Ex. 37).

---

[10]In a court order dated October 12, 2006, switching the investigating body to the GWG, the court noted that "[t]he files accidentally were [sic] not sent to the association of experts originally chosen by the court," and that the GWG had already begun its investigation. It also explained that

> [b]oth the association and the society [GWG] constitute a pool of independently working psychologists who are regularly called on by courts for the assessment of family law-related questions. Changing the expert would not be reconcilable with the welfare of the children since the children would unnecessarily be exposed to additional questioning and observations.

(Pet'r Ex. 18).

[11]The circumstances surrounding Dr. Hertkorn's investigation are disputed. Ms. Kufner testified that Dr. Hertkorn spoke German and refused to conduct the interview with Ms. Kufner in English. Ms. Hertkorn did, however, obtain another individual, Dr. Strief, whose English was "not fluent," to interview Ms. Kufner. Both Dr. Hertkorn and Dr. Strief interviewed the children at least once without the parents. Additionally, Ms. Kufner testified that the children met a second time with both Dr. Hertkorn and Dr. Strief in the presence of Mr. Kufner.

Entitled "Psychological Expert Opinion," the report details a thorough analysis of the expert evaluations of both parents, the photographs, and the children in an effort "[t]o recover a family psychological assessment in association with the arrangement of parental custody." The report lays out the process by which the GWG met with and obtained information from both the parents and the children, and notes that the GWG was presented with copies of the photographs at issue. The report reveals that Mr. Kufner was given a MMPI II diagnostic personality test, interviewed alone, and observed in a home visit with the children. The report also indicates that Ms. Kufner was never observed with the children because she twice cancelled the appointment, first because of an illness and then because she desired an interpreter. Ms. Kufner also apparently cancelled her individual interview; however she did engage in a fifteen minute interview at the children's school. The children were interviewed separately and underwent a diagnostic "project method" examination.

The report determined that the results of Mr. Kufner's personality test were in the normal range and that the interactions between him and his children were positive and loving. The report also concluded that the children were healthy, happy, and displayed age-appropriate development. They were also very happy in Germany, at their school, and with their friends.

Ultimately, the report found no indications that any conduct by Mr. Kufner had negatively affected the children, including the

taking of the photographs. Further, the report warned that the continuing breakdown between the parents would only harm the children, and noted that Ms. Kufner appeared unable to properly evaluate and recognize the emotional importance of Mr. Kufner's role in raising the children.

The court also received a letter dated September 20, 2006 from Ms. Hofler, who reported her conclusions concerning Mr. Kufner's visitation rights with the children.[12] After noting that the relationship between the parents had significantly worsened, but without addressing directly the nature and effect of the photographs, Ms. Hofler recommended that visitation rights should not be denied to Mr. Kufner and suggested that the parties mutually agree upon a visitation plan.

On October 18, 2006, without an oral hearing, the court issued a temporary "Ruling on Access and Contact," to be followed until the court determined the final merits of the custody case. That order held the following:

> 1. The Petitioner [Mr. Kufner] shall be entitled to access and contact to his children for two weeks, commencing on Thursday 19 October 2006, at the end of the school and ending on Tuesday.
>
> The Petitioner shall contact the children punctually from school on Thursday and shall take them to school on Tuesday

---

[12]Ms. Kufner apparently contacted Ms. Hofler, voicing her concerns about the photographs and requesting more evaluation and investigation. According to Ms. Kufner, Ms. Hofler did not meet again with the children but instead sent a letter to Mr. Kufner requesting that he explain the photographs.

> morning, where they shall be picked up at the end of school by the Respondent [Ms. Kufner].
>
> 2. The Petitioner shall be given the right of access and contact to his children for the autumn vacation.
>
> 3. The parties shall refrain from any disputes in the presence of their children.
>
> 4. The parties are warned that in the case of any infringement of the order, they may render themselves liable to coercive detention for one day, for each individual infringement case.

(Pet'r Ex. 19). The order also contained a "Statement of Reasons" section, in which the court explained that its ruling was in the best interests of the children and based on proposals made by the experts. In addition, the court stated:

> there is no sufficient and adequate indication to the effect that the father has overstepped any boundaries or taken any inappropriate approach in bringing up his children. It cannot be inferred from the photographs in dispute that the father is a pedophiliac [sic] or inappropriately encourages any sexualised behaviour [sic] of his children. Incidentally, the Respondent has known of the existence of these photographs for a long time, without her taking any offence at them at considering them to be an obstacle to the father's access and contact.

Finally, the court cautioned that "both parties have lost sight in the course of the litigation of their children's interests and welfare due to the parties seeking to enforce their own interests. Therefore they had to be urged to adopt a behaviour seeking the best interests of their children." (Pet'r Ex. 19). This visitation order effectively increased Mr. Kufner's visitation from four days every two weeks to about six days every two weeks.

Beginning in the summer of 2006, and continuing throughout the pendency of the custody dispute, the parents were also embroiled in

a dispute about M.K.'s medical care. M.K. had developed significant problems with his ear, nose, and throat, prompting Ms. Kufner to seek an operation on M.K.'s adenoids. Mr. Kufner opposed any operation because he believed it was not medically necessary.[13] This disagreement fueled the parties' animus toward each other and by the fall of 2006, the parents' interactions had significantly deteriorated; the divorce proceeding had become high-conflict, and the parents could not communicate with each other in any productive way.

On November 12, 2006 the court issued an injunction structuring the visitation rights of Mr. Kufner over the December holidays. The injunction additionally forbid Ms. Kufner from traveling to the United States with the children and ordered that she deposit the children's American passports with her lawyer. The latter provision was amended in a December 13, 2006, order requiring Ms. Kufner to deposit the American passports at the district offices of DYF.

Finally, on December 20, 2006, the court issued a decision memorializing the parents' agreements in the dispute. Both parents, the children and an interpreter were present, and the court heard from both children in the absence of the parties. A

---

[13] Mr. Kufner was concerned that the risks associated with a procedure that required full anesthesia could outweigh the benefit of the procedure. He testified that medical advice from a specialist persuaded him that the procedure was not as urgently needed as Ms. Kufner claimed.

record of the decision reported that the parties agreed to a settlement in court that formalized the visitation rights laid out in the November 12 interim order, required Ms. Kufner to deposit the children's American passports with the United States Consulate, and enjoined Ms. Kufner from traveling to the United States over the Christmas holidays. (Pet'r Ex. 25).

Then, in late January 2007, and in direct violation of the German court's order, Ms. Kufner acquired the children's American passports from the Consulate and, without notifying Mr. Kufner, left Germany with the children for the United States. After determining that Ms. Kufner and the children had relocated to the United States, Mr. Kufner flew to Rhode Island to initiate this case.

While all the parties were in Rhode Island, however, Mr. Kufner sought an order in Germany awarding him sole custody. On February 16, 2007, he successfully obtained a temporary order awarding him full custody. Additionally, by leaving Germany in violation of a court order, Ms. Kufner has exposed herself to the possibility of criminal charges if she returns.

**III. Procedural History**

In wrongful removal cases under the Hague Convention, courts are often required to balance two competing principles. First, and primary, is the Hague Convention's clear mandate to act "expeditiously in proceedings for the return of children." Hague

Convention, Art. 11. Indeed, one of the Convention's primary purposes is "to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed." Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006) (quoting Hague Convention, pmbl.). At the same time, there can be no doubt that where a credible Article 13(b) defense has been raised, a Court in the receiving country must make a thorough and full determination of whether a "grave risk" of harm would exist if the children were returned to the home country. See Danaipour v. McLarey, 286 F.3d 1, 14-15 (1st Cir. 2002). Although the Court has expedited the timelines and procedures in this case, as should be clear below, the pursuit of a prompt resolution did not sacrifice thoroughness.

On January 31, 2007, Mr. Kufner filed a Petition for Return of Children pursuant to ICARA and the Hague Convention. Mr. Kufner also sought an ex parte order prohibiting Ms. Kufner from removing the children from the District of Rhode Island pending the resolution of the Hague Convention petition. The Court granted this request in an order dated January 31, 2007.

On the same day, Ms. Kufner obtained a Temporary Restraining Order against Mr. Kufner from the Rhode Island Family Court.

At a conference on February 5, 2007 in which both parents' counsel were present, the Court modified its initial order. The Court stayed all family court proceedings and orders and allowed Ms. Kufner to travel somewhat more freely; however, the modified

order also required her to surrender the children's passports. On February 8, the Court ordered expedited discovery and scheduled an evidentiary hearing to begin on February 22.

On February 16, the Court appointed Sharon O'Keefe, Esq., as Guardian ad litem and attorney for M.K. and J.K. pursuant to Federal Rule of Civil Procedure 17(c) and by consent of the parties.[14] The Court asked the Guardian to prepare a report recommending, among other things, the types of evidence and evaluations that would be helpful to the Court in determinating the issues relevant under the Hague Convention; what role, if any, the children should play in the proceedings; and how visitation, if any, should be structured between Mr. Kufner and the children during the pendency of the proceedings. After meeting with both parents and the children, the Guardian issued her report and the Court admitted it into evidence (under seal) on February 22. (Court Ex. 1).

In her report, the Guardian made a number of recommendations concerning the types of evidence and evaluations that would be helpful in resolving the matter. First, she recommended that the Court view the entire array of photographs, as opposed to a few in isolation, because they were taken all at one time. She also

[14]Throughout the pendency of this proceeding, the Guardian has proved invaluable in her efforts both to work with the parties and the court and to safeguard the interests of the children. Although a Guardian is not required in Hague Convention cases, the Court depended heavily on her assistance in order to achieve a satisfactory resolution in the case.

recommended that the Court obtain an expert opinion to determine whether the photographs were pornographic in nature, particularly in light of the cultural and other contexts in which they were taken. To this end, and because the Guardian believed that this expert testimony should come from a professional with clinical training and expertise in evaluating or investigating sexual abuse of children, she recommended appointing an independent expert. The Guardian also suggested considering the German child welfare agency's view of the photographs and their evaluation of the parents. She also recommended that the Court undertake a thorough analysis of the investigations carried out in Germany in response to the allegations made by Ms. Kufner.

Apart from her recommendations regarding the types of evidence and evaluations the Court should consider, the Guardian also offered helpful recommendations concerning the role the children should play in the proceeding.[15] After her interview with the children, the Guardian determined that the children, especially J.K., had taken an unhealthy view of their power and responsibility in the custody determination, and that any more involvement of the children in the proceeding would be significantly harmful.[16]

---

[15]It should be noted that in Germany the children had been intensely involved in the custody proceedings; J.K. even told the Guardian that he had been asked at least "fifteen" times about who he wants to live with and how much time he wants to spend with each parent.

[16]This view was subsequently reaffirmed by the Court's medical expert, Dr. Carole Jenny, in her report.

Consequently, the Guardian recommended that the children not be brought into the proceeding before this Court, either for the purpose of being interviewed or to testify. Respondent initially objected to this recommendation because she believed that the children's views were a relevant part of the Article 13(b) inquiry. However, the Guardian reported that the children stated consistently that they were very attached to their mother and that, given the choice, they would want to live with her. The Court therefore concluded that it would assume for purposes of this proceeding that, if asked, the children would choose to live with their mother in the United States.[17]

The Guardian also recommended, and the Court ordered, that the parents allow M.K. to attend an appointment with a specialist at the Massachusetts Eye and Ear Infirmary to address his medical issues. The appointment, which both parents and M.K. attended on February 26, was inconclusive, and the specialist recommended that M.K. undergo an overnight sleep test, which was scheduled for March 7. As a result of this sleep test, the specialist diagnosed M.K. with a mild to moderate sleep apnea and recommended that he undergo certain procedures to remove his tonsils and adenoids. However, he

---

[17]It should be noted, however, that when the children were interviewed in Germany and asked where they would like to live, they consistently answered that they wanted to remain in Germany. Moreover, as outlined below, the Court has determined and ordered that custody should revert to the father. It is possible that the children's views might be altered by this modification; nevertheless, the Court will continue to assume that the children's preference would be to live with their mother.

noted that this surgery was not urgently needed. The impact of this recommendation is addressed below.

In response to the Guardian's report, and based on Ms. O'Keefe's recommendations, the Court ordered visitation for Mr. Kufner. Visitation was initially supervised for two afternoons a week, but as the proceeding continued visitation was increased to two or three afternoons and one weekend day per week.[18] The Court allowed this visitation to be supervised or unsupervised, at Mr. Kufner's election.[19]

On February 22, the Court began to hear evidence from the parties, beginning with Mr. Kufner's prima facie case on his petition, and continued to take evidence, in seven days of testimony, through March 16.

After Mr. Kufner's presentation of his case-in-chief, Ms. Kufner began to present her Article 13(b) defense. Because this defense was based largely on the existence of certain photographs, the failure of German officials to address sufficiently the photographs, and the children's physical symptoms, and because the Court took seriously Ms. Kufner's claims, the Court appointed an

---

[18]Specifically, Mr. Kufner was entitled to an oscillating visitation schedule of three afternoons and one weekend day one week, and then two afternoons and one weekend day the next week.

[19]Although initially supervised, the Court and the Guardian saw no reason to continue this requirement. Mr. Kufner, however, expressed concern that unsupervised visitation could expose him to further allegations, and therefore requested that he be allowed to decide whether to have his visits supervised.

independent expert in pediatrics, child abuse, child sexual abuse and child pornography, Dr. Carole Jenny, to offer her opinion on the photographs, the children's symptoms, and the investigation undertaken in Germany.[20] The Court engaged in an extensive colloquy with the Guardian and counsel outlining the areas which the Court wanted Dr. Jenny to address. Specifically, the Court asked Dr. Jenny to address at a minimum two questions:

1. Are the photographs taken by Mr. Kufner in September 2005 consistent with child pornography?
2. Are the behavior problems suffered by the children indications of sexual abuse?

Dr. Jenny's report was received (under seal) into evidence on March 16 and copies were given to each of the parties. In her report, Dr. Jenny concluded that there was no evidence to suggest that Mr. Kufner was a pedophile or was sexually aroused by children or that the pictures were child pornography. Additionally, she concluded that there was no evidence that he would take similar photographs of the children in the future, particularly because this set of photographs has caused a major disruption in his life.

[20]Both parties had planned on retaining their own experts to testify on the significance of the photographs and the children's physical symptoms. After some discussion, however, the parties mutually agreed to withhold such expert opinion until after hearing from the Court's appointed expert, Dr. Jenny. It should be noted that the Petitioner objected to the Court's appointment of an independent expert on the ground that the burden of proving the Article 13(b) defense was the Respondent's, not the Court's. The Court overruled the objection because the stakes were so high in the proceeding, and the Court wanted the best expertise available to assess the claims made by Ms. Kufner regarding Mr. Kufner.

Dr. Jenny also approved of the investigation and evaluation undertaken by the GWG, stating that it was an excellent assessment and that the GWG's conclusions were consistent with its observations. Further, Dr. Jenny determined that the symptoms the children were displaying - including difficulty sleeping, crying out at night, eye twitching, bed-wetting, crying before visits to their father, doing a "pee-pee dance," having an invisible friend and playing with the foreskin of their penises - were all consistent with the tremendous amount of stress and disruption the children have had in their lives in connection with the high-conflict custody dispute, and were not attributable to any sexual abuse. Dr. Jenny also strongly recommended that the children not undergo further sexual abuse evaluation because it would increase their already elevated stress levels and would be harmful. Finally, Dr. Jenny noted her concern that the children may have been psychologically abused by both parents to the extent that the parents were angry or hostile to one another in front of the children to the extent that either parent said negative things about the other directly to the children.

After reviewing Dr. Jenny's report, the Guardian agreed with its conclusions in their entirety.[21] The parties, although given the opportunity, did not file any rebuttal expert reports.

In the interest of leaving no stone unturned, the Court, on its own initiative, submitted the photographs to the FBI to determine, through the National Center for Missing and Exploited Children and the Child Victim Identification Program, whether they had been disseminated through the Internet. Results from the database, reported to the Court directly in a March 27 letter from the FBI, indicated that the photographs had not been released to a wider audience over the internet. (Court Ex. 13).

Finally, the Court asked the parties to submit joint questions to be sent, pursuant to Article 15 of the Convention, to the

---

[21]The Court is satisfied that Dr. Jenny made a thorough and searching inquiry into the record and allegations. Any objection to the validity of her conclusions based on the concern that she did not interview the children or the parents can be allayed by the fact that Dr. Jenny was explicitly asked whether further investigation or evaluation of the parents or the children was necessary. Had she believed such investigation was necessary for her to reach a medically-certain opinion, she would have said so. In fact, Dr. Jenny explicitly recommended that no further evaluation or questioning of the children occur:

> To have these children subjected to another complete evaluation in not only not indicated, but I think it would be harmful to the children and would increase their already elevated level of stress. In addition, given the current tense emotional climate the boys are in, I would be concerned that further interviews and evaluations could be tainted by undue influence of one parent or the other and could provide unreliable information . . . . Further questioning of them will undoubtedly be harmful.

(Court Ex. 8).

Central Authority in Germany for an advisory opinion concerning German custody law.[22]

The Court also employed significant resources to convince the parties to find a mutually-acceptable resolution to the case that would avoid protracted litigation in this Court. To that end, the Court asked Magistrate Judge Lincoln Almond to observe the live testimony over closed-circuit television and to be available after-hours to facilitate settlement negotiations. Although Judge Almond put significant effort into this task and conducted settlement conferences on February 23 and March 1, it was to no avail -- the parties were incapable of reaching an agreement.

Midway through the proceeding, Ms. Kufner began to exhibit concerning, and perplexing, behavior. Without informing her attorneys, Mr. Kufner, or this Court, Ms. Kufner went to the Rhode Island Family Court to seek a domestic relations restraining order against Mr. Kufner; this action was in direct violation of this Court's order staying any and all family court proceedings and taking jurisdiction over the entire matter. In her petition to obtain the restraining order, she failed to disclose that there was an ongoing proceeding in this Court. (The presiding judge, however, was aware that this Court had taken jurisdiction and appropriately denied the application.) Ms. Kufner also contacted

---

[22]However, the Court ultimately determined that, in light of all the evidence, submitting these questions to the Central Authority was unnecessary.

the FBI, without this Court's knowledge, in an attempt to initiate an independent investigation, it appears, against Mr. Kufner, alleging that he trafficked in child pornography.[23] Further, Ms. Kufner was also chronically non-compliant with the Court's visitation orders, often initially refusing to comply at all, but then usually bringing the children to the drop-off site late. Most disturbingly, over one weekend Ms. Kufner brought the children to Hasbro Children's Hospital, where she complained that the children had been sexually abused by Mr. Kufner. Such a complaint usually triggers an automatic investigation and invasive and intensive evaluation of the children, something which the Court had explicitly ordered not to be done, on the recommendation of the Guardian, until Dr. Jenny had finished her report. Fortunately, the case was diverted to the Child Safe Clinic and the children were not evaluated beyond a simple physical exam. Finally, Ms. Kufner displayed continual difficulties with her attorneys, terminating then rehiring them several times during the course of the proceeding. Ultimately this communication breakdown resulted in a motion to withdraw as counsel on March 13, three days from the last scheduled day of testimony. On March 16, Ms. Kufner fired her original attorneys and hired a new attorney to conduct the final evidentiary hearing.[24] Just prior to issuing this Opinion Ms.

[23]This fact was reported directly to the Court by the FBI.

[24]It is worth noting that, in this Court's view, Ms. Kufner received stellar representation from her counsel, particularly

Kufner's new counsel moved to withdraw, citing a breakdown in communications; Ms. Kufner began filing pro se documents with the Court, and, finally, counsel amended his filing to state that he had been terminated.

## IV. Legal Framework

### A. Wrongful Removal

Passed by Congress on October 25, 1990, and ratified by ICARA, the Hague Convention provides a mechanism to ensure that children are promptly returned to their habitual residence after they have been wrongfully removed. The Convention also seeks to secure protection for the "rights of custody and of access under the law" of the habitual residence. See Hague Convention, art. 1. Thus, "[t]he Convention's procedures are not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006) (citing Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir. 2005));

---

Mr. Pollack and the firm of Sullivan & Worcester. This is noteworthy because counsel represented Ms. Kufner as a result of their willingness to take Hague Convention referrals through the National Center for Missing and Exploited Children on a pro bono basis. Mr. Pollack and his firm invested hundreds of attorney hours at no cost to Ms. Kufner, only to be terminated because of a "communication breakdown," which the Court understands to have arisen largely from Ms. Kufner's demands that counsel act in ways they clearly felt were improper or unethical.

see also Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000) (noting that the Convention's remedial scheme is designed "to restore the pre-removal status quo and discourage a parent from crossing international borders in search of a more sympathetic forum").

For an applicant to succeed in a petition seeking the return of a child, he must demonstrate by a preponderance of the evidence that a wrongful removal or retention occurred. Whallon, 230 F.3d at 454; see 42 U.S.C. § 11603(e)(1). Under Article 3 of the Hague Convention, the removal or retention of a child is wrongful if:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

19 I.L.M. 1501.

Here, it is undisputed that M.K. and J.K.'s habitual residence at the time of removal was Munich, Germany. The parties disagree, however, both as to whether Mr. Kufner has demonstrated that Ms. Kufner either wrongfully removed or wrongfully retained the children and as to whether Mr. Kufner, at the time of removal, had "rights of custody" over the children and, if so, whether he was actually exercising those rights prior to removal.

Ms. Kufner first argues that there is no evidence to support a finding that she has wrongfully removed or retained the children within the definition of the Hague Convention. Consequently, she

argues, Mr. Kufner's petition for return of the children under the Hague Convention is premature, and this Court has no jurisdiction over the current proceeding. This claim is, however, unpersuasive when viewed against the overwhelming evidence that Ms. Kufner did, in fact, remove the children from Germany to the United States with the intention of remaining indefinitely, thereby meeting the definition of removal within the meaning of the Hague Convention.

As the Court of Appeals for the First Circuit noted in Toren v. Toren, the Hague Convention does not define the terms "retention" and "removal." 191 F.3d 23, 27 (1st Cir. 1999). But, because Article 3 states that "[t]he removal or retention of a child is to be considered wrongful where . . ." the First Circuit has held that this formulation "clearly establishes the proper order of inquiry: first, the court should inquire into whether there has been any removal or retention at all; and second, the court should inquire into whether such removal or retention has been wrongful." Id. at 27 n.3. Therefore, before it undertakes a "wrongful removal" inquiry, a Court must first satisfy itself that a removal or retention has occurred within the meaning of the Hague Convention.

As for the other components of a petitioner's prima facie case, proof of an actual removal or retention must be established by a preponderance of the evidence. In Toren, the court concluded that the father had not sufficiently set forth a claim that his children had been wrongfully removed or retained by their mother

principally because the mother had only expressed her intention to retain the children in the United States but had not, as of the date the Hague petition was filed, actually retained the children past a mutually agreed upon date. See id. at 28. The court refused to confer jurisdiction for a claim brought under the Hague Convention where that claim was based on the future intent of one party. Id. ("To the extent that the father's argument is based on the mother's future intent, the father is seeking a judicial remedy for an anticipatory violation of the Hague Convention.")

Here, however, unlike in Toren, there is ample evidence that Ms. Kufner took the children from Germany in violation of numerous German court orders and against the wishes of Mr. Kufner, clearly establishing that a removal occurred. In an effort to soften the blow of these actions, Ms. Kufner suggests that she removed the children and came to the United States only temporarily in order to obtain medical care for M.K. But this claim is belied by Ms. Kufner's own consistent admissions in Germany that she wanted to relocate the children to the United States. Additionally, before traveling with the children, Ms. Kufner made a number of trips to the United States during which she investigated schools for the children. This all suggests, quite clearly, that Ms. Kufner removed the children within the meaning of the Hague Convention.[25]

[25]Ms. Kufner also attempted to suggest that in order for there to be a removal within the meaning of the Hague Convention, a party must spend some specific amount of time in the receiving country. Ms. Kufner was unable to point to any support for this

Ms. Kufner next argues that Mr. Kufner did not have custody of the children as evidenced by the German court's award of visitation and access rights to him, but not to her. She therefore contends that she must have had sole custody and he must have had only visitation rights. However, this claim is clearly belied both by the specific custody order in this case and by German custody law in general.

Under the Hague Convention "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). Custody rights are distinguished from "rights of access," which the Convention defines as including "the right to take a child for a limited period of time to a place other than the child's habitual residence," and which are not a sufficient basis for a wrongful removal action. See id. art. 5(b); Whallon, 230 F.3d at 455. Moreover, although the Convention's explicit language offers little development of what may constitute

---

proposition, and in any case, the Court believes this purported requirement would be counter to the overall scheme of the Hague Convention and ICARA, which contemplates immediate and expedited consideration of these cases. Such a requirement would also be unwise. Were it so, any removing party could frustrate the clear mandate of the Convention to ensure the expedient return of wrongfully removed children by claiming that the removal was only temporary. Any proceeding would then necessarily be delayed until the "temporary" removal became permanent. Some removals may be temporary excursions not falling within the meaning of the Hague Convention, but to require a period of time to elapse before a removal can be proved runs counter to the clear prescriptions of the Convention.

"rights of custody," courts have routinely looked to the background report of the Convention. See Whallon, 230 F.3d at 455. The background report states that "'the law of the child's habitual residence is invoked in the widest possible sense,' and that the sources from which custody rights derive are 'all those upon which a claim can be based within the context of the legal system concerned.'" Id. (quoting Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 67, in 3 Acts and Documents of the Fourteenth Session 426, 446).

Here, there can be little doubt that Mr. Kufner possessed and was exercising custody rights over M.K. and J.K. The Court finds that Mr. and Ms. Kufner were separated but not divorced at the time Ms. Kufner left and that they were, by order of court, exercising joint custody over the children. Although each party had sought sole custody, the court order of March 1, 2006 "concerning parental custody" makes clear that "[b]oth parties shall exercise the parental custody jointly." This order was never superceded, explicitly or implicitly, and is therefore controlling. It is true that there were at least two additional orders by the German court establishing visitation and access rights for Mr. Kufner, but there is no evidence to support the claim that these orders somehow terminated his jointly-held parental custody over the children. In fact, these orders reveal that they were crafted because Ms. Kufner was denying Mr. Kufner access to the children; the access and visitation orders were therefore necessary in order to compel Ms.

Kufner to allow Mr. Kufner the ability to exercise his parental rights. (Pet'r Ex. 19) ("The ruling had to be made by way of the temporary injunction, since the Respondent [Ms. Kufner] is refusing to grant the father access and contact to their children without any court order."). Blackletter German law confirms this understanding:

> "[w]here the parents are married at the birth of the child, both acquire the parental care automatically without any further act being required or even possible. Parental care thus continues until ended by law (e.g.[,] at the death of the parent) or by Court order. The parents' divorce or separation thus remains without influence on the continuing parental care for the child.

Peter Gottwald, et al., Family and Succession Law in Germany 79 (2001). Here, it is clear from the evidence that the parents were undergoing divorce proceedings in which each parent desperately wanted sole custody of the children; however, at the time Ms. Kufner left Germany, the German court had not finally resolved the matter, but had clearly made explicit that which German law implies: until ended by law, parental care (custody) is possessed jointly by the parents of the children.[26] Accordingly, Mr. Kufner has demonstrated by a preponderance of the evidence that the

---

[26]As well, because there was utterly no evidence that Mr. Kufner abandoned the children, he has clearly demonstrated that he was exercising his custody rights. Baxter v. Baxter, 423 F.3d 363, 370 (3d Cir. 2005) ("If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.") (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1065-66 (6th Cir. 1996)).

children were removed in breach of his custody rights, thereby establishing a wrongful removal, within the meaning of the Hague Convention, from their country of habitual residence.

**B. Exceptions**

Normally, proof that the children were wrongfully removed will result in the immediate return of the children. See Hague Convention art. 12. However, the Hague Convention provides several limited exceptions to this general rule, which, if proven, may result in an order that the children not be returned to the country of habitual residence. See Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002) ("[E]ven if the conditions for an [] exception are met, the Hague Convention gives the court discretion to return the child[ren] to the country of habitual residence."). Nevertheless, "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed child," and "[e]xceptions to the general rule of expedient return . . . are to be construed narrowly." Id. at 13-14 (citations omitted). Of these "defenses," Ms. Kufner invoked two, both based on Article 13.

**1. Grave Risk of Harm**

The first exception Ms. Kufner asserts, an "Article 13(b)" defense, by its terms holds that a court is not bound to return a child if the respondent can establish that:

> (b) there is a grave risk that his of her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13(b). In order to succeed in opposing return based on an Article 13(b) exception, the respondent must establish by clear and convincing evidence that the exception applies. Danaipour, 286 F.3d at 13. Importantly, none of the Article 13 defenses may be used "'as a vehicle to litigate (or relitigate) the child's best interest interests,'" id. (citations omitted), because "those and other issues underlying the custody dispute are presumptively to be adjudicated in the place of the child's habitual residence." McManus v. McManus, 354 F. Supp. 2d 62, 69 (D. Mass. 2005).

In this context, "'[g]rave' means a more than serious risk," Danaipour, 286 F.3d at 14. One court has characterized the inquiry as whether the child would suffer serious abuse that is a "great deal more than minimal." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000). There are three types of harm that inescapably fall within the "grave risk" exception: physical harm; psychological harm; and intolerable situations. See id. The ordinary disruptions necessarily accompanying a move would not by themselves constitute a risk of grave harm, because this analysis would create perverse incentives. However, a finding that a child is "settled" may "form part of a broader analysis of whether repatriation will create a grave risk of harm." Blondin v. Dubois, 238 F.3d 153, 164 (2d Cir. 2001) ("Blondin II").

Where the alleged grave risk of harm adverts to sexual abuse, the court's inquiry must extend to types of abuse other than rape,

"particularly when such abuse occurs at the hand of a parent." Danaipour, 286 F.3d at 16. Consequently, "[t]he proper focus is on the effect on the child and whether there is 'grave risk of physical or psychological harm or otherwise . . . intolerable situation' to which the child would be exposed upon return." Id. at 17 (citation omitted). At all events, a court must not assert an "overly restrictive approach to the type of conduct that constitutes sexual abuse, and to the relationship between sexual abuse of a child and grave risk." Id. at 16.

"[T]he Convention assigns the task of making the 'grave risk' determination to the court of the receiving country." Id. at 15. And, therefore, it is incumbent upon such a court to thoroughly and adequately assess the grave risk claim. See id. at 5 (reversing a district court for failing to make a full determination on the grave risk of harm). Although the First Circuit has not ruled out the possibility that in some circumstance it might be appropriate to defer a finding of grave risk to the courts of the country of habitual residence, see id., it has never found such a situation.

The grave risk complained of here involves a combination of the photographs taken by Mr. Kufner, the physical symptoms displayed by the children, and the alleged inadequacy of the German court's investigation. Ms. Kufner alleges that the existence of these factors in combination would create a grave risk of harm if the children were returned to Germany. In effect, Ms. Kufner claims that Mr. Kufner engaged the children in a photo session

disguised to create child pornography; that the children feel abused by this (hence the symptoms); and finally that the German courts and child welfare agencies are incompetent or otherwise unable to see what Ms. Kufner perceives as an obviously harmful situation. Consequently, Ms. Kufner fears that she will be unable to protect the children in the future. Thus, she argues that only the system of child protection available in the United States can protect the children from their father, and that return of the children to Germany would create a grave risk and an intolerable situation.

Where Ms. Kufner sees smoke, however, there is not only no fire, but there is not even smoke. Here, the overwhelming absence of any evidence suggesting the children were subjected to sexual abuse or, if returned, will be abused combined with the thoroughness and adequacy of the German court's investigation compels the conclusion that there is no grave risk (let alone any risk at all) that return to Germany would expose the children to any physical or psychological harm or would otherwise place the children in an intolerable situation.

To begin, and contrary to Ms. Kufner's claims regarding Mr. Kufner, both the Guardian and Dr. Jenny determined that, outside the contested photograph session, there was no evidence that Mr. Kufner ever sexually abused the children in any way. These conclusions were consistent with the investigations undertaken by

the German courts and child welfare organizations, which both the Guardian and Dr. Jenny found to be thorough and appropriate.

With respect to the photographs, Dr. Jenny explicitly rejected any conclusion that they could be considered child pornography or that Mr. Kufner took them in an effort to produce child pornography. In addition, she determined that there was no evidence that he would take similar photographs in the future, not least because of the disruption that these photographs caused in his life. The Court wholly agrees with Dr. Jenny's conclusions.[27] Viewed in context, the photographs suggest nothing more than that Mr. Kufner indiscriminately snapped pictures during an evening spent with the children. There can be no question that a few of the photographs, when viewed in isolation, are explicit or even off-putting, but this fact alone cannot establish either the photographs' pornographic nature or the photographer's invidious intent. Indeed, Dr. Jenny found that even in the most explicit photographs there was no evidence that the children were engaging in suggestive poses. See Court Ex. 8 ("Regarding the nature of the poses in the photos, they appear to me to be consistent with boys acting silly. While the poses may be considered to be unnatural or sexual, it is well known that boys will 'moon' each other when

---

[27]After the submission of Dr. Jenny's report into evidence, the Court gave each party an opportunity to submit their own expert report. Because neither party chose to avail themselves of this opportunity, Dr. Jenny's conclusions are effectively uncontroverted and any objections to her findings have been waived.

acting out, and although they are attempting to be naughty, this behavior is not necessarily sexual.").

Dr. Jenny also concluded - notwithstanding the complete absence of any evidence suggesting Mr. Kufner is a pedophile - that it would "be highly unusual for a pedophile or child pornographer, with ready access to two children, to only photograph them on one occasion." In sum, Ms. Kufner has failed to prove at all that these photographs amount to anything more than a father engaging in playful behavior with his children.

Next, both the Guardian and Dr. Jenny found the symptoms displayed by the children were not due to sexual abuse. The Court agrees with this conclusion as well. Beyond the actual symptoms, there was no evidence (not even testimony from Ms. Kufner) that the symptoms were caused by abusive behavior from Mr. Kufner. Therefore, the relevant question for purposes of the grave risk analysis is whether the symptoms themselves suggest or are consistent with sexual abuse. All of the experts who have addressed the question have concluded they are not. As Dr. Jenny noted, the children have had their family dissolve, have witnessed their parents arguing, have moved from their family home, have left their friends and their school, and have moved to the United States. In addition, they have been questioned by multiple people about their feelings and experiences and have been used as tools in their parents' increasingly acrimonious divorce. On this basis, Dr. Jenny concluded that the symptoms are consistent not with

sexual abuse but with the stress and disruption the children have experienced due to the high-conflict divorce. Accordingly, and when combined with the evidence that the children interact normally and appropriately with their father when they spend time with him, the Court finds that these stressors are undoubtedly the cause of the anxiety symptoms observed over the past year.[28]

Finally, with respect to the sexual abuse claims, both the Guardian and Dr. Jenny, after analyzing the German court and the child welfare agency's investigation into Ms. Kufner's alleged claims of abuse, unequivocally concluded that the claims were investigated thoroughly, properly and adequately. Dr. Jenny stated that:

> [I] was very impressed with the evaluation done in Germany by GWG. They interviewed the children and the parents. They observed interactions with the father and the children. Their evaluation was not complete, only because the mother did not cooperate with the evaluation. They used appropriate psychological testing instruments. Their conclusions were consistent with and supported by their observation. In my opinion, the German agency did an excellent job of assessing the children and their father.

(Court Ex. 8). The Guardian also expressed a similar belief:

> One thing is clear to me. The German Family Court did not dismiss Mrs. Kufner's claims summarily. There is a process in the German Family Court to provide professional advice to their judiciary when allegations of child abuse or neglect arise. It is apparently heavily relied upon by the courts and based on my review of the interim reports submitted by the

---

[28] Dr. Jenny also dismissed any inference that the children's "pee-pee dance" was caused by sexual abuse. Instead, she found that it was not "particularly unusual behavior in boys [of the children's age]," and declined to consider it "pathological or . . . evidence of sexual abuse."

Department of Youth and Families and the GWG, their opinions and recommendations are given great weight.

(Court Ex. 1).

The Court agrees with these conclusions. First, any claim that the GWG failed to investigate Ms. Kufner's allegations thoroughly is belied by its exhaustive report dated February 22, 2007 (Pet'r Ex. 37). Although the German court did not have this report when it entered its interim orders in October and November, the report demonstrates that the GWG took its role seriously and investigated thoroughly the claims of sexual abuse by Mr. Kufner.[29] Further, the German court itself was diligent in its approach to resolving Ms. Kufner's claims. After hearing the allegations, the court ordered an investigation by the Department of Youth and Families and also an independent investigation.[30] After receiving initial summary letters from both organizations, which concluded that there were no concerns that Mr. Kufner had abused the children, the court properly refused to capitulate to Ms. Kufner's

---

[29]That this report was not released until February 22, 2007 is not troubling; the German court had not finally resolved its custody determination, and likely was waiting for this final report to be released. It is true that Ms. Kufner left before this report was released, but its existence eviscerates her assertion that the German authorities failed to investigate her claims. Moreover, its existence demonstrates the willingness of German authorities to investigate such claims in the future, and to act in accordance with their findings.

[30]The fact that the GWG was not the originally-appointed investigating agency is immaterial. Although at times Ms. Kufner questioned the legitimacy of this organization, she submitted no evidence to suggest that the agency was somehow inadequate or biased against her.

demands that Mr. Kufner be prohibited from interacting with the children. Instead, the court structured visitation while deferring a final custody determination until it received the full GWG report, which, much like the experts in the United States, found no evidence of any wrongdoing on the part of Mr. Kufner. This Court can perceive of no procedural or substantive fault in this regard, and accordingly finds nothing that would suggest, let alone prove by clear and convincing evidence, that the German court's investigation creates the potential for a grave risk of harm if the children are returned to Germany.

With respect to M.K.'s medical problems, the Court likewise finds that there is no grave risk of harm that these problems will go untreated if he is returned to Germany. As noted above, the specialist contacted, at the behest of the Court, from the Massachusetts Eye and Ear Infirmary has recommended that M.K. undergo certain procedures to correct his sleep apnea.[31] Although this procedure could be performed here in the United States, it also can be performed in Germany (the specialist stated that the procedure was not medically "urgent"), and Mr. Kufner has not only pledged under oath that he will abide by the specialist's recommendation, but he has already scheduled an appointment with a specialist in Germany for the procedures.

---

[31]The specialist also recommended that a procedure to address M.K.'s frequent ear infections also be performed at the same time.

**2. The Children's Views**

Article 13 also provides that a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. Ms. Kufner insists that because the children have expressed a clear desire to remain in the United States with their mother, the Court should decline to return the children to Germany. It is true that this clause in Article 13 would provide a potentially independent vehicle preventing the children's return to Germany if their views were sufficiently considered and mature. However, a court is not compelled to defer to the children's views, and it may disregard them entirely in appropriate circumstances. See Tsai-Yi Yang v. Fu-Chiang Tsui, No. 2:03-cv-1613, 2006 WL 2466095 *14 (W.D. Pa. Aug. 25, 2006) (noting that the application of the "wishes of the child exception" is left "wholly to the discretion of the district court"). In addition, a court may use the children's views as a factor in resolving an Article 13(b) defense. See Blondin II, 238 F.3d at 166 (holding that the "wishes of the child" exception "provides a separate ground for repatriation and that, under this provision, a court may refuse repatriation solely on the basis of a considered objection to returning by a sufficiently mature child" but noting that a younger - there, an eight-year-old - child's testimony could be properly

used only as a factor in a broader analysis under Article 13(b)) (emphasis omitted).

In Yang, the district court was faced with a child who expressed a mature and considered desire to remain in the United States, but who expressed this view only after she was taken to the United States. Yang, 2006 WL 2466095 WL at *15. The court concluded that such a desire was only a product of the "attachment that Raeann has made to her living conditions and family in Pittsburgh . . . as a result of the passage of time during the instant litigation," and therefore could not predicate an order refusing return of the child. The court also expressed its concern that using the child's wishes in this type of situation (where the wish to remain occurred only after the child had been wrongfully retained) "would reward the malfeasant parents, allowing them the opportunity to seek to obviate their wrongful removal or retention during the pendency of legal disputes." Id.

Here, as already noted, the Court has decided to assume that, if asked, the children would express their desire to remain in the United States with their mother. However, as in Yang, the evidence clearly indicates that this desire emerged only after Ms. Kufner had wrongfully retained the children in the United States. Indeed, the GWG and Department of Youth and Families reports indicate that, when asked in Germany, the children expressed their desire to remain in Germany. It should be noted that the German court, its investigatory agencies, and the Guardian and Dr. Jenny here in the

United States all expressed a serious concern that each parent was attempting to poison the children against the other parent. Testimony from each parent suggests a similar concern. Based on the inconsistent wishes of the children - when in Germany they wish to remain in Germany, and when in the United States they wish to remain in the United States - and in light of the possibility that their "wishes" are the product of a parent's invidious influence, as well as their young age, lack of maturity and susceptibility to parental influence, the Court exercises its discretion to disregard the children's wishes in determining whether Article 13 should result in an order refusing to return the children to Germany. See Blondin II, 238 F.3d at 162 (noting that a grave risk of harm does not arise in situations "where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences"); see also 51 FR 10494-01, Section III.I.(2) ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.").

**3. Undertakings**

A determination that a respondent has not proved an Article 13(b) defense and that the children can be returned to the country of habitual residence will not, in every case, automatically result in the return of the children. See Danaipour, 286 F.3d at 21; Roxanne Hoegger, What if She Leaves? Domestic Violence Cases Under

the Hague Convention and the Insufficiency of the Undertakings Remedy, 18 Berkeley Women's L.J. 181, 187 (2003). Undertakings, which are "based neither in the Convention nor in the implementing legislation of any nation," Danaipour, 286 F.3d at 21, are a type of safeguard that courts may impose in order to help ensure that a potential risk of harm does not materialize.[32] The consideration of undertakings "allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction." Walsh, 221 F.3d at 219. However, the use of undertakings must be narrow in scope, and "must focus on the particular situation of the child" and on whether some set of requirements "will suffice to protect the child." Danaipour, 286 F.3d at 22.

Because undertakings "raise serious comity concerns," Danaipour, 286 F.3d at 23, and are not enumerated within the Hague Convention, their use has generated a considerable amount of controversy. Some cases view the use of undertakings favorably.

---

[32]Undertakings were initially created in the context of British family law but were adopted by American courts in the context of Hague Convention cases. See Danaipour, 286 F.3d at 21. In the context of Convention cases, undertakings "refer to a promise by the petitioning parent 'to alleviate specific dangers that might otherwise justify denial of the return petition.'" Blondin II, 238 F.3d at 160 n.8 (quoting Carol S. Bruch, The Central Authority's Role Under the Hague Child Abduction Convention: A Friend in Deed, 28 Fam. L.Q. 35, 52 n. 41 (1994)).

See Walsh, 221 F.3d at 219 ("Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm."); Blondin v. Dubois, 189 F.3d 240, 249 (2d Cir. 1999) ("Blondin I") (encouraging the consideration of the "range of remedies that might allow both the return of the children to their home country and their protection from harm, pending a custody order in due course") (emphasis omitted); Turner v. Frowein, 752 A.2d 955, 341-346 (2000) (instructing that courts must analyze "ameliorative measures," including whether the child could be safely returned to the home country in the care of the abducting parent or a third party and whether judicial authorities in the home country are capable of enforcing the ameliorative measures). And, at least one case has expressed skepticism over the use of undertakings except in very limited situations. See Danaipour, 286 F.3d at 22. In Danaipour, the Court of Appeals for the First Circuit analyzed the use of undertakings from the perspective of international comity and concluded that undertakings which "[c]ondition[] a return order on a foreign court's entry of an order" likely offend notions of comity because they would "smack of coercion of the foreign court." Id. at 23 (citing Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 120 for the proposition that "the return of a child cannot be

made conditional upon [a] decision or other determination being provided [by the court of the country of habitual residence].") The court in Danaipour also doubted whether undertakings that "go beyond the conditions of return" would be enforceable in the home country, especially in countries where contempt of injunctive power is absent. Id.

In this case, some narrowly-focused undertakings that do not offend notions of comity are necessary and appropriate to ensure that the children would not be exposed to a risk of harm upon return to Germany. This conclusion has nothing whatsoever to do with the unfounded sexual abuse claims made by Ms. Kufner, see Danaipour, 286 F.3d at 25 (agreeing that "undertakings should be used more sparingly when there is evidence that the abducting parent is attempting to protect the child from abuse"), but instead is due to the attachment the children have developed with their mother, an attachment that has been noted by both the Guardian and Dr. Jenny.

At the moment, Ms. Kufner has lost custody of the children (while the Hague Convention proceeding was ongoing, the German court issued a temporary order conferring sole custody of the children to Mr. Kufner)[33] and is subject to criminal penalties for violating German court orders if she returns to Germany. (And, of course, as discussed above, this Court has awarded temporary

[33]There is, however, no final order of custody from the German court, rendering the sole custody order only temporary.

custody to Mr. Kufner for the reasons outlined). There has also been persuasive testimony, from the Guardian in particular, that the children have developed a strong attachment to their mother, and any resolution of this matter or the underlying custody proceeding in Germany that prevents the children from spending significant time with their mother would be tremendously harmful. A return to Germany on terms that endorse or allow such a result, either because Ms. Kufner will be imprisoned or because she will have lost custody and any visitation rights, would in the Court's view subject the children to potentially irreversible harm.[34]

Mr. Kufner has been consistent in his stated desire not to deprive Ms. Kufner of access to the children, and he has stated, under oath, that once back in Germany, the criminal charges against Ms. Kufner will be dropped.[35] But, even were the parties to

---

[34]The Court is aware that at least some cases have characterized this potential type of harm merely as "adjustment problems," which, without more, cannot form the basis for denying a petition to return the children. See Friedrich v. Friedrich, 78 F.3d 1060, 1067-68 (6th Cir. 1996) (stating that allegations which are "nothing more than adjustment problems that would attend the relocation of most children" are not sufficient to meet the "grave risk" burden). Of course, here the "grave risk" exception has not been established and, therefore, the concerns enunciated in Friedrich are inapplicable. Nevertheless, where the potential for harm is real, even if it does not meet the Article 13(b) definition, this Court believes it has an obligation to attempt to ensure that it does not manifest. See Danaipour, 286 F.3d at 21 (noting that undertakings can be used to mitigate the possibility of harm while simultaneously allowing "courts to comply with the Convention's strong presumption of a safe and speedy return of the wrongfully removed child.").

[35]Specifically, Mr. Kufner testified that he does not want to exclude the mother from the lives of the children and would

substantially agree on terms that would assuage the concerns present here, there can be no guarantee that the court in Germany will similarly agree when making its final custody and visitation determinations. See Danaipour, 286 F.3d at 24 (citing a Massachusetts state court's refusal to enforce undertakings adopted by a court in the United Kingdom).

Without doubt, therefore, some ameliorative measures are necessary in this case. See Blondin I, 189 F.3d at 248. At a minimum, because Ms. Kufner must be allowed to have a continued role in the lives of the children, there must be no legal disincentive to her return to Germany. And, additionally, she must be allowed consistent access to and visitation with her children. However, it is also the case that based on the reports of the Guardian, the medical expert, the extensive record evidence in this case and careful observations of the Respondent over the course of a seven-day trial it is the view of this Court that Ms. Kufner is in need of immediate and most likely continuing psychological assessment and counseling or therapy as a condition to such access. Finally, as noted herein, M.K. is in need of certain medical procedures. In order to accomplish all of these competing goals

---

ensure that any charges are dropped ("[W]e have spoken to the district attorney in charge of this case and told him that we do not wish to press criminal charges. And he, in turn, confirmed that upon the voluntary return of my wife [and] the children to their habitual residence, there's no public interest to pursue criminal charges against [Ms. Kufner]. So if I don't press charges, which I won't, neither will the DA.").

the Court will adopt the limited undertakings set forth below as part of its Order.

**V. Conclusion and Undertakings**

For all of the reasons set forth above, the Court concludes as follows:

1. The Petitioner, Dominik Kufner, has proven by a preponderance of the evidence that the children M.K. and J.K. were wrongfully removed from their country of habitual residence, by their mother, Tina Kufner, within the meaning of the Hague Convention and ICARA, 42 U.S.C. § 11603.

2. Respondent Tina Kufner has failed to prove by clear and convincing evidence the defenses raised pursuant to Article 13(b) of the Hague Convention and ICARA, § 11603(e)(2)(A).

Given these conclusions, the Petition is Granted and the children's passports shall be released to Mr. Kufner seven days from the date of issuance of this Order and the children shall be forthwith returned to their country of habitual residence, Germany. This Order is subject to the following Undertakings:

1. Petitioner is ordered, consistent with representations made by him under oath and to this Court, to secure the dismissal of any and all criminal charges currently pending against Respondent in Germany. Petitioner shall produce verification to this Court that this has been accomplished and any failure to do so, or any reinstatement at the urging or behest of the Petitioner of such charges after the return of the children to Germany shall be in

violation of this Order and shall subject the Petitioner to sanctions for contempt of court.

2. Pursuant to his representations made under oath to this Court, and as recommended by the medical specialist, Petitioner shall act expeditiously to obtain the prescribed medical procedures for M.K. in Germany. Petitioner shall produce verification to this Court that this has been accomplished and any failure to do so shall be in violation of this Order and shall subject the Petitioner to sanctions for contempt of court.

3. Until the appropriate German court makes specific determinations regarding custody and access and visitation rights, and consistent with his representations to this Court, Petitioner shall not unreasonably oppose Respondent's efforts to obtain reasonable access and visitation with the children, nor shall he oppose any effort on her part to obtain appropriate counseling to increase her visitation up to the point of and including joint custody.

It is so ordered.

WESmith

William E. Smith
United States District Judge

Date: 3/28/07