UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Case No. CA 07 046S

DOMINIK KUFNER,
Plaintiff (Petitioner),

v.

TINA KUFNER,
Defendant (Respondent).

**PETITIONER'S MOTION FOR ORDER OF FEES AND COSTS PURSUANT TO 42 USC 11607 (b)(3).**

**Preliminary Statement**

Father had to mortgage both his future and that of the parties' children to obtain the order of return. Here, Father seeks an order requiring Mother fully pay him for the costs incurred in obtaining that order. This court well understands this award will not compensate the children and Father for the personal damage they sustained because of Mother's destructive conduct.

Father had to borrow $700,000 from his own father, plus incur substantial additional debt to obtain this result. Consequently, over the years, as Father repays this debt, the life that the children can be offered will be quite

different.[1] Over the years, if, as and when Mother pays the award, the money will serve to benefit the children.

## I. Relief Requested

1.1 Pursuant to 42 USC 11607(b)(3), Petitioner, Dominik Kufner (Father), moves this court to order Respondent, Tina Kufner (Mother), to pay money to reimburse Father for the fees and costs he incurred in successfully prosecuting his petition and obtaining an order for the return of the parties' two minor children to their habitual residence, Germany.

1.2 Father asks to be made financially whole, consistent with the public policy embodied in ICARA. Mother's kidnapping of the parties two children into Rhode Island required Father to borrow heavily in order to have money to fight Mother and her high powered team of lawyers.

---

1 For the immediate future, Father intends to keep the children in their private school in Munich, Germany, seeing that as a critical touchstone and safe haven for them at this critical time in their lives.

## II. Reasoning

2.1 The history, process, and progress of this case are well-know to this court, all of which are incorporated by reference; all of which resulted in an order of return entered on March 28, 2007.

2.2 From the outset, essentially everything that took place in this case had to be done on an expedited basis in order to try to meet the Convention's built-in time standard.

2.3 Beyond what happened in the courtroom, much also occurred before the case came into the courtroom and, as well, much happened outside the courtroom, all of which required Father to incur substantial fees and costs.

**Private Detectives**

2.4 In Germany, Mother was not making progress in her efforts to set aside the parties' anti nuptial agreement. At that point she created a plan which included fabricating dastardly personal allegations against Father, hoping he would buy her silence. After two independent agencies investigated, Mother sought to prevent completion of the evaluation, realizing her false claims were determined to have no basis or substance. At the same time, Mother laid plans to wrongfully remove the children to America so she could start a divorce here in order

to try to get a better financial deal.

2.5 a. After Mother removed the children from Germany, Father had to find out where they were, come to Rhode Island and start this case. He also had to ensure both the children's safety and that, on her learning Father was here seeking a return, Mother would not move them again.

b. Father did that by hiring private detectives for round the clock observation for approximately one week until Mother was served with his complaint and an order prohibiting her from removing the children from this District.

c. Then, as this case neared completion, Father became highly concerned that Mother might move the children again,[2] as she came to understand that her claims were both being disproved and, again, determined to have no substance. Father's concern was heightened as he observed Mother's increasingly unwillingness to comply with court orders,[3] coupled with her in-the-courtroom-combativeness with her team of lawyers from

---

[2] Besides English and her admitted ability to speak conversational German, Mother is fluent in the Portuguese language. Mother's parents are both from the Azores, where she has numerous relatives, all of whom could have easily provided her with a safe haven, particularly with the financial support from her parents.

[3] Among other things, Mother failed to comply with court-ordered visitation, filing a second application in the R.I. Family Court, took the children to the Hasbro Hospital claiming

Sullivan and Worcester - lawyers who were representing her at no charge to her. In fact, Father became most concerned upon Mother firing those lawyers while in the courtroom; rehiring them over the weekend and firing them, again, at the end of the next court day.

2.6 Primarily for the safety and welfare of the children, Father had a felt need to try to prevent Mother from again removing the children.

2.7 As to this and, perhaps, every one of Father's expenses, in retrospect, one could claim that paying for detectives was an unnecessary expense. But, for example, the second surveillance observed Mother moved the children from her parents' home to a hotel where she checked in under an name not her own, plus she then turned in her rental car for a different make and model. Thinking Mother was about to flee, the detectives intentionally permitted Mother to observe them, with the hope she would accept that, if she ran, Husband would immediately know about it and be able to call the FBI and local police to bring her and the children back to Rhode Island.

---

they had been sexually abused by Father and asked they be given

**Retaining counsel.**

2.8 Father was all too well aware of the numerous, albeit unproven claims made by mother in Germany. Therefore he anticipated, *and correctly so*, Mother would make similar and even more dastardly claims here.

2.9 At the start of the Father's German divorce case, Father hired **Bradford Neal Martin, Esq.**,[4] his South Carolina business lawyer, to consult with his German divorce lawyer, **Frau Andrea Walther**. Very early on Father was worried Mother would improperly remove the children from Germany. At that point Martin researched the law on the Hague Convention on the Civil Aspects of International Child Abduction. As a result of that research, Father specifically asked the Weilheim court to put language into its March 2006 order that restated the German statutory law, that married parents exercised custody of their children, jointly.

2.10 a. When Mother kidnapped the children to Rhode Island, it was only natural for Father to continue with Martin as counsel. Martin, in and effort to find Mother and the children, contacted lawyers in several cities, each though to be a possible destination. The children went missing on Tuesday,

---

an invasive examination.

[4] Mr. Martin's c.v. is attached as **Exhibit 1**.

January 23, 2007. Their whereabouts were not discovered until six days later when Mother called the children's school to falsely claim they were out of school because they were still "sick".

b. Martin's firm did necessary research which led to the drafting of the initial pleadings and memorandum seeking the return of the children to their habitual residence. Martin attended the first conference with this court on Monday, January 29, 2007, when the trial was set for Thursday and Friday, Friday February 1 and 2, 2007.[5]

c. Beyond knowledge of Father's business and proceedings in Germany, Martin was also well-familiar with the need to seek out numerous court-certified translators who would be needed to do a lot of work in this case. Martin's firm headed up what proved to be the Herculean task of getting

---

5 Martin immediately prepared the following witnesses from Germany for their imminent testimony 1) Lucie Lucas, the children's' long time au pair; 2) Tepani Hanninen, the family friend who was called by Mother the night before Mother abducted the children and the recipient of Mother's voice mail in which Mother claimed she never claimed Father was a pedophile and admitted he was not a pedophile; 3) Father's German Attorney Walther, who would explain the thorough proceedings in the German courts and thorough investigation done by the German social welfare and forensic psychologists; 4) Charles Lucci, family friend of Father and; 5) Tanya Kufner, aunt of the children. When this court issued a new order, while these witnesses were literally in flight from Germany, depositions of all witnesses needed to be conducted. Martin did so, a process that took about one week.

hundreds of pages of legal documents translated from German into English.[6]

d. Martin also brought a great deal of trial experience to bring to the table.[7]

2.11 Martin[8] also had information about numerous topics

---

[6] Because of the number of these documents and, as well, Mother's unwillingness to admit to the accuracy of translations or even to admit, e.g. that a document was a copy of her anti nuptial agreement, Father had to delay entry of documents into evidence, gather more German language documents, match them up, etc. all of which served to slow down Father's cross examination of Mother. This was frustrating to both the court and counsel and also partially resulted from the shortness of time to prepare exhibit books for trial, compounded by the need to gather documents from numerous sources.

[7] Martin was also in charge of presenting the following witnesses to the Court: Dominik Kufner, Iwona Koletta; and by depostion Dr. Alex Weintrob, Dorote Lucci, Tepani Hanninen, Tanya Kufner, Charles Lucci and Lucie Lucas and cross examining Scott Melo, and Astrid Zimmerman.

[8] Attorney Martin has known and represented the Kufner family for some thirty years. Martin was well able to speak to several issues.

**Anti Nuptial Agreement**. In Germany, Mother is trying to invalidate the parties' anti nuptial agreement. Martin drafted that agreement on behalf of Husband, sent it to Mother's Rhode Island counsel for review, made changes requested by Mother's counsel and finalized the document for signature. The agreement was translated into German. At the time of signing, the agreement was read to Mother and Father in German with a simultaneous English translation, and then the German copy was signed by Mother under oath before a Notary Public. At trial, Mother claimed an inability to agree the document presented to her was a copy of the original. Mother fails to accept that in a 10-year marriage, even without an anti nuptial agreement, it would be highly unlikely for her to get any interest in a

which was provided to Mother's counsel. This permitted Mother's counsel to be accurately informed about such matters as Father's financial reality.

2.12 Martin understood the need to associate with so-called local counsel. To that end, Martin associated with **Charles A. Tamuleviz, Esq.** and **Christopher E. Hulquist, Esq.** of Providence, R.I., both of whom Father believes are well known to this court.

2.13 Father commenced his petition, sought emergency orders and other relief.

---

company which four generations of Father's ancestors established and built.

**Business Reorganization of Kufner**

Martin could also discuss the recently completed reorganization which the family company went through to avoid going out of business and to meet both reduced business and competition from goods manufactured in China, and, as well, the on-going business activities in South Carolina and throughout the USA. This information refutes Mother's claim - which she must direct to the Weilheim court, not to this court - that Father manipulated his income to show the German Court he did not have money with which to pay more alimony or to pay her a lump sum. This, even though her anti nuptial agreement specified the amount of alimony to be paid in the event of a divorce, while waiving all claims she might have to all Husband's interests in the family business.

**Rejection of Mother's demand for Ransom**

Of more importance is the fact that, due to inheritance laws in Germany, Father will not get title to the family business until both his father and uncle pass away. So, Mother's demand through her counsel for a very large lump sum payment, in return for which she'd drop all charges and return to Germany with the children, was based upon her false premise that Father had an ownership interest in the company.

More importantly, Father was reviled by and absolutely rejected the concept that he should pay a ransom to Mother.

2.14 At the first lobby conference, Mother appeared with the formidable Boston law firm of Sullivan and Worcester with its specialized Hague Convention Pro Bono project led by Attorney Barry Pollack and his team of lawyers and paralegal staff. While Sullivan and Worcester likely paid its lawyers, that firm agreed to represent Mother at no charge to her.

2.15 In the first lobby conference, Pollack stated to Father's counsel he was an expert in and claimed he had never lost a Hague Convention case. That scared Father, who concluded it was in the children's best interests for him to seek and retain a lawyer who was also expert in Hague Cases. That led Father to retain **Gerald L. Nissenbaum, Esq.**[9]

2.16 Before the trial started, Father's counsel had to seek out, on an urgent basis, numerous experts whom he then reasonably believed would be needed to confront Mother's claims.

2.17 By way of summary, in connection with this case Father had to incur $700,000 in loans from his own father in order to pay toward the following expenses, all of which are detailed on the accompanying charts and exhibits.

2.18 a. As we now know, Mother's counsel dedicated an enormous amount of time and energy to her case. Beyond representing her in the courtroom, their lawyers, law clerks and

[9] Mr. Nissenbaum's c.v. is attached as **Exhibit 2**.

paralegal staff, whom together were greater in number than all of Father's "team" put together, did all kind of things to try to prove Mother's claims. They called a large number of people in Germany and around the world for the purpose of recruiting them as witnesses and even paid some of Mother's out of pocket expenses, e.g. for the cost of taking deposition.

b. While doing pro bono work is a worthy effort, in this case, it left Mother with absolutely no control over what she demanded, how she proceeded, what claims she made, as she had not one penny at risk in terms of legal fees and costs which no doubt had a formidable value.

2.19 It may be fairly said that Mother's lead counsel made everything as difficult as possible for Father, including his attempt to control who would be able to negotiate on behalf of Father. The result of Attorney Barry Pollack's claims, arguments and tactics served to swell, enormously, the costs Father felt he had to incur in the run up to the trial and on through trial. In sum, as the saying in Boston is often heard, he tried to "big-firm litigate" Father into submission. When that did not work, and he could not force Father to pay ransom, Pollack's relationship with Mother blew up and out into the open, as she came to realize her tactics were not going to

result in her becoming a wealthy woman.

**Delineation of Fees for Counsel, Experts and Others.**

2.20 The following seeks to lay out many of the different areas of Father's various expenses, together with a brief description of what various experts did. However, Father will not belabor the matter because the court was in a position to see what went on in its courtroom and has an understanding of what it takes to prepare a massive case as this on an extremely short notice, particularly when most of the critical documents were written in German and needed to be obtained and translated.

**Father's hotel, travel, etc. expenses while in the USA.**

2.21 Father had a wide variety of expenses for his living arrangements in Rhode Island. **Exhibit 3** is a spreadsheet, which details only $51,827.91 of Father's expenses. Father needs time to get back to Munich, Germany, go through credit card and other bills to provide the court with a full list of his expenses. For example, as this is being prepared, Father is in the process of returning with the children to Germany for which he will incur hotel, air fare and related travel expenses likely to be on the order of $4,000.

**Father's legal fees and costs**

2.22 Father had large legal fees and costs for three lawyers, their associates, and paralegal staff, which are detailed below.

2.23 **Attorney Martin's bills and expenses: Exhibit 4** is a spreadsheet setting forth Martin's bills for legal services, which total $218,687.50. **Exhibit 5** is a spreadsheet containing a detailed listing of Martin's out of pocket costs charged by Martin to Father, which total $33,721.85. The detailed backup for the fees and expenses is in **Exhibits 6, 7, 8 and 9** which are copies of four itemized bills sent by Martin to Father. Copies of documents backing up expenses are attached to each bill. The expenses are *not* double counted on the list of legal fees. The total charged by Martin's firm up through March 30, 2007 is $252,409.35 which does *not include* all of the sizeable additional bills yet to be received from translators.

2.24 **Attorneys Tamuleviz and Hulquist's bills and expenses: Exhibit 10** contains a spreadsheet setting forth a summary of their legal bills which total $175,500. **Exhibit 11** contains a detailed listing of their out of pocket expenses, which total $58,370.74. The detailed backup for the fees and expenses is in **Exhibits 12, 13,** and **14** which are copies of three itemized bills sent to Father by Tamuleviz and Hulquist. Copies of documents

backing up expenses are attached to each bill. The listing of expenses is *not* double counted on the list of legal fees; and one expense, for about $1,600 does not appear on their bills, but is added and a copy provided with the list of bills.[10] The total charge by Tamuleviz and Hulquist up through March 16, 2007 is $233,870.74.

2.25 **Attorney Gerald L. Nissenbaum, Nissenbaum Law Offices: Exhibit 15** contains a spreadsheet setting forth a summary of legal fees charged Father by Nissenbaum Law Offices, which total $257,828. **Exhibit 16** contains a detailed listing of the out of pocket expenses charged Father by Nissenbaum Law Offices, which total $49,149.50. The detailed backup for the fees and expenses is in **Exhibits 17, 18** and **19** which are copies of three itemized bills sent to Father by Nissenbaum Law Offices. Copies of documents backing up expenses are attached to each bill. The listing of expenses is *not* double counted on the list of legal fees and includes fees paid to Dr. Edward S. Gross and others. The total charged by Nissenbaum Law Offices up through April 10, 2007 is $306,977.50.

2.26 Consistent with the principals set out in ***Grendel's Den,***

---

[10] After the court issued its opinion, it was felt by Father, his counsel and the GAL he needed to move from the temporary residence to another location where it was unlikely Mother would suspect he was, to ensure the safety of all. Father moved to a

***Inc. v. Larkin***, 749 F.2d 945, (1st Cir. 1984), the bills from each attorney set forth such details as the date on which work was done, who did the work, a general description of the work performed (providing the court with needed information but not at the sacrifice of the attorney client privilege), the amount of time that work consumed, and the extended value of that time. On some bills, the time per lawyer is summarized at the bottom and then multiplied to arrive at that the total.

2.27 The hourly rate for lawyers is fair and reasonable in light of their respective education, training, experience, and reputation. While Martin's rate may seem low, vis a vis other counsel, particularly given his experience, his rate is actually at the high end of fees charged by counsel in Greenville, S.C. On the other hand, Nissenbaum's rate may seem high, it is not at the highest level of similarly qualified lawyers in Boston, MA.

2.28 Before a lawyer or expert was hired, that person's hourly rate was discussed with and agreed upon by Father, as were the hourly rates for associate counsel, law clerks, paralegal and other staff.

2.29 As for experts, they had to be located under stressful conditions, provided with necessary material and their affidavits prepared and provided to opposing counsel before the

---

hotel into a room booked under the Tamuleviz and Hulquist firm

trial commenced in accordance with scheduling orders issued by the court.

2.30 **Edward Gross, M.D.** (**Exhibit 20** [Affidavit and c.v.]) a practicing and teaching pediatrician, with wide forensic experience, who was asked to review and give an opinion on Mother's claims that Father's sexual abuse and physical abuse of the children was proven by the so-called naked pictures.

2.31 **Professor Dominic Boyer, Ph.D.** (**Exhibit 21** [Affidavit and c.v.]) an expert anthropologist was asked to review the naked photographs and give an opinion on whether they are considered pornographic in Germany or in America.[11]

2.32 **Wolfgang Vomberg, Esq.** (**Exhibit 22** [Affidavit and c.v. excluding statistical and German-language pages]), is an expert in German family law and, as well, an expert on Germany's record in returning children under the Hague Convention.[12] In addition

---

name.

[11] In order to get the naked pictures to Dr. Boyer over a weekend, it was necessary to send a messenger from Boston to upstate New York on a Saturday delivery, with Dr. Boyer working on this matter over the weekend and providing his opinion by Monday.

[12] Attorney Vomberg has personally handled more than 200 in-coming Hague Convention cases in Germany and achieved a very high return rate. Vomberg is also a co-author of the leading German language treatise on this Convention. Father believed he needed to have evidence on these two topics ready to present to the District Court because Pollack claimed Germany had a poor record of returning children under the Hague Convention; and argued that therefore the USDC ought not to return the Kufner

to testifying, Vomberg obtained and reviewed the entire so-called German file to provide Father's Counsel with assurance that the claims represented by Father were documented therein, which was so. Vomberg was paid a total of $25,000 directly by Father, covering Vomberg's time, travel and expenses.

2.33 **Alex Weintrob, M.D.** (**Exhibit 23** [Affidavit and c.v.]) an expert forensic child psychiatrist who reviewed all relevant material and opined on numerous relevant topics, including material harm and prejudice to the children.

2.34 During trial, the court appointed Carol Jenny, M.D. At the suggestion of Nissenbaum, counsel agreed on the record,

---

children to Germany. Pollack dropped these claims only when Vomberg came from Frankfurt, Germany to testify at trial.

Pollack also argued the German court order of March 1, 2006 (**Trial exhibit 3A** - parties to exercise custody of their children jointly]) and German law did not give Father a right to custody because subsequent orders regarding 'access' resulted in Mother having the only right to custody. Vomberg brought to court an English-language treatise by C.H. Beck and others on German "Family & Succession Law."

Vomberg testified at trial and also provided the court with a copy of treatise by Beck, which, in turn, was specifically relied upon by the Opinion issued by the District Court.

While Nissenbaum spent some three hours with Vomberg on the evening before he testified, it was clear that much more time was needed. However, in this case, with very short time-lines for everything, one does not have the luxury of spending a full day or two with an expert from another country, with his lifetime of experience in a system with a different way of presenting evidence to a court. That does not make one system better than another, just different.

with the approval of the court, that none of the above witnesses, nor any of Mother's expert witnesses would testify until after the receipt of Jenny's report and testimony. If, thereafter, a party wanted to, he or she could take evidentiary depositions of their various experts, which would then be submitted to the court.

2.35 After Dr. Jenny testified, Father deposed Dr. Weintrob. Weintrob's deposition, with Father's designation of portions thereof were filed as evidence in this case (collectively docket #54) without objection from Mother's counsel.

2.36 Weintrob's total fee is $22,500, as set forth on **Exhibit 16**, of which Father has already paid $20,000.

2.37 Documentary evidenced for the funds transferred to Weintrob and for transfer to others appears on **Exhibit 24**, which is a list of "advances" paid to Father by his family corporation. These advances have been or will be paid back to the company by Father's father, as the company must have the cash flow. Father has signed a promissory note to his father, which requires repayment in full for the money borrowed.

2.38 **Robert Arenstein, Esq., an acknowledged expert in Hague Convention cases**, was retained for the purpose of doing needed research and preparation of draft memoranda on points of

law that arose during the case. By way of two examples, Arenstein and Nissenbaum worked together in the preparation of memoranda on the "Article 13b [burdens of proof] and on the Child Preference" - noted on the docket as Father's pre trial memorandum, Docket #33 and on the "Motion and Memorandum on Enforcing Order of Custody Issued by German Court [under UCCJEA], Docket #41. Father paid Arenstein a retainer of $15,000. Arenstein's c.v. and bill (showing his hourly rate, etc.) have been requested, but not yet received; and will be filed with the court when received. Arenstein has advised he will not be charging for time over the $15,000. Documentary evidenced for the funds transferred to Arenstein is set forth on **Exhibit 24**.

2.39 Per the District Court's order, Father had to pay for half the fees of GAL and Dr. Jenny. Father is aware that Dr. Jenny's fee was $3,500 and the GAL's total fees, up through the end of trial, were $22,640. Father is responsible for one-half these fees or $11,320. Money was paid to the GAL on account of Dr. Jenny's and the GAL's fees from Father's clients' funds at Tamuleviz and Nissenbaum, in a total sum of $9,590. The balance of the debt due by Father on this account is $1,730.

2.39 The GAL provided detailed copies of her bills to the court, setting forth the balances due her up through the date of

her last bill. The District Court will not be surprised to learn that the GAL was, as requested by the District Court very actively involved in the post-Judgment portion of this case. It is expected the GAL will provide her bill for additional time.

2.40 Mother's share of the money due the GAL and Dr. Jenny will come from the 12,000 Euro, with any balance going back to Father. Father has instructed that, to the extent he has any refund, it should first to go pay any balance he might then owe the GAL, with any other balance to be paid promptly.

2.41 While the case was pending, when Father had the children, he paid for a visitation supervisor, at the rate of $60 per hour, some of which appears on the Tamuleviz bills. To the extent this charge is not itemized on Father's above stated expenses **(Exhibit 3)**, Father will seek to provide the court with additional details.

2.42 As needed, Father also paid for airfare, hotels and meals for out-of-state witnesses to come to testify at trial (together with their hotel and related expenses). Beyond what is included in this motion, Father still needs to gather additional payments and obligations for these expenses.

2.43 Father's lawyer in Germany, Frau Walther, was active and severed an important role. She obtained a copy of the entire German court file, as requested by this court, and

provided a copy of that file to Vomberg for his review. She also filed motions on behalf of Father seeking sole / exclusive custody of the children and, as well, a motion asking for a so-called Article 15 order. And, she spent countless hours trying to facilitate responses from the Germany social services agency and the GWG to various issues, successfully urging them to issue reports.

2.44 Repayment of the Father's debt will necessarily cause a reduction in Father's and the children's standard of living. Even so, history promotes confidence that Father accurately assessed his need for these services.

2.45 Because of the numerous issues raised by Mother and her experienced counsel, Father had no choice but to engage equally experienced counsel and prepare his case to address all of those potential matters. Proper preparation included hiring experts, taking expedited depositions, filing various motions and responding to those filed by Mother, and a seven day trial.

2.46 In sum, Father's lawyers and paralegal staff spent a total of 1,754.45 hours representing Father in this action up through the dates on the attached exhibits. Since then, there has been numerous other pleading and work caused by further pleading by Mother both in this court and the First Circuit Court of Appeals.

2.47 As shown on the spreadsheet at **Exhibit 25**, Nissenbaum spent 308 hours, Hickey, Nissenbaum's associate, spent 36 hours, Martin spent 543.25 hours, Martin's associates spent 148.5, Tamuleviz spent 253 hours, Hulquist spent 211 hours. In addition, 254.7 hours of paralegal time was spent on this case (**Exhibit 25**), broken down as follows: Nissenbaum's paralegal staff spent 100.7 hours; Martin's paralegal staff spent 154 hours.

2.48 In this case, one can say that the proof was in the pudding, in that the children were ordered returned to Germany by this court.

**Legal basis for ordering Mother to pay money to Father.**

3.1 42 USC 11607 (b)(3) requires that:

> Any court ordering the return of a child pursuant to an action brought under section 4 [the section detailing how to file a petition for the return of a child] ***shall*** order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

(Emphasis supplied).

3.2 Beyond the mandate in ICARA, at bar, Mother's conduct

went beyond being an obdurate litigant and nefarious to fraudulent. And, this is so in face of what felt to Father to be a shift of the burdens of proof assigned under the Convention and ICARA from Mother to him.

3.3 Once Father proved he had and was exercising a right of custody to the children and that Mother had taken the children to America without his permission or that of the German court, the burden of proof was then on Mother to prove her case. Mother's primary claims were that she had leveled serious charges against Father in Germany and that the German court and investagatory agencies had not done a proper investigation, thus exposing the children to the Father, who was a pedophoile, a sexual and psysical abuser of the children, and, among other things, a pornographer and one who was engaged in international Internet pornography.

3.4 But, Mother did not list any experts who could testify in support of her claims.[13] She need to have but did not have witnesses to prove the German social service and GWG did not perform a proper investigation. She had to prove, but had no

---

[13] Mother listed one social worker whose c.v. showed she had been involved no more than 10 sexual abuse cases in her entire 30-year career. And, her career focused primarily in managing various social service offices and not being involved in clinical work. It is doubtful, had she taken the stand that, under the court's gate-keeping role, this witness would have been allowed to testify.

witnesses to testify that the so called naked pictures would be considered pornographic in Germany. She had to prove her claim that the pictures were involved in Internet ponorgraphy, but she listed not one witness in support. In sum, mother was before this court making unsupported claims - claims which, unlike ***Danaipour v. McLarey,*** 286 F.3d 1(1st Cir. 2002) - had had actually been investigated in depth in Germany.

3.5 So, what happened? The court appointed a Guardian ad litem and, then appointed Dr. Jenny. The court undertook to contact the FBI to get a search of the Internet.

3.6 Under the law applicable to the Convention, Mother had to prove by clear and convincing evidence both (i) that the children would be, if returned, at a grave risk of harm at the hands of Father and, as well, (ii) that Germany could not protect the children from that harm. Mother never offered evidence, other than her unsupported claims, in support of her burdens of proof.

3.7 Mother claimed that M.K. needed urgent ear surgery, which he was being deprived of in Germany. Yet, she admitted she never brought this to the attention of, nor requested assistance from, the German court. Put another way, Mother's own failure in this regard doomed her ability to prove this was

an Article 13b defense. Yet, the court[14] insisted the parties go to the appointment with Dr. Keamy that had been unilaterally made by the Mother. And, in the end, the opinion provided by Dr. Keamy was the same as that testified to by Father, which he had obtained in Germany - that M.K. did not need urgent surgery, but rather this was elective.

3.8 Mother could not sustain her burdens of proof by merely waiving her arms and resting on her own, unverified claims. Evidence is needed to support claims. Yet, she had no such evidence or experts to present.

3.9 The Father, while making his objections for the record, cooperated and facilitated wherever he could. He obtained and filed a full copy of the German file. He had his German counsel prod and beg the GWG and social service agencies to file their reports, which, until now, had been held up by their desire to have a last interview with Mother.

3.10 The record will show that Father produced translated

---

[14] Father does not question that the court acted to ensure the health and welfare of the children. And, of course, at the end of the day, the court's GAL and expert, Dr. Jenny agreed with everything that Father's experts were prepared to testify to. Father's only point here is that - if Mother had to prove her case and did not, this case would have been over much sooner, with the same result. Of course, all the while, up until the GAL and Dr. Jenny filed reports, Mother was cheering on the appointments made by the court, fully understanding this might provide Mother with the very evidence she did not otherwise have.

documents on essentially every critical point raised by Mother and that Mother did not provide any substantive documents in translation, other than the Kain affidavit. And, as to Kain, she failed to appear for her deposition and thereafter disappeared into the proverbial woodwork.

3.11 As a result of all that took place at trial, Father believes it fair to say that he disproved each and every one of Mother's claims, including proof that he, not Mother was the parent who acted in the best interests of the children.

3.12 At the end of the case, Mother was left holding her false, unproven, empty claims.[15] Dr. Jenny testified that the GWG did a proper evaluation and arrived at conclusions consistent with the information they received. Dr. Jenny, the R.I. DCYF, the German social service agency, the GWG and even the FBI found the pictures not to be pornographic and that the father was not engaged in pornography. This is consistent with the testimony which Dr. Gross and Dr. Boyer were prepared to provide to the court.

---

[15] Even at this late date, Mother is trying to prove no proper investigation because the social welfare agency did not show the naked pictures to the children. But, that was not its job. Its job was to determine if the pictures were pornographic and if there was any evidence of sexual abuse, as alleged by Mother. The social service agency states that experts (GWG) were appointed and it was thus, its job to discuss the phtotographs with the children.

3.13 Mother's dastardly accusations missed the Article 13b mark by a wide margin and beyond, as they were proven to be false. Mother's attempt to foist these claims on the court amounts to attempted fraud.

3.14 In addition to making fraudulent misrepresentations to the court, Mother showed a reckless disregard for this court's authority and orders, by repeatedly violating its orders. This all took time and, thus, cost Father more and more money, and required the court to take time from other pending matters.

3.15 Mother and her counsel approached this case with the apparent philosophy that they would make the easy things hard for Father so that he would think that the hard things were impossible. That is fine, so long as now that Mother has lost, she accepts she cannot just go forward without having to **PAY** damages.

3.16 Mother's conduct, metaphorically speaking, was like that a wild operator of an uninsured car intentionally being driven into Father in order to strike and then substantially maim him for life. In a real sense, Mother did strike Father with her litigation car; and she has thrown him deeply into debt. Now, having no insurance, this court is asked to order Mother to pay Father that total sum required to fully compensate

him for his very real financial injuries - and this does not include a sum for either pain or suffering.

3.17 Mother's actions rise to the level of having committed a fraud on Father and on this court. Such fraud cannot be tolerated and, in and of itself, ought to require an award of legal fees and costs.

3.18 As described in ***Aoude v. Mobil Oil Corp.***, 892 F.2d 1115 (1989), fraud on the court has been defined where:

> [b]ecause corrupt intent knows no stylistic boundaries, fraud on the court can take many forms. ... The present case is a near-classic example of the genre. Appellant's bad faith is manifest. By [appellant's] own admission, he fabricated the purchase agreement; gave it to his lawyer; read the complaint before it was filed; realized that counsel, acting on his behalf, proposed to annex the bogus agreement to the complaint (thus representing it to be authentic); and nevertheless authorized the filing. Thereafter, [appellant] and his counsel continued to act out the charade until, in the course of pretrial discovery undertaken by [the opposing party], a [witness] revealed a glimmer of the truth. Even then, [appellant] hedged his bets, forcing [the opposing party] to piece together the sordid story bit by bit. ... The only conceivable reason for [appellant's] elaborate duplicity was to gain unfair advantage, first in the dispute, thereafter in litigation. The tactic plainly hindered defendant's ability to prepare and present its case, while simultaneously throwing a large monkey wrench into the judicial

> machinery. In our view, this gross misbehavior constituted fraud on the court. See ***Cleveland Demolition Co. v. Azcon Scrap Corp.***, 827 F.2d 1332, 1338 (5th Cir. 1978) (fraud on court may exist where witness and attorney conspire to present perjured testimony); ***Rozier v. Ford Motor Co.***, 573 F.2d 1332, 1338 (5th Cir. 1978)."

3.19 "The failure to disclose material facts, ***Jose v. Lyman***, 316 Mass. 271, 281(1944) which deprives an interested party of his day in court, constitutes fraud upon the court. See, ***O'Brien v. Dwight***, 363 Mass. 256 , 285-289, and cases cited." ***Altsuler v. Minkus-Whalen, Admx.***, 31 Mass. App. Ct. 937 (1991) (Rescript).[16]

3.20 "Fraud on the court implies corrupt conduct and embraces 'only that species of fraud which does, or attempts to defile the court itself. ***Munshani v. Signal Lake Venture Fund, II, LP***, 60 Mass. App. Ct. 714, 718 (2004) (Plaintiff attempted to support claim with fraudulently manufactured e-mail allegedly sent him by defendants, resulting in dismissal of case due to plaintiff's "wholly false" e-mail and "deliberate and intentional fraud on the court"; and where plaintiff,

---

16 Many of the cases regarding fraud as cited by Father are Massachusetts state court cases. Father did not have sufficient time to research and fully brief the issue of fraud specific to Rhode Island or Federal Law. However, it can be said that fraud is fraud, so if it is found by a Massachusetts court, it would likewise be found in a Rhode Island or Federal court.

"throughout the entire process .... remained silent and never once came forward to revel his fraudulent conduct.")

3.21 "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense. ***Rockdale Mgmt. Co. v. Shawmut Bank, N.A.***, 418 Mass. 596, 598, quoting from ***Aoude v. Mobil Oil Corp.***, 892 F.2d 1115, 1118 (1989)." ***Munshani,*** *supra* at 718.

3.22 "When a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct. The judge has broad discretion to fashion a judicial response warranted by the fraudulent conduct. (citations omitted)" ***Munshani,*** *supra* at pp. 718-719.

3.23 A party's fraudulent conduct adversely impacts the court by "setting in motion a number of hearings and a detailed investigation by the Court's appointed expert" and that the court and the defendants were "made dupes to [plaintiff's] actions" and "spent countless hours trying to sort out [the

fraud]." "And, had plaintiff 'succeeded with his fraud, he could have dramatically changed the face of the case ... to the serious detriment of the defendants and the Court as well.' " ***Munshani***, *supra* at 720.

3.24 At bar, Mother made allegations she knew were false. She did so knowing the courts in Germany had already investigated her claims and found them invalid, and without substance or a basis in fact. Nevertheless, her conduct caused Father to incur substantial legal fees and costs to attend hearings on her allegations, hire experts to refute her allegations and, as well, pay the court appointed experts.

3.25 "All courts are at the mercy of litigants and their advocates ... in the often difficult search for truth. The ability to discover fraud in the process, particularly sophisticated computer fraud, is greatly limited. Thus, the imposition of strong sanctions is one of the very few ways of deterring such activity in the future. This Court intends such a message here." ***Munshani***, *supra* at 720-721 (quoting, with approval, from the decision of the trial judge.)

3.26 " 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.' These powers are 'governed not by rule or

statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' ***Link v. Wabash R.R. Co.***, 370 U.S. 626, 630-631 (1962)" ***Munshani,*** *supra* at 721.

3.27 A "court retains inherent power to do what is necessary and proper to conduct judicial business in a satisfactory manner. ... The courts' inherent power includes 'the ability to do whatever is reasonably necessary to deter abuse of the judicial process.' " ***Aoude v. Mobil Oil Corp.***, 892 F.2d 1115 (1989). Here, the best way to deter Mother from again acting out as she did in this court, is to now make her "pay" for her behavior by awarding Father fees and costs.

3.28 "There is an irrefragable linkage between the courts' inherent powers and the rarely-encountered problem of fraud on the court. Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system." ***Aoude v. Mobil Oil Corp.***, 892 F.2d 1115 (1989).

3.29 "Tampering with the administration of justice in a [fraudulent] manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated

consistently with the good order of society. ... The public welfare demands that the agencies of the public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." ***Aoude v. Mobil Oil Corp.***, 892 F.2d 1115 (1989) quoting with approval from ***Hazel - Atlas Glass, Co. v. Hartford - Empire Co.***, 322 U.S. 238, 246, 88 L. Ed. 1250, 64 S. Ct. 997 (1944).

3.30 "All in all, we find it surprisingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process - to combat those who would dare to practice unmitigated fraud upon the court itself. To deny the existence of such power would, we think, foster the very impotency against which the Hanzel-Atlas Court specifically warned." ***Aoude v. Mobil Oil Corp.***, 892 F.2d

3.31 Fraud deprives the other party of a fair hearing. ***Newark Stereotypers' Union No. 18 v. Newark Morning Ledger, Co.***, 397 F.2d 594, 599 (3rd Cir.) In this case, this court and the Father had to spend countless extra time and money to investigate and address Mother's false claims, claims which had already been investigated in Germany.

3.32 "There is not the slightest unfairness in holding plaintiff responsible for the bitter fruit of the scheme he masterminded ..." ***Aoude v. Mobil Oil Corp.***, 892 F.2d 1115

(1989).

3.33 In Germany, when a parent who is receiving child support and alimony kidnaps a child, their right to receive child support and alimony terminates. Accordingly, under German law, as of February 1, 2007, Father was no longer obligated to pay alimony to Mother. Nevertheless, this court ordered him to continue making said payments which he has done **(Exhibit 26)**.

3.34 The fees and costs incurred by Father are a direct result of Mother's nefarious conduct.[17]

3.35 Accordingly, the only way to make this right and encourage Mother not to continue with such conduct is to make her pay for her conduct. That Mother claims to be broke does not mean an order ought not to enter requiring her to reimburse Father for the expenses she created. Such an order will also

---

[17] Where a case is long and difficult, where a party has adopted dilatory and evasive litigation practices and is recalcitrant and taken positions which increase counsel fees, the Probate Court should award the responding party her attorney's fees. ***Perkins v. Blake***, 3 Mass. App. Ct. 415 (1975); ***Redding v. Redding***, 398 Mass. 102, 110-111(1986); ***Davidson v. Davidson***, 19. App. Ct. 364, 378 (1985). The Court may award additional legal fees and costs to the Wife in consideration of the Husband's obstructionist tactics. ***Kennedy v. Kennedy***, 400 Mass. 272, 275 (1987). ***Downey v. Downey***, 55 Mass. App. Ct. 812 (2002). (Husband's "obstructionist conduct" prolonged proceedings and caused wife's counsel to engage in extra ordinary discovery efforts.) Where a party provokes unnecessary or ill - motivated litigation, the provocateur ought not to gain an advantage through its use, nor force the other party to bear the burden of defending such claims. See, ***Bird v. Bird***, 24 Mass.App.Ct. 362 (1987),

serve a public purpose - to warn others who may be similarly inclined that they best tread lightly and come to court only with legitimate claims.

3.36 Mother, an educated, talented designer with a history of owning a thriving business at which she made over $100,000 per year, is well able to obtain employment from which, over time, she will be able to pay down her debts.

**IV. The Size of the Potential Award.**

4.1 Father spent a great deal of money on this case. Having done so, he is back to square one - where he was on January 22, 2007 - with the children in Germany, while he still faces an on-going highly contested divorce with Mother. The issues there remain as they were at that time, with the need for a final trial on the validity of the pre-marital agreement, custody, visitation, alimony and child support.

4.2 Having spent more than $900,000 per the summary below, the status quo still exits in the German courts.

**Summary of Money Paid by Father**

| Paid to | Exhibit | Amount |
|---|---|---|
| List of Money paid directly by Father | 3 | $51,827.91 |
| Attorney Martin | 4-9 | $252,409.35 |
| Attorneys Tamuleviz and Hulquist | 10-14 | $233,870.74 |
| Nissenbaum Law Offices | 15-19 | $306,977.50 |
| Wolfgang Vomberg | n/a | $25,000.00 |
| Dr. Weintrob | 17 | $22,500.00 |
| Attorney Arenstein | 17 | $15,000.00 |
| GAL and Dr. Jenny | n/a | $9,590 |
| | | |
| Total | | $917,175.50 |
| | | |

4.3 Even if the court thinks Mother could never or might never pay Father the award he seeks, that should not deter the court from entering the award designed to make Father whole, financially speaking. Mother is well-educated, highly talented in art and photography, speaks several languages and, in Germany could likely obtain good paying employment in the international department of a bank or large corporation.

4.4 Father had formidable opposition in Sullivan and Worcester, in Mother and, as well, in having to accept the Court's desire to act with an abundance of caution. As to the latter, Father accepted that as a standard, feeling he had nothing to hide and that the evidence would prove Father was innocent of Mother's charges.

4.5 Mother is the one person who can well be said to be

responsible for all of Father's monetary losses. And, now, she should be ordered to pay Father his out of pocket costs. None of this will compensate the US Government or this court for the time it took, on an urgent basis, to try and decide this case.

4.6 Father asks the court to look at things from his point of view, as the case was moving forward, when decisions had to be made and the choices were not many, all under extreme conditions.[18]

4.7 From Father's point of view, his retaining and paying Dr. Gross and Dr. Boyer was reasonable at that point in time. Back then, there was no way of knowing the court would appoint Dr. Jenny or that her report would do everything Gross and Boyer would have done, and more.

4.8 Father prepared a memorandum on the factors courts have used to consider accepting the child's preference and on evaluating the age and maturity of the children. At that point Father could not know what the GAL and Dr. Jenny would opine, but at the time it was reasonable to do that work.

4.9 The court may find that instead of a wide variety of

---

[18] For example, while Vomberg may not have been the best witness, in terms of providing the court with information, he was qualified and did provide the court with a treatise which he said was authoritative and which was accepted as such by this court. Beyond that, under the circumstances, Vomberg was one of two witnesses who were available and the other witness had previously been consulted by Wife, so there was a conflict.

hourly rates, that a blended rate should be used. Or the court may find that the bills, as submitted, are fair and reasonable and meet the requirements of federal law.

4.10 If the court is to hold a hearing, Father asks for permission to subpoena to a deposition or to court the records of Sullivan and Worcester to put before the court all of its time records, and, as well, the expenses, plus the regular billing rates of each of the attorneys and other staff who worked on this case on behalf of Wife. In that way, the court would compare the time they took, compared to what was done by Father's counsel,[19] understanding it was Father who seeming has the burdens of proof, as Mother did not have experts, etc. Alternatively, the court could invite Sullivan and Worcester, or order it, to produce this material to Father's counsel and to the court.

4.11 That said, Father believes that this court saw and heard the case and is an excellent position to evaluate the work and the fees and costs that should be awarded. As such, there is no requirement that the court hold a hearing on the amount of fees and costs awarded.

4.12 Father had come to the firm belief that the court is

---

[19] In the exercise of its discretion, the Court may compare the services and legal fees of the parties and evaluate the work which was performed by counsel for each party as reflected in the pleading and during court appearances and trial. ***Robbins v. Robbins***, 19 Mass. App. Ct. 538, 541 (1985).

highly trained, intelligent and, most of all for a judge, fair. Therefore, Father advises the court that he is content to rest on his written pleading and the submissions and that he will not appeal no matter what or how much is awarded.

## V. CONCLUSION

5.1 Having obtained an order of return, in furtherance of the announced Congressional intent, as set forth in ICARA, this court is obligated to order Mother to pay Father's fees and expenses. This part of ICARA is intended to somewhat make up for the fact that, unlike many other Convention countries, the USA does not provide free public counsel in such cases. Thus, the mandatory provision of ICARA provides a way for the successful left behind parent to recapture his or her expenses.

5.2 The court is asked to order Mother to pay Father an award which it finds is proper under these circumstances, including a consideration of the fact that Mother did not proceed in good faith or with fair dealing, but instead came to this court with unclean hands with a goal of perpetrating fraud.

Dated: April 10, 2007

Respectfully submitted,

Dominik Kufner, by his attorneys

/s/ Gerald L. Nissenbaum

Gerald L. Nissenbaum, Esq.
(MA BBO# 372400)
NISSENBAUM LAW OFFICES
160 Federal St., 24th Fl.
Boston, MA 02110
617.330.9090
617.330.6909 (fax)

Charles A. Tamuleviz, Esq.
(Fed. Bar# 6115)
TAMULEVIZ, HULQUIST & BIANCHI, LLP
144 Westminster St.
Providence, RI 02903
401.490.2939
401.490.2940 (fax)

Bradford Neal Martin, Esq.
(Fed. Bar #3310)
BRADFORD NEAL MARTIN & ASSOC. PA
75 Beattie Place, Ste. 910
Greenville, SC 29601
864.552.9990
864.552.9992 (fax)

CERTIFICATION OF SERVICE

On this 9th day of April 2007, I caused the forgoing, Petitioner's Motion For Order of Fees and Costs, to be filed electronically and it is available for viewing and downloading from the ECF system.

By E-mail to:

Tina Kufner, Pro Se

/s/ Gerald L. Nissenbaum

Gerald L. Nissenbaum, Esq.
(MA BBO# 372400)
NISSENBAUM LAW OFFICES
160 Federal St., 24th Fl.
Boston, MA 02110
617.330.9090
617.330.6909 (fax)
E-mail: jerry@nissenbaumlaw.com