# FORENSIC PSYCHIATRIC OPINION

**Re: Dominik Kufner v. Tina Kufner**

**Date of Report: February 21, 2007**

## BRIEF TABLE OF CONTENTS

I. Reason for Referral and Introduction ........ page 1

II. Sources upon which opinion is based........ page 2

III. Summary of Documents submitted........ page 4

IV. Issue addressed........ page 15

A. Children's stated preference........ page 15

B. Potential benefits and risks of children remaining in U.S. ........ page 17

C. Potential benefits and risks of children returning to Germany ........ page 18

D. "Pornographic content of photographs ........ page 19

E. Evaluation of forensic evaluation in Germany........ page 19

F. Issue of estrangement or alienation........ page 20

V. Forensic Formulation and Conclusions........ page 20

A. Forensic Formulation ........ page 20

B. Forensic Conclusions........ page 20

## I. REASON FOR REFERRAL AND INTRODUCTION

A forensic psychiatric opinion was requested by Bradford Martin, Esq. in reference to the issue of the Kufner children, Joseph, age 8 ½ years (DOB: 9-3-98), and Matthias, age 7 years (DOB: 12-9-99) having recently (some time between January 23rd and 25th, 2007) been brought to the United States from Germany by their mother without their father's knowledge or consent. The father is seeking immediate return of the children to Germany with him. Based upon several photographs of the children naked, Ms. Kufner, the mother, has alleged that the children are at risk of "grave danger", stating her belief that the photos are pornographic, and that the father thus represents a serious risk to their safety. The children have allegedly stated that they do not wish to return to Germany with their father. Ms. Kufner has made a motion in the Rhode Island Federal District Court requesting that she be allowed to remain in the United States, alleging an exception to the Hague Convention. She has also filed a Domestic Abuse complaint with the Cumberland (RI) Police Department, requesting a restraining order, implying both physical and sexual abuse of the children.

I have been asked to offer an opinion, based upon the documents submitted to me, regarding:

1. The issue of the use and credibility of children's stated preference
2. An assessment of the potential risks and benefits of, a) the children's continuing to remain in the United States, b) the risks and benefits of their returning to Germany, and c) the potential effects of anything more than a short-term delay in their returning.
3. The alleged "pornographic" aspect of the photographs of the children
4. The adequacy of the forensic evaluation done in German (GWG)
5. The issue of estrangement or alienation

## II. SOURCES UPON WHICH THIS REPORT WAS BASED

The following documents were submitted to me. Note should be made that they are all translations from German into English.

Case 1:07-cv-00046-S-LDA Document 35-1 Filed 02/21/2007 Page 6 of 46

1. Photographs of the Kufner children naked.
2. Photographs of the Kufner family on vacation
3. Photographs of the Kufner family and of the father's home
4. A chronology of events as prepared by Mr. Kufner.
5. Letters and decisions of the Local Court of Weilheim, Germany, dated from February to October 2006
6. Documents prepared by the Department of Youth and Family, District Office of Weilheim Schongau
7. Psychologist Documents prepared by the Corporation for scientific forensic and legal psychology, Family Law Work Group
8. Letters from attorneys of both parties, dated August 10, August 22, Sept. 12, and Dec. 20, all 2006
9. Transcript of phone message from Tina Kufner on 1/23/07
10. Ms. Kufner's Statement of Domestic Abuse, dated Jan. 31, 2007
11. Affidavit of Alexandra Kain dated 10-22-06
12. Deposition of Lucie Lucas dated 2-8-08
13. Deposition of Tapani Hanninen dated 2-8-07
14. Deposition of Tanja Kufner dated 2-09-07
15. Deposition of Charles Lucci, dated 2-9-07
16. Certification of Ms. Kufner In Support of Modification of *EX Parte* Order, filed with Rhode Island District Court, dated Feb. 2, 2007
17. Report Cards of both children for the period of 8/21/06 to 1/19/07
18. Affidavit filed by Ms. Kufner's attorneys, dated Feb. 7, 2007
19. Affidavit of Agnes G. dated July 28, 2006
20. Report of the expert psychological assessment dated February 22, 2007

## III. SUMMARY OF THE DOCUMENTS SUBMITTED

A. Photographs of the Kufner children naked.

1. These apparently are the photos referred to elsewhere as the "pornographic" photos.

2. There are 39 photos, all showing the children without clothes In some the children are making faces, as if for the camera. In some they appear to be hiding behind large blocks (?). One picture shows one of the boys apparently lying across a sofa or chair, with his backside toward the camera, demonstrating his scrotum. Another shows a child facing the camera with his buttocks and anus exposed.

B. Photographs of the Kufner family on vacation

1. 75 photographs taken at the beach and apparently elsewhere. Many show the children (either in the nude or in clothing) in what appears to be a natural setting, for example at the beach, with a female, and in a baby pool.

C. Photographs of the Kufner family and of the father's home

1. 73 photos of children and family - these show the children in various activities and seemingly having a good time

2. 13 photos of the father's home

D. A chronology of events with comments, as prepared by Mr. Kufner

1. Begins with 1988 and ends with February 2007.

2. Reports on his relationship with Ms. Kufner, outlining their premarital agreement, marriage, birth of children, etc. Reports that she smoked and drank alcohol during her pregnancy with Joseph.

3. Report on his parenting of the children.

4. States that between 2002 and 2005 she began to show sings of depression

5. They separated in June 2005. In September 2005 Mr. Kufner moved into a new house, which the boys loved.

6. Relates the picture-taking incident.

7. States that from October 2005 to March 2006 Ms. Kufner made it clear she wanted to take the children to the US.

8. A custody case begins in December 2005.

9. Initial contact from Dept. of Youth in relationship to custody dispute. Ms. Kufner filed for sole custody.

10. Review of court proceedings 2006.

11. September 2006 - children tell father they have been forced to make recorded statements about him and then receive an award. Children also report that they are forced to move to America because their mother wants this.

12. December 2006 - dispute over Christmas vacation and his fear that Ms. Kufner will leave with the children.

13. Dec. 20, 2006 - the Court rules that the children's passport be deposited at the US consulate until Jan. 20th.

14. January 2007 - the Court orders Ms. Kufner to pay back money.

15. January 23-31, 2007 - relates incidents in which Ms. Kufner took the children to the US, a police investigation begins, it is discovered that Ms. Kufner is with her family in Rhode Island, Ms. Kufner reports to the police that Mr. Kufner had physically abused her and the children.

16. Feb. 2, 2007 - Ms. Kufner submits motions to U.S. District Court of Rhode Island

E. Letters and decisions of the Local Court of Weilheim, Germany, dated from February to October 2006

1. 2-23-06 judge's decision that Ms. Kufner deposit the children's passports

2. 8-29-06 asked the Dept of Youth to take into account the photographs submitted by Ms. Kufner

F. Documents prepared by the Department of Youth and Family, District Office of Weilheim Schongau, Ms. Holler

1. 2-6-06 - regarding custody and visitation rights.
2. 7-10-06 - regarding custody, summarizes that both parents have sufficient space for the children, relates the various allegations of each, and concludes that there is no evident acute endangerment of the children when they are with their mother. Recommends no further disputes and suggests parent counseling/mediation.
3. 9-20-06 - regarding visitation rights. Offers the opinion that there is not sufficient evidence for suspension of contact between the father and the children
4. 2-14-07 - Ms. Hofler's resume.

G. Psychologist Documents prepared by GWG, the Society for scientific forensic and legal psychology, Family Law Work Group

1. 8-18-06 Note that Dr. Streif, who speaks English fluently, will be brought in
2. Ms. Hertkorn's letter of 9-28-06 to the Judge related to her exploration. It states that regular contact of the children with their father "corresponds to the interest and the declared wish of the children."

H. Letters from attorneys of both parties

1. 8-10-06 - Petition that Mr. Kufner consent to relocation of the children to Rhode Island and offers grounds, including that the disadvantages of the move are far less than the disadvantages of remaining in Germany.

Case 1:07-cv-00046-S-LDA Document 35-1 Filed 02/21/2007 Page 10 of 46

2. 8-23-06 - Requests that Mr. Kufner's visitation rights be suspended until the presentation of the expert opinion and that only supervised contact be permitted. Grounds are the photographs referred to above

3. 9-12-06 - apparently Mr. Kufner's response to the above. Discusses the photographs, and the au pair girl, Ms. Kain. Asks that the petition for suspension of visitation rights and supervised visitation be rejected.

4. 12-20-06 - apparently from Ms. Kufner's attorney and in relationship to the upcoming winter vacation and objecting to any prohibition of her travel to the United States, and apparently to the issue of depositing the children's U.S. passports. Denies that Ms. Kufner raised the prospect of her traveling to the U.S. without Mr. Kufner's consent. Denies that she planned relocation without his consent.

I. Transcript of phone message from Tina Kufner on 1/23/07

1. To Bega and Tapani asking them to retract a statement that Tapani had written, and denying that she is unfit or that she has called Mr. Kufner a pedophile.

J. Ms. Kufner's Statement of Domestic Abuse, dated Jan. 31, 2007

1. States that Mr. Kufner has taken photos of her children "in a pornographic and perverse nature" in Germany.
2. "My children had bruises and wounds on their body during the time I had picked them up."
3. The children said their father took the pictures against their will.
4. She had seen child pornographic material next to his compute while in his house.
5. Requests a restraining order to protect her children and herself from further abuse.

K. Affidavit of Alexandra Kain dated 10-22-06

1. She was hired as a nanny in September 2005.

2. She relates an experience in which she was putting the boys to bed, and they were running around naked "out of my control". As she was trying to round them up, they were "jumping from couch to couch and throwing things at each other" until Mr Kufner started playing games with them and then picked up his camera and began taking photos of the boys playing nude. Many of the photos seemed harmless to her, but "certain poses and the closeness of the shots" made her uncomfortable and question his "seemingly harmless and playful attitude towards it."

3. She relates another incident in which she states that he was behaving inappropriately with her, asking if she were lonely, and sitting close to her As a result she left his employ the next morning and wrote him a note. She assumed that if his intentions were pure and perhaps misunderstood, he would have contacted her for an apology or to simply clear his name.

L Deposition of Lucie Lucas dated 2-8-08

1. She is a witness on behalf of Mr. Kufner. She has worked as an au pair.

2. She relates that the boys would sometimes run around being silly and were naked

3. She is asked to comment upon photographs.

M. Deposition of Tapani Hanninen dated 2-8-07

1. A witness on behalf of Mr. Kufner.

2 Discusses relationship with Mr. Kufner.

3. States that it was normal for little children to be naked during the summer.

4. He is asked to comment upon the naked photos and Ms. Kufner having filed them with the court, claiming that he was a pedophile.

N. Deposition of Tanja Kufner dated 2-09-07

1. She is Mr. Kufner's sister and a witness for him.

2. She is asked about her relationship with Ms. Kufner and about their marriage. She is also asked about her marriage and divorce

3. She is asked about nudity in Europe and about the photos.

O. Deposition of Charles Lucci, dated 2-9-07

1. Witness for Mr. Kufner.

2. Asked about his relationship with Ms. Kufner and Mr. Kufner.

3. Asked about children and nudity. Asked about Ms. Kufner and Mr. Kufner taking photos of the boys while they naked

P. Certification of Ms. Kufner In Support of Modification of *EX Parte* Order, filed with Rhode Island District Court, dated Feb 2, 2007

1. She seeks a modification of the Order that will permit her to travel with the children to Massachusetts and will prevent Mr. Kufner from using private investigators "to stalk and/or intimidate my family and me."

2. She states that she brought her children to Rhode Island because "Petitioner engaged in deviant acts with them." She includes a sample of photographs he took. "Under any civilized standards, the poses in several of the pictures clearly constitute child pornography."

3. She notes that she attempted to bring these to the attention of authorities in Germany, but was limited by her not being able to read or write German and, "to say the least, child abuse protection efforts are not sophisticated in Germany." Additionally the German court reviewed only a portion of the photographs, "which did not include the most graphic."

4. She attaches Exhibit A (photographs), B (record of video rentals, including two labeled as hardcore), and C (affidavit of Alexandra Kain)

Q. Report Cards of both children for the period of 8/21/06 to 1/19/07

Joseph

1. Absent 20 days, late 8 days
2. Regarding expectations: Meets, nearing, or more time needed in English; mostly meets expectations in Advanced German, and in non-academic subjects.

Matthias

1. Absent 21 days, late 8 days.
2. Matthias is described as "a lively well-mannered student", who is an asset to his class
3. He is described as a good student who is meeting expectations in both academic (including English and Advanced German) and non-academic subjects

R. Affidavit filed by Ms. Kufner's attorneys, dated Feb. 7, 2007

1. Asking that Mr. Kufner's motion be rejected and that all lawsuits be suspended until the Rhode Island court has passed a decision.
2. Notes that this lawsuit will involve an investigation against Mr. Kufner for child pornography.
3. States that the photographs are not harmless pictures of little children in the nude. Lists as evidence the photos.
4. Lists as evidence a number of declarations in lieu of an oath by various witnesses.
5. Offers a history of Ms. Kufner's discovery of the photos.
6. States that on 1-23-07 both children were sick and running a temperature. Therefore Ms. Kufner called the school to notify it of the children's absence. They were not ready to go to school the following days and therefore stayed at home. On 1-24-07 both children told Ms. Kufner that they had recently seen the "naked skin" photographs on their father's computer screen. This alarmed Ms. Kufner to such an extent that "she spent the following days thinking of how to protect the children." She "felt the understandable need to visit her

family where she would find a shoulder to cry on and be able to restore her energy for a few days before having to face the dispute with the petitioner back in Germany." She had called Mr. Kufner to inform him that the children were sick and therefore there would be "a necessary interruption of access."

7. She needs to await the outcome of the lawsuit in Rhode Island before returning to Germany. It can be ruled out that she wanted to make off to the USA with the children in order to deprive Mr. Kufner of access.

8. She has visited the US before. Had she intended to leave Germany for good, she could already have done so long ago.

9. She denies many of his allegations. For example, she did not delay meeting with the GWG, but simply it was difficult to find a date.

10. Multiple declarations in lieu of an oath:

a. Ms. Lucas describes the children's love of their mother, the clean and tasteful nature of Ms. Kufner's house and furnishings, Ms. Kufner's having called her in a desperate state stating that she had no money for the children's clothing, and offering her opinion that Mr. Kufner is conducting a slander campaign against his wife and imploring the Court not to believe his accusations. Discusses both parties use of alcohol.

b. Mr. Kas - has known the family. He is supportive of Ms. Kufner and her care of the children and the household. He was struck that on one occasion Mr. Kufner poured himself a drink after greeting Ms. Kufner and the children. States that Mr. Kufner drinks excessively. "It is mere speculation whether Ms. Kufner's drunken driving and being checked by the police was staged by Mr. Kufner or not or was a chain of unfortunate circumstances, but it was an absolute exception to her entire prior behavior."

c. Ms. Wacker, psychotherapist, stated that she visited Ms. Kufner and the children in May and October 2006 and found the atmosphere "relaxed and pleasant."

d. Ms. Grunwald, a friend of Ms. Kufner, notes her positive relationship with Ms. Kufner. She states that she has accompanied her in regard to legal issues, that Ms. Kufner worried that Mr. Kufner would not return the children, has been told of the nude photos, and was present when Ms. Kufner had to submit the children's passports (noting that at no time did

Ms. Kufner express or suggest an intention of leaving the country with the children and not coming back). Denies that Ms. Kufner's household was messy.

S. Affidavit of Agnes G. dated July 28, 2006

This affidavit stated that Agnes was a witness to the functioning of Ms. Kufner's household. Agnes stated that the mother influenced the children in a negative manner about their father, stating that their father wanted to take them away from their mother and did not provide sufficient money. Agnes further stated that the children were not adequately cared for, that Ms. Kufner frequently drank alcohol, and that the house was not kept in a proper condition, with much trash, dog excrement being left in the house, and filthy toilets.

T. Report of the expert psychological assessment dated February 22, 2007

1. The report (allegedly prepared by a Mrs. Hertkorn) reviewed the court order to make "a family psychological assessment in association with the arrangement of parental custody".
2. The methodology was carefully outlined. It was noted that a Dr. Streif, a psychologist who spoke English, was involved in the assessment.
3. It was noted that on 1-16-07 the evaluators agreed with Ms. Kufner by telephone for a home visit on 2-7-07
4. The evaluators were informed by Mr. Kufner on 1-29-07 that Ms. Kufner had, without his knowledge, left the country, terminating their schooling.
5. While early in the evaluation the children were open with the evaluators, their demeanor changed, so that by the end they appeared to fear saying anything that would enforce their experienced conflict of loyalty.
6. The positions of the mother and father were reviewed. The mother spoke of the naked pictures of the children, which raised her suspicion that the father had pedophilic tendencies. "She claims that upon her inquiry, the children made pertinent remarks." This suspicion was reinforced by the appearance of sexualized conduct on the children's part. The evaluator reported that Ms. Kufner is convinced that the best interest of the children

would be served by living with her in Rhode Island and attending school there. She further reported that she was not sufficiently integrated in Germany. The father stated that his wife is not capable of assuming full responsibility for the children based upon her mental susceptibilities He stated that she had integrated into Germany. He reported his having taken the pictures in question while they children were at his house and were frolicking in the living area before bed. He stated that in part the children took their own pictures and that he had sent these photos to Ms. Kufner in October 2005 It was noted that he stated he would be able to concentrate on the children's custody, but also considered it very important for the boys to have a lot of contact with their mother because they are very attached to her.

7. The father was given an MMPI-2, which results were in the normal range The mother did not receive the same.

8. Interaction of the boys with their father was reported as positive and loving, filled with good humor and fun, free of fear, and harmonious. He was also reported as giving the children structure and direction. It was further noted that in his child-rearing he was well-skilled at recognizing the children's needs. There were no indicators of any problems in the father and children's relationship.

9. The children were assessed as apparently healthy with age-appropriate development. They stated that they were happy in their current school (Munich International School). They reported having numerous friends.

10. In the course of the assessment, "an increasing emotional burden of the children because of the parents' conflicts became apparent, which has obviously brought both children into an increasingly intense conflict of loyalty." Joseph described himself has having a positive relationship with each parent. He "constantly and unambiguously expressed the desire to go on living with his mother in Germany and to regularly visit his father." This was apparently related to his wanting to remain in school and with his friends. "He wants to 'persuade' his mother to stay here He said that, mainly, she wants to move to the United States because her friends live there. "The first time Joseph was asked, he answered clearly that if his mother were to move to the US, he wanted to stay with his father"

11. In regard to the nude photos, Joseph said that he could no longer remember. When asked, he described a "Pee-Pee Dance", as he and his brother dancing naked such that their genital shook. They had thought it was funny and had laughed.

12. At one point Joseph stated that he really wanted to spend more time with his father, such as one week with each parent. "To the question of what he thought his mother would say to this wish of his, the boy stated, visibly downcast: 'She would say no because she wanted me to go to America.' In that case he said he would rather stay with his father in Germany. But the best would be if the parents were 'back together, no fighting.'"

13. Matthias demonstrated a positive relationship with both parents, and noted that he was satisfied with the status quo. When asked about the nude photos, he said his father had taken 3 or 4 pictures, and that it was "really funny." Asked about the Pee-Pee Dance, he described it, said that it was Joseph's idea, and that it was "really funny." He further said that he and his brother had told their mother, who thought it was "a little funny" too, as had their father.

14. It was noted that, in conclusion, the boys had made solid statements that they wanted to spend more time with their father as well as stay in Germany. It was noted that Joseph's statements on a Sentence Completion test, "suggest an immediate deciding opinion-shaping influence by the mother on the boys' attitude towards their father." Both children knew of their mother's intention of returning to the US, and were afraid that she "would not give any consideration to their wish to stay in Germany, to live near their father and also especially to stay at their familiar school, that they were so used to."

15. It was noted that the evaluation revealed a positive attachment of the children to both parents. The positive relationship of the sons with their father was put into question by the mother. "Among other things, she alleged that the father neglected his parental responsibility and accused him of sexual abuse of the children." "She demanded a discontinuation of the contact between the father and the children." It was reported that she showed an absence of the tolerance "necessary for the maintenance of an emotionally positive and socially favorable relationship between the father and the children. In particular the mother is apparently unable to properly evaluate and recognize the emotional

importance of the father" for the children, and "to guarantee a corresponding contact of the father with the children in the best interest of the children."

16. "From an expert point of view, the step to leave Germany unprepared with the children was detrimental to the children Joseph and Matthias." She (the mother) was noted to be "no longer capable on account of the separation to satisfy her parental responsibility for the welfare of the children. The evaluation provided no indication that the father is not in a position to assume the parental responsibility for the children Joseph and Matthias. Against this background it is at this time recommended from an expert point of view to transfer the right of custody of the children to the father."

## IV. ISSUES ADDRESSED

### A. CHILDREN'S STATED PREFERENCE

General considerations

1. In addressing and evaluating a child or adolescent's stated preference for one position over another, it is, in my opinion, necessary to evaluate such within a biopsychosocial context, namely the biological, psychological/emotional, and sociocultural (family, peers, overall cultural elements [such as religion, language, country of origin]) factors and how they interact. This will include an evaluation of the child or adolescent's overall intellectual and emotional maturity and stability. Any evaluation must consider the context in which a child offers a preference.

2. Biological factors include: age and developmental level, biological maturity, and cognitive maturity. The last involves overall intelligence, but, more importantly, the level of the development of cognition. This includes: a) the ability to think critically; b) the ability to think about one's own thought processes; c) being able to tolerate and synthesize mutually contradictory or ambivalent thoughts and feelings, as contrasted to all-or-nothing or black-or-white thinking (for example that one decision can be both good and bad, or the risks and benefits of taking a course of action or of not taking that course of action); d) the capacity

for abstract (versus concrete) thinking; and, finally, 3) the ability to intellectually and rationally consider what is best for him/her.

3. Psychological factors include: emotional maturity; the ability to take another person's feelings into consideration and to be able to have that affect his/her preference without determining it, self-esteem, identity issues.

4. Sociocultural factors include: **most importantly**, the degree of pressure and influence one or both parents exerts upon the child/adolescent to make the choice the parent wants him/her to make, and how that influence is exerted (secretly, directly, subtly, very indirectly, by actions if not words). This is sometimes referred to as attempts to alienate an individual. Factors also include the individual's interactions with his/her family and peers, and how that affects his/her stated preference.

Considerations specific to this case

1. Based upon the level of biological maturity, including cognitive maturity of children aged seven or eight, in my opinion they lack the ability or capacity to, a) think critically, b) on a cognitive level to assess what is in their best interest, and c) step back and consider the advantages and disadvantages of a particular course of action.

2. Psychologically, children of this age, and particularly children caught up in a parental dispute, lack the emotional maturity to assess what may be best for them, particularly over the long term. Additionally, they generally experience considerable apprehension about any change, and often will express a preference to remain in their immediate surrounding rather than undergo another change This preference is thus based upon their emotions, rather than upon a level of cognitive or emotional maturity

3. In this case, the issue of parental influence is especially strong. The documents indicate that she has spoken to the children of her wish to live in the United States. Again, according to the documents they, especially Joseph, have expressed the wish to remain in Germany and spend time with their father. It is clear that Ms. Kufner, by her actions if not her words, has very much attempted to influence the children to experience some significant level of apprehension in regard to being with their father. Their current stated preference is likely

related to, a) their abrupt leaving him and their country, whether or not she attributed this to their being sick and needing to be with her family, and, b) the fact that their time with their father is being supervised. No matter how this has been explained to them, it is clear that it is very different from their usual situation. Additionally, based upon the reported level of her concern that the children are in danger when they are with their father, in my opinion it is unlikely that this has not, in some way, been communicated to them.

4. Considering the high level of attention that has been paid, and continues to be paid, to the nude photographs, it is highly likely that the children have gotten the message that their father has behaved in an inappropriate manner with them. This too is likely to significantly affect any stated preference of theirs.

5. An additional factor in this case is the likelihood of a high level of suggestibility in children of this age. They have a high tendency to believe that a parent is acting only in their interest, and thus have a high tendency to believe that the other parent is potentially harmful to them if the first parent so describes him.

**B. POTENTIAL BENEFITS AND RISKS OF THE CHILDREN REMAINING IN THE UNITED STATES**

Benefits

1. The major benefit would be that, if there were a high probability that the children have been abused by their father, remaining here with their mother and with supervised visitation, the children would be safe.

2. This benefit, however, could also occur were they to return to Germany with their mother.

Risk

1. Even assuming the charges against their father are true (which assumption I am not making), there is, in my opinion, major risk to the boys of significant long-term psychological turmoil and damage as a result of their remaining in the U.S. This is because,

a) they have been abruptly removed from the ongoing stability, particularly in regard to their schooling; that stability is especially important to children who are exposed to ongoing parental instability and ongoing litigation; b) they have been removed from ongoing stable home environments; c) they have been removed from ongoing contacts with friends and family in Germany; d) they are now placed in a situation in which they will have to adjust to a new school, new friends, etc.

2. Assuming the charges against their father are not true, there is, in my opinion, significant risk that their previously established, and apparently documented, positive relationship with their father, will be very much adversely affected This is likely to have ongoing negative effects upon their overall sense of trust (already challenged by their mother suddenly removing them from their father's care and additionally obtaining supervision of visitation).

3. In my opinion, these risk factors are increased the longer the children remain in the United States. Delay in returning to Germany clearly accentuates the risks.

4. A **major** risk, in my opinion, is represented by Ms. Kufner's charges against the boys' father and her apparent incapacity to support the boys' relationship with him. In contrast is Mr. Kufner's stated position of supporting the boys' ongoing relationship with their mother, despite the actions she has taken against him.

## C. POTENTIAL BENEFITS AND RISKS OF THE CHILDREN RETURNING TO GERMANY

Benefits

1. These children, who have already been exposed to considerable instability as a result of their parents' ongoing litigation, in my opinion, are very much in need of whatever stability they had while in Germany, particularly in relationship to their schooling, their friends, and their relationship with their father.

2. Any further litigation which would take place in this country can occur in Germany, where the Courts and authorities are familiar with the background. Based upon the documents submitted to me, it is my opinion that the parties' positions have been and are being addressed.

3. Their ongoing contact with both parents, assuming their mother would return to Germany with them, can be preserved

Risks

1. Assuming their mother returns to Germany with them, I see no substantial risk to the boys.

## D. "PORNOGRAPHIC" CONTENT OF PHOTOGRAPHS

1. I have viewed the multiple photographs submitted to me. Of the many photos of the boys naked, seemingly only two show specific views of buttocks and genitals. These are among 39 pictures, which appear to show the boys in a variety of playful poses. In my opinion to characterize these as child pornography is grossly inappropriate, particularly within the context of the picture-taking.

2. An additional issue is the aspect of European culture in regard to nudity or taking pictures of children in the nude. In my opinion, attitudes toward nudity and taking pictures of children in the nude vary a great deal throughout the United States, from some people finding them offensive to others finding this quite natural and normal.

## E. EVALUATION OF THE GWG FORENSIC PSYCHOLOGICAL EVALUATION

1. As noted above, this report outlined in detail the methodology used.

2. In my opinion, the methodology was in accordance with that used in forensic evaluations (custody and otherwise) in the United States, and is in accord with most professional parameters for custody evaluations. In my opinion the evaluation appears to have been carefully done. The conclusions appear to follow the data that was elicited and reported. I saw no evidence of bias against Ms. Kufner. On the contrary, in my opinion, the evaluation can be seen as quite open-minded and fair-minded.

### F. THE ISSUE OF ESTRANGEMENT OR ALIENATION

1. The documents indicate that Ms. Kufner attempted to influence the children against their father. As far back as August 2006 she asked that the children's visitation with him be supervised, in my opinion, a clear message to the boys that their father was dangerous.
2. The German forensic report noted Joseph's comments about his mother influencing him.
3. Ms. Kufner's abrupt removal of the children from their father's care, with the reasons she has offered the Court (implied physical and sexual abuse), appears to represent an attempt, if not to alienate the children from their father, at least to significantly affect their previous reported (including by the neutral evaluator) good, close, and loving relationship with him.

## V. FORENSIC PSYCHIATRIC FORMULATION AND CONCLUSIONS

### A. FORENSIC FORMULATION

1. Based upon the documents submitted to me, there is a long history of high-conflict disputes between the parties. These have been submitted to the German Court, which ordered the evaluations noted above.
2. According to the documents, Ms. Kufner has wanted to resettle in Rhode Island for some time (see above letters from her attorneys of August 2006 in which she asked permission to relocate and then asked that visitation be supervised) and has tried to influence the boys to want to come to the US, which would involve leaving their school and their ongoing contact with their father. They boys are reported to not want to resettle.
3. The issue of the "pornographic" pictures is not a new one, but one that has been investigated by the German court system.
4. Out of her stated concern that remaining in Germany posed a grave danger to the boys, she abruptly and without informing Mr. Kufner (she stated in her papers only that she had informed him that the boys were sick and thus would not be seeing him), removed the boys from contact with their father.

**B. FORENSIC CONCLUSIONS**

1. Based upon the documents submitted to me, it is my professional opinion that the children were and are, in fact, not in any danger in their father's presence. There are indications that, to the contrary, they are at greater risk being with their mother, who appears to be alienating them from their father.

2. In my opinion, the pictures which have been alleged to be pornographic are not, in fact, so, particularly noting the specific and general context in which they were taken.

3. Based upon the foregoing, in my opinion Ms. Kufner exposed the boys to the risk of significant interference in their development.

4. Weighing the risks and benefits of remaining in this country as opposed to returning to Germany, in my opinion there is far greater risk to their psychological well-being of their remaining here as opposed to returning to Germany.

Alex Weintrob, MD

Certified in General, Child & Adolescent, and Forensic Psychiatry,

American Board of Psychiatry and Neurology

Clinical Associate Professor of Psychiatry,

Cornell University Medical College

Clinical Associate Professor of Psychiatry,

New York University Medical School

New York State License # 86965

**ALEX WEINTROB, M.D.**
**12 West 96th Street**
**New York, NY 10025**

**Telephone: (212) 662-9513**
**Facsimile: (212) 662-9625**

# CURRICULUM VITAE

## EDUCATION

Harvard College, 1952-1956; AB cum laude, June 1956

School of Medicine, University of Pennsylvania, 1956-1960; M.D., June 1960

Internship, Montefiore Hospital, July 1960-June 1961

Residency in Psychiatry:

Montefiore Hospital, July 1961-February 1962 and February 1964-June 1964 (U.S. Army: February 1962-February 1964)

Kings County Hospital, July 1964-June 1965

Fellowship in Child Psychiatry, Albert Einstein College of Medicine, Jacobi Hospital, July 1965-June 1967

## PSYCHIATRIC EXPERIENCE

Private Practice of child, adolescent, and adult psychiatry, July 1967-

Private Practice of child, adolescent, and adult forensic psychiatry 1980-. (Last includes child custody, visitation, relocation; civil and criminal issues.)

Staff Psychiatrist and Consultant for family therapy, Jewish Child Care Assn., 1967-1970

Clinical Director, Youth Residence Center (a residential treatment center for emotionally disturbed adolescents, Jewish Child Care Assn.), 1970-1988

Consultation/Liaison Child Psychiatrist - Lenox Hill Hospital Dept. of Pediatrics, 1975-

U.S. Department of Health and Human Services - Alcohol, Drug Abuse, and Mental Health Administration, Consultant, 1979-1982

Consulting Pediatric Psychiatrist, Center for Learning Disorders, 1982-

Examiner, American Board of Psychiatry and Neurology
Adult Psychiatry, 1986-1990
Child & Adolescent Psychiatry, 1988-

Panelist, New York State Supreme Court Panel of Impartial Psychiatrists, 1987-

Washington Business Group on Health - National Resource Network for Child and Family Mental Health Services - Technical assistance consultant, 1995-1997

Disaster Psychiatry Outreach – clinician, Rapid Deployment Team

Physicians for Human Rights – forensic evaluations of traumatized asylum seekers

New York State Unified Court System P.E.A.C.E. Program – lecturer & group facilitator

Participant, CAPTN- The Child and Adolescent Psychiatry Trials Network

## HOSPITAL AND MEDICAL SCHOOL APPOINTMENTS

New York University Medical School - Clinical Associate Professor of Psychiatry

Cornell University Medical College - Clinical Associate Professor of Psychiatry
This position has involved teaching and supervision of medical students, adult and child/adolescent residents in psychiatry, and fellows in forensic psychiatry.

New York Hospital - Associate Attending Psychiatrist, 1989-

Lenox Hill Hospital - Attending Psychiatrist, 1975-

Beth Israel Medical Center - Assistant in Psychiatry, 1967-1975

Albert Einstein College of Medicine, Instructor in Psychiatry, 1968-1972

## BOARD CERTIFICATION AND LICENSES

Board Certification - American Board of Psychiatry and Neurology
Certified in Psychiatry 1968 (cert. #9839)
Certified in Child and Adolescent Psychiatry 1970 (cert. #642)
Certified (Added Qualifications) in Forensic Psychiatry 1996 (cert. #492)

Medical License - New York State #86965

## PROFESSIONAL MEMBERSHIPS

American Academy of Child and Adolescent Psychiatry - Life Fellow; Delegate, 1981-1987; Secretary/Treasurer of Assembly of Regional Organizations, 1985-1987; Member of Academy Council, 1985-1987

American Society for Adolescent Psychiatry --Life Fellow; Treasurer, 1992-1994; Vice President, 1994-1996; President-elect, 1996-1997, President, 1997-1998

American Psychiatric Association – Distinguished Life Fellow; Chairman of, and presenter at, Committee on Childhood and Adolescence, N.Y. District Branch, 1981-1985; Area II - Committee on Childhood and Adolescence, 1985-1995

Association of Family and Conciliation Courts
New York Society for Adolescent Psychiatry - Board of Directors, 1984-1987; President, 1989-1990

New York Council on Child and Adolescent Psychiatry - Board of Directors, 1979-1982; Chairman, Pediatric Liaison Committee, 1980-1985; President, 1986-1987; Advisory Council, 2001 -

International Society for Adolescent Psychiatry – Member of Scientific (Program) Committee, 1998-1999

American Academy of Psychiatry and The Law

New York County Medical Society - Special Committee on Maternal and Child Welfare, 1985-1992

Interdisciplinary Forum on Mental Health and Family Law (American Academy of Matrimonial Lawyers) - National Forum (delegate of Amer. Acad. Child/Adol. Psychiatry), 1990-; New York State Forum (delegate of N.Y. Council Child/Adol Psychiatry), 1990-; Member of Executive Committee, 1992-1995, 1998-2001; co-chairman, 2001- 2003

National Interdisciplinary Colloquium on Child Custody Law - a group of nationally recognized judges, attorneys, and child psychiatrists who collaborated on writing textbooks on issues of custody and visitation for the judiciary; 1993-

## PUBLICATIONS

Changing Population in Adolescent Residential Treatment: New Problems for Program and Staff. American J. Orthopsychiat., 34: 104-112, 1974

Long Term Treatment of the Severely Disturbed Adolescent: Residential Treatment versus Hospitalization. J Amer. Acad. Child Psychiat. 14: 436-450, 1975

Confidentiality and its Dilemmas in Child and Adolescent Psychiatry, Chapter 43 in Principles and Practice of Forensic Psychiatry, ed. Richard Rosner. Chapman & Hall: New York, 1994

Levy, RJ, ed. Legal and Mental Health Perspectives on Child Custody Law: A Deskbook for Judges. West Group: Eagan, MN 1998 (contributor)

Replenishing ASAP's Vines: Vintage and Nonvintage Wines. Foreword, Adolescent Psychiatry, Vol. 23, ed. A. Esman. The Analytic Press: Hillsdale, NJ, pp. 1-4, 1998

Custody, Visitation, and Relocation Disputes in Adolescence (with Nye, S.) in Textbook of Adolescent Psychiatry, ed. Rosner R.; Edward Arnold: London, 2003

Levy, RJ, general ed. Mental Health Aspects of Custody Law, Carolina Academic Press: Durham, NC, 2005 (contributor)

## SELECTED PROFESSIONAL PRESENTATIONS (WORKSHOPS, SYMPOSIA, LECTURES)

The Future of Residential Treatment - Chairman of, and presenter at, Panel at 1978 Annual Meeting, American Association of Psychiatric Services to Children

Suicide in Residential Treatment - Chairman of, and presenter at, Panel at 1982 Annual Meeting, American Association of Suicidology

Self-Mutilation and Suicide in Disturbed Adolescents: Theoretical, Clinical, and Research Issues. Workshop at Annual Meeting, American Orthopsychiatric Assoc., April 1984

Changing Patterns in Residential Treatment. Symposium at Annual meeting, American Academy of Child Psychiatry, October 1985

Adolescent Suicide - Workshop at Council of Family and Child Care Agencies (New York) April 1986, October 1987

The Impartial and "Partially Objective" Child Psychiatrist's Custody/Visitation Evaluation: A Judge, an Attorney, and Two Child Psychiatrists Evaluate the Evaluators. Leader of Workshop at Annual Meeting, Academy of Child and Adolescent Psychiatry, October 1989

Case 1:07-cv-00046-S-LDA Document 35-1 Filed 02/21/2007 Page 30 of 46

How To Do Child Custody Evaluations - Course at American Psychiatric Assn. Annual Meeting, May 1990, May 1991

Update on Current Issues in Child Custody Evaluations - Chair, Symposium at American Academy of Child & Adolescent Psychiatry Annual Meeting, October 1990

Visitation: From Infancy through Adolescence - Problems and Pitfalls. Panel at American Academy of Matrimonial Lawyers Annual Meeting, October 1991

Child Visitation Problems in Divorce - Symposium at American Psychiatric Association Annual Meeting, May 1992, and at American Academy of Child & Adolescent Psychiatry Annual Meeting, October 1992

How to be an Effective Expert Witness in a Child Custody Case - Institute, American Orthopsychiatric Association Annual Meeting, May 1992

Love Them or Leave Them: Management of Treatment-Resistant Teenagers - Seminar, annual meeting, Northeastern Society of Orthodontists, Dec. 1992

Attachment Theories in Child Custody Recommendations: Science vs. Myth - Lawyers vs. Psychiatrists. Chairman, Symposium at American Academy of Child and Adolescent Psychiatry Annual Meeting, October 1994

Psychological Aspects of Facial Deformity. Paper presented at Annual Meeting of Northeastern Society of Orthodontists, December 1994

Parent Education and Custody Effectiveness (P.E.A.C.E.) -- Main speaker and group leader, 1996-

Adolescent Psychiatry and the Law -- Yearly lecture for course : Adolescent Psychiatry: Forensic Considerations and Clinical Practice, 1996-

The Forensic Expert in Custody/Visitation Disputes. Symposium at the Association of the Bar of the City of New York, March 1997

Elicitation of Cooperation and Conflict Resolution in Pre-teens and Teenagers, Pediatric Dentistry-Orthodontic Study Club, New York, November 1997

Evaluation of Allegations of Sexual Abuse. Half-day symposium with Dr. April Kuchuk. New York Freudian Society, November 1997

Psychiatric Society Presidents' Policy Dialogue. Colloquium involving presidents of the major psychiatric societies dealing with children and adolescents. Annual Meeting, American Society for Adolescent Psychiatry, March 1998.

Child Custody Evaluations: When is a forensic expert necessary. Interdisciplinary Forum on Mental Health and Family Law, New York, November 1998

Teenage Violence in America: The Different Faces of Disordered Teenagers. Biennial Meeting, International Society of Adolescent Psychiatry, France, July 1999.

Child Psychiatry and Divorce Custody Litigation. Chairman of, and presenter at, Symposium at Annual Meeting, American Academy of Child and Adolescent Psychiatry, New York, October 1999.

Munchausen By Proxy: Co-mingling of Psychiatry and the Law. Fall Meeting, Tri-State APPL, December 1999

Munchausen By Proxy: Case Presentation and Review of the Literature. Pediatric Grand Rounds, Lenox Hill Hospital, December 1999

Perils and Pitfalls of Child Custody Litigation. Symposium on Child Custody: How to Protect the Children. New York State Office of Mental Health, Annual Research Conference, December 2000

The Therapeutic Alliance: Special Considerations with Adolescents. Society for Adolescent Psychiatry, New York, February 2001

Psychiatric Evaluations in Child Custody Litigation: A View from the Couch, Bench and Bar. Faculty member. April 2001

Forensic Evaluations for Custody and Visitation: Science or Wizardry - The Judge As A Cautious Consumer of Psychiatric Expertise. New York State 2001 Summer Judicial Seminar: Furthering Justice Through Education, July 2001

Update on Juvenile Delinquency: A Tale of Two Homicides. New York Society for Adolescent Psychiatry, New York, May 2002

Confidentiality in Adolescent Psychiatry. Annual meeting, American Society of Adolescent Psychiatry, New York, March 2003

Adolescent Murderers: Two Cases in Contrast. Annual meeting, American Society of Adolescent Psychiatry, New York, March 2003

Psychopharmacology Update. Lenox Hill Hospital Pediatric Grand Rounds, Jan 15, 2004

The Scientific Basis of Expert Testimony: Its Application to Matrimonial Disputes. Chairman, Symposium at Annual meeting, American Psychiatric Association, New York, May 2004

Numerous Presentations at Pediatric, Psychiatric, and Child Psychiatric Grand Rounds, and at various legal associations and schools on a variety of topics including Child Custody, Adolescent Depression, Adolescent Suicide, Attention Deficit/Hyperactivity Disorder, Child and Adolescent Psychopharmacology, Chronic Illness in Children, Violence in Adolescence, etc. Presented at Lenox Hill Hospital, St. Vincent's Hospital, Association of the Bar of the City of New York, American Academy of Matrimonial Lawyers, schools, etc. 1970-