UNITED STATES DISTRICT COURT
THE DISTRICT OF RHODE ISLAND

DOMINIK KUFNER, C.A. No. 07-46S
Petitioner,

v.

TINA KUFNER,
Respondent.

**PETITIONER'S REPLY TO RESPONDENTS OBJECTION TO PAY FOR PETITIONER'S LEGEL FEES AND COSTS.**

## I. INTRODUCTION

Dominik Kufner called his wife's cell phone on the afternoon of January 23, 2007, in hopes of speaking with his children. He was devastated to hear an American ring tone because that ring tone confirmed Dominik's worst fears: his wife had finally followed through on her threat to abduct his children to the United States. Tina Kufner, in defiance of German court orders that she was obligated to obey, had set into motion circumstances that would radically alter the future lives of Dominik Kufner and his children.

Dominik did not know where in the United States the children were, but immediately began his quest to restore his family and return the children to the country of their birth. He made a call to his family's longtime attorney in Greenville, South Carolina. This attorney had represented the family's U.S. business interests for more than 30 years, but more significantly, had been contacted almost a year before to research what protections international law would provide in case Tina Kufner kidnapped the children. For six difficult days, Dominik did not

know his sons' whereabouts, but finally Tina made a tactical mistake by calling the German school to claim that the children had been absent due to "sickness". Little did she know that the school had caller I.D., and thus the childrens' whereabouts were discovered. Dominik Kufner was merely beginning an almost three-month ordeal to restore his reputation and children to their rightful home and heritage in Germany.

The known history of Dominik's family can be traced back to 1592, and the family business has existed since 1862. Joseph and Matthias, now seven (7) and eight (8), are the heirs apparent of this family business. If the Mother succeeded in her outrageous claims of child pornography and sexual abuse, the future of the children, Dominik, and the family business would be in jeopardy. Therefore, Dominik faced the daunting task of fighting some of the most outrageous and scurrilous accusations anyone can make in a country that was not his. He was compelled to assemble a legal team to fight the prospect of losing his children forever, as well as the threat to his own freedom and the future of the family business that employs him.

Now, Dominik, relying on international law and the U.S. justice system, petitions this Court with the only instrument left that can return his children and him to the financial position they were in prior to the wrongful abduction, and to serve as a deterrent to the Respondent in her efforts to continue her reign of terror.[1] The Mother has suffered no consequences for her wrongdoing to date: she has not been held in contempt of court despite her numerous violations of court orders; she received the luxury of being represented by a preeminent law firm for free, which she contemptuously fired; and she has been shielded from criminal prosecution by the undertaking this Court has ordered. It is now time to issue an order that will serve to deter her

[1] Respondent's demands during the mediation of the case show that this was an attempt to extort money from Father using the children as ransom. See Exhibit 1.

from her obvious plans to kidnap the children again and take them to Portugal, her ancestral home. Something must be done to stop the madness.

## II. Relief Requested.

Petitioner has moved this court to order that he be awarded costs and requests that Respondent's Motion to Strike Costs be denied.

## III. Basis for Granting Requested Relief.

Petitioner has made a motion for costs pursuant to 42 USC 11607 (b)(3).

### A. An Award of Costs is Necessary to Restore Father to the Financial Position he Would Have Been in had There Been no Removal or Retention

#### 1. Purposes of Awarding Costs and Fees

Under ICARA, costs are properly assessed against Tina Kufner (hereinafter referred to as "Respondent"), and should be paid by her. The purposes of awarding costs and fees under § 11607(b) (3) are (1) "to restore the applicant to the financial position he or she would have been in had there been no removal or retention" and (2) to deter such removal or retention. Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10494-01, 10511 (Mar. 26, 1986).

This case began in Germany where Dominik Kufner (hereinafter referred to as "Father") sought to work with Respondent to arrange suitable joint custody of the children. When Father stopped giving Respondent large sums of money every time she threatened to take the children to America, Respondent began attacking him with allegations that he had harmed the children by taking some nude photographs, in the privacy of his home with the children's au pair present.

In February 2006, Respondent filed for sole custody of the children, alleging that Father had taken inappropriate photos of the children. Father fully cooperated with the German Court, the allegations were proven groundless, and he received increased access to the children.[2] When Respondent realized she would not get what she wanted in Germany, she deviously secured the children's passports from the American Consulate's office (in defiance of the German Court's Order) and wrongfully removed the children from Germany by traveling secretly to the United States.

**2. <u>The Daunting Task Facing the Father</u>**

Father is a German citizen who has lived and worked almost his entire life in Germany. He is not experienced with the American court system and has certainly never faced anything as serious as the abduction of his children and surrounding charges of child pornography and abuse.

None of the legal fees or other costs would have been incurred if Respondent had stayed in Germany to pursue the custody issues, as ordered by the German Court. Her coming here forced Father to seek the return of the children, to put the kids and him back at the same place they all were in as of January 23, 2007 in Germany. And, that is what Father is asking the Court to do, to put his children and him back into the position they were in on January 23, 2007.

**3. <u>Father Contacts the Company's American Lawyer</u>**

Father first called upon the attorney who had represented his father's company and him personally in preparing the antenuptial agreement and working out the marital provisions with

[2] During the pendency of the U.S. case, Father was awarded full temporary custody.

Respondent's attorney in the United States.[3] He also used Mr. Martin in March of 2006 to research what legal protections he may have in the event of an international kidnapping.

Father had information that Respondent and the children could be in New York, Las Vegas, or Rhode Island. Once he was able to locate the children, Father then had to hire local counsel to appear with Mr. Martin in Rhode Island, where Respondent had been hiding the children.

**4. <u>A Nationally Recognized Lawyer is Hired by Respondent</u>**

Respondent retained Barry Pollack and his firm Sullivan & Worcester to represent her.[4] Pollack appeared with a team of 2 attorneys and a paralegal along with local counsel. Pollack's firm was paid by a non-profit organization but was free to Respondent. Pollack presented himself as an authority on the Hague Convention with the resources of a 200 person firm behind him. In response to Pollack's appearance in the case, Father retained Jerry Nissenbaum, who has been involved in numerous Hague Convention cases, to assure he would have an advocate with significant Hague Convention trial experience, in light of attorney Pollack's self-proclaimed bold statement that he had never lost a Hague Convention case.

**5. <u>Pollack Contested Almost Every Issue in the Case</u>**

Under the Hague Convention, to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that "the child has been wrongfully removed" within

---

[3] Mr. Martin's past experience with Father was required when Respondent alleged that she had been placed in a poor financial position by the antenuptial agreement and that she had not understood the agreement when she signed it because it was in German when in fact she received an English version of the agreement to review and sign. Respondent continually introduced irrelevant but explosive issues requiring Martin's knowledge of the family, such as allegations that Petitioner was abused by his father.

[4] The firm's website states that Pollack was selected as one of Massachusetts' "Super Lawyers" and states it has over 200 members. It further states Pollack has successfully represented parents and children in more than a dozen international child abduction matters.

the meaning of the Convention. 42 U.S.C. § 11603(e) (1). A petitioner can establish that the removal of a child is "wrongful" where: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal. Humphrey v. Humphrey,434 F.3d 243, 246 (4th Cir. 2006). Respondent refused to consent to the *prima facie* case, instead attacking the fact that Father had "joint custody" even though the initial German Court's Order clearly stated he had joint custody, and the law of Germany always awards joint custody automatically unless unusual circumstances are proven.

As a result, Father was forced to hire a German law expert, Wolfgang Vomberg, to testify regarding German custody law, the meaning of "joint custody", and the German Court system in general. The District Court would not accept Vomberg as an expert on German law and ordered an Article 15 filing. Under an Article 15 filing, the local court generally provides a statement that the removal or retention was wrongful within the meaning of Article 3 of the Convention. The Court did not accept the statement from the German Court, but instead required the parties to prepare "joint" Article 15 questions to be answered by an "Article 15 Court" in Germany.[5]

**6. Respondent Claimed Grave Risk of Harm**

Respondent then argued that Father's actions placed the children at "grave risk of harm." ICARA places the burden of proving Father posed a "grave risk of harm" on Respondent, by clear and convincing evidence. Respondent presented no testimony from an expert witness to

[5] The Court later reversed its position and accepted the Art. 15 filing, finding Father to have custody rights at the time of the wrongful removal. But the added cost was already spent.

prove such harm.[6] Instead, the Court appointed its own expert witness, Dr. Carole Jenny, to address this issue.[7] The parties were required to meet with this Court to determine what materials would be presented to Dr. Jenny. Father's counsel had to prepare for the cross-examination of Dr. Jenny including a review of cases in which she had testified in the past and articles she had written.

Before the Court appointed its own expert, Father had hired a child psychiatrist, Alex Weintrob, to address the "risk of harm" to the boys allegedly presented by the Father and the risk of harm if the children stayed in Rhode Island. Father also hired an anthropologist to address cultural attitudes and norms regarding children's nudity in Germany and Dr. Gross, a pediatrician. These experts were necessary to confront the serious charges claimed by Respondent.

**7. <u>Respondent Challenges Every Single German Translation</u>**

The Court then ordered the entire German Court file to be translated along with the Youth Services and Psychological Institute's file. Since these documents favored Father, he was saddled with the Herculean task and expense to quickly arrange for the translations. However, every time Father submitted a translated document, Respondent objected, even though ICARA allows for a relaxed evidence standard. The Court ruled that all translations must be made by a

---

[6] Respondent only presented an affidavit from Evelyn Strawn which identified further investigations she thought were necessary in order to render an opinion.
[7] Jenny has made a national reputation of protecting children from child abuse and runs a local sexual abuse clinic. Due to her strong advocacy against child abuse, Father feared his chances of convincing Jenny of his innocence were unfavorable.

certified translator under a certified seal. This resulted in significant additional expense to Father.[8]

**8. The Hearing Continued Over a Period of Nine Weeks**

Hearings under ICARA are to be expedited and the Court initially scheduled the hearing for Thursday and Friday, February 8th and 9th. Father arranged to fly witnesses from Germany to the hearing. However, because Respondent's counsel again raised the issue of his unavailability, the Court reconsidered and postponed the hearing. Since Father's witnesses were literally in the air, the Court ordered them to be deposed, resulting in three days of depositions. The District Court then undertook a piecemeal approach to the hearing with nine days of testimony spread out over seven weeks due to scheduling constraints. This dramatically increased the travel costs for Father's counsel. The District Court also required two mandatory settlement conferences[9], also adding to Father's legal fees.

During the course of the hearing, the Guardian ad Litem placed great importance on investigating whether or not the younger child really had emergency health issues, as the Mother alleged. The hearing was stopped so that the child could see a specialist regarding his adenoids, causing an additional delay and increased costs for Father. It was once again determined that the child did not immediately need surgery and was not being medically neglected by Father.[10]

---

[8] Despite the continuing objections, Respondent not once presented evidence that any of the translations were substantively inaccurate.

[9] It was during this time that Respondent indicated that she would drop her child abuse case for a payment of between 3 and 10 million dollars.

[10] The medical neglect claim was not proper in a Hague case, but the Respondent's insistence caused Father great expense in defending it. He was ordered to pay $3500 to Dr. Keamy, and the results supported what Father had contended all along, that there was no emergency health issue.

Respondent's numerous accusations, all proven to be false, delayed the proceedings and dramatically broadened the scope of the trial to include not only the child abduction case, but also child abuse, psychological abuse, medical neglect, pornography, internet exploitation of children, German protection of minors, etc. Respondent had a *pro bono* attorney and his large staff at her disposal for most of this case, working to advance allegations that the Mother certainly knew were false. From the Father's standpoint, literally everything was on the line, and he worked tirelessly to prove to this Court's satisfaction the baseless nature of Respondent's horrific claims.

**9. The Wrongful Removal has Financially Ruined the Father**

Respondent argues incessantly that Father is wealthy. He is not. Father has had to borrow $700,000 from his father, for which he has signed a promissory note, plus incur substantial additional debt to obtain this Court's Order of Return. Father does not own any shares in his family's textile company and his relationship to the company is that of an employee. Any reduction he has experienced in his salary was based not on Petitioner's desire to reduce his finances "on paper", as Respondent contends, but on legitimate financial decisions made by the company.[11]

Furthermore, Father was forced to take a leave of absence from his employment in order to right the wrong that Respondent has committed against the children and him. The children are the ones who will be most negatively affected by this case. If Respondent is not ordered to pay back the costs, the children will have to leave the excellent private school they currently attend,

[11] The company was recently reorganized by its creditors due to the pressure of Chinese participation in the world wide textile industry.

will have to move to a smaller residence, and will suffer the long-term impact the Respondent's irresponsible actions created in wreaking havoc on the family's financial stability.

**10. <u>The Expenses Incurred in Finding and Seeking the Return of his children</u>**

Father incurred the following costs as a result of Respondent's actions[12]:

**<u>Surveillance fees</u>**

Respondent fled Germany with no notice to Father. Initially, private investigators had to be hired to locate his children. Based on Respondent's past behavior, Father began searches in Las Vegas, New York City, and Rhode Island. The children's location was discovered the sixth day of their abduction when Respondent called the German school to claim the children were "sick" and the school had caller I.D. Then private investigators were then hired to try to keep Respondent from fleeing Rhode Island.

This proved quite necessary for two reasons: 1) Respondent engaged the detectives in a high speed chase, eventually losing them the first day her location was discovered; and 2) Respondent moved the children to a secret hotel, registering under an assumed name, in the middle of trial. As a sanction for wrongful removal, the Hague Convention permits the Court to require Respondent to pay legal and travel expenses and costs incurred in locating the children when circumstances make such award appropriate. <u>Roszkowski v. Roszkowska</u>, 644 A.2d 1150, 274 N.J.Super. 620 (N.J.Super.Ch.1993).

**<u>Expert Fees</u>**

Expert fees were incurred to refute Respondent's 13(b) claim that the children should remain in the United States because Petitioner's actions placed the children at a "grave risk of

[12] Father incorporates by reference his previous motion for costs and the supporting documents filed therewith.

harm". Petitioner incurred expenses for Alex Weintrob[13], Edward Gross, and Dominic Boyer. The only reason these experts were necessary was to answer the outrageous false claims made by Respondent of sexual abuse and child pornography. It was initially unknown that the Court would appoint its own expert. Additionally, the deposition of Alex Weintrob was necessary to rebut the Respondent's objections to Dr. Jenny's findings, including the need to prove a stay of the Court's Order would be harmful to the children. Petitioner also incurred expenses for the Court appointed Guardian ad Litem and the Court appointed expert, Dr. Carole Jenny.

**Visitation Supervisor**

Petitioner incurred additional costs for David Tassoni who supervised his visitation with the children. Mr. Tassoni charged $60 per hour for his services. The Court initially directed that Father have only supervised visitation. Even once the restriction was lifted, the continued presence of the supervisor was necessitated by the fact that Respondent accused Father of continued abuse of the children during his visits.

**Translation Fees**

Petitioner incurred translation fees in the amount of $12,155.41. The Court ordered the production of the entire files of: 1) the German Family Court; 2) the German Youth Services Agency; and 3) the German Psychological Institute. Since this evidence was favorable to the Father, the entire financial burden fell on the Father. Respondent objected to the use of German documents but did not provide any of her own translations, with the exception of the Kane Affidavit. The Court ruled that certified translations of all German documents must be provided,

[13] See Exhibit 2 not previously made an Exhibit to Father's Motion for Costs. Father would also refer the Court to the Exhibits filed with his previous Motion for Costs.

and these were paid for by the Petitioner. See Antunez-Fernandez v. Connors-Fernandes, 259 F.Supp.2d 800 (N.D. Iowa 2003). Father, who prevailed on his wrongful removal claim, is entitled to recover from Respondent the costs he incurred for translations.

**Attorney Fees**

Where the trial judge allows a fee petition to a prevailing party, the amount allowed must be reasonable. To determine what amount is reasonable, the court generally engages in a "lodestar" analysis. *See* Hensley v. Eckert, 461 U.S. 424, 103 S. Ct. 1933 (1983). The essence of this determination is the multiplication of the "number of hours reasonably expended on the litigation" by a "reasonable hourly rate." Hensley v. Eckert, supra at 433, 103 S.Ct. 1933. The rate applied to the reasonable hours expended should be the prevailing rate in the community, taking into account the experience and qualifications of the attorneys involved. *See* Gay Officers Action League v. Puerto Rico, 247 F.3d 288 (1st Cir. 2001). After making its initial calculation, the court then may adjust the fee upward or downward based on other considerations, including the results obtained. *See* Hensley v. Eckerd, supra at 434-435, 103 S.Ct. 1933.[14]

It was reasonable for Father to hire local counsel, Chuck Tamuleviz,[15] and Hague Convention expert Jerry Nissenbaum to assist his long-time counsel Bradford Martin. The counterpart to attorney experience and skill, and the increased compensation they command, is that "a client (and by extension, an opposing party subject to a fee award) should receive the benefit of the attorney's expertise in the form of at least some reduction in the amount of time

[14] Jerry Nissenbaum was paid an hourly rate of $700 per hour and Charles Tamuleviz at $400 per hour. It may assist the Court to request the normal hourly rate Attorney Pollack charges in determining a reasonable rate. Although local counsel was necessary in the case, the Court may choose to limit reimbursement for local counsel to the 102.5 hours he was required to appear in Court in his capacity as local counsel. Also, Local Rule 54.1 requires an affidavit of an independent local lawyer, which will be filed shortly.

[15] This memorandum will be supplemented with the detailed billing records for Mr. Tameleviz and his firm.

that an attorney of lesser experience with the subject matter would have to expend." T & D Video, Inc. v. City of Revere, 66 Mass.App.Ct. 461, 848 N.E.2d 1221 (Mass.App.Ct. 2006).

Father used Martin and his firm at their lower, South Carolina hourly rates, for the vast majority of the preparatory work and for most of the trial work in this case. In Whallon v Lynn, 356 F.3d 138 (1st Cir. 2004) an award of costs for more than one law firm was permitted. The use of Martin's associates and staff to coordinate the translation of voluminous documents for use by witnesses and the court was necessary and cost-effective. The use of an associate by Martin also resulted in a lower hourly rate to being billed for research.

**Other Costs**

Father set forth the other costs he incurred in the course of this action in his previous motion and asks that these expenses be reimbursed as well. See Berendsen v. Nichols, 938 F.Supp. 737 (D.Kansas 1996). (Mother who had obtained order requiring return of her child under International Child Abduction Remedies Act (ICARA) was entitled to reimbursement for costs of $1,377.65 in connection with action, representing costs of telephone calls, facsimile transmissions, witness fees, certified mail and postage, service fees, copying, filing fees, mileage, motel costs, rental car expenses, and gas.) See also Antunez-Fernandez v. Connors-Fernandes, 259 F.Supp.2d 800 (N.D. Iowa 2003). (Father, who prevailed on his wrongful removal claim under the Hague Convention on the Civil Aspects of International Child Abduction and ICARA, was entitled to recover from mother his travel expenses, including those incurred for plane ticket, car rental, and hotel.)

**Respondent's claims that she can't pay**

Respondent claims that she has no means of paying any costs awarded because she has stayed home for the last eight (8) years. Respondent has presented no evidence that she is incapable of obtaining work, either in the United States or Germany. Respondent has a Degree in Fine Arts from the Rhode Island School of Design. She has had a distinguished design career and had successful careers in both the United States and Germany.[16] Respondent has received $181,882.25 from Father since November of 2005. If Respondent were to begin employment rather than continuing her irresponsible false claims against Father in Germany by bringing additional charges against him there, she would have adequate money to support herself and pay Father.[17]

## B. An Award of Costs is Necessary to Deter the Respondent

### 1. Flagrant Disregard of the Court's Authority

Not only has Respondent not had to pay for legal counsel, she has not been held responsible for her flagrant disregard for the Orders of the Courts in Germany and Rhode Island:

1) Respondent defied German Court Orders by obtaining the children's passports from the U.S. Consulate on January 23, 2007.

2) Respondent defied German Court Orders by kidnapping the children January 23, 2007.

[16] In New York in the early 1990's, Respondent had a salary of $80,000 per year as a knitwear designer. She made an annual salary of $65,000 in Rhode Island, and started her own business in Germany that turned a profit of approximately $100,000.00 after only two years. She sold this business to an assistant for U.S. $25,000.00.
[17] It needs mention that Father has full custody of the children, which would allow Respondent to work full time.

3) Respondent defied the German Court's findings that the photographs of the children were not pornographic, nor abusive, by filing abuse claims against Father in Rhode Island's Family Court.

4) Respondent defied the Federal Court's stay by re-filing abuse claims in Rhode Island Family Court before a different judge.

5) Respondent defied the Federal Court's sealing of the photographs by showing them to the children's Catholic School administrators.

6) Respondent defied the Federal Court's limitations on what evidence would be submitted to Dr. Jenny by contacting her directly.

7) Respondent defied the Federal Court's sealing of the photographs by filing a claim with the FBI in Boston against Father alleging child pornography.

8) Respondent defied the Federal Court's Order that no further physical examination of the children would be permitted by taking them to the Hasbro Child Abuse Clinic.

9) Respondent defied the Federal Court's visitation order by challenging the authority of the Court-ordered visitation supervisor, Lori Giarrusso, as recounted in GAL Sharon O'Keefe's e-mail dated April 5, 2007.

10) Respondent defied the Federal Court's Order to turn over her computer to attorney Boren in order to have the photographs permanently removed by a computer professional.

11) Respondent defied the intent of the Federal Court's Order by continuing to distribute the photographs in Germany in an attempt to have the Father criminally prosecuted for child pornography.

12) Respondent defied the Federal Court's Order by continuing to show the photographs to the parents of the children's school mates in Germany.

**2. <u>Risk of Future Kidnapping to Portugal</u>**

Respondent has been insulated from criminal prosecution in Germany for kidnapping, as required by Judge Smith's Order dated March 28, 2007.[18] The absence of any repercussions against the Respondent for abducting the children reinforces the message that abduction of the children was a successful maneuver which should be repeated. She was even able to retain an excellent, experienced law firm on a pro bono basis. There is a very real threat that the Respondent, who speaks Portuguese fluently, will next attempt to abduct the children to Portugal, her ancestral home. In fact, Respondent's cousin is a police officer in Portugal dealing with sexual abuse cases. He filed an affidavit in the German custody case claiming that the photographs at issue are pornographic and harmful to the children.

**3. <u>Continued Irrational Behavior in Germany</u>**

Respondent has returned to Germany and is continuing to seek criminal prosecution of Father for alleged child pornography and to have Father arrested for alleged breaking and entering. Respondent continues to show the nude photographs to the parents of the children's school friends, in defiance of the Federal Court's Order. Respondent's current behavior in

[18] The requirement that Father dismiss any charges for kidnapping takes away a significant chance of recovery of expenses through the reduction of alimony. Under German law, alimony can only be excluded if someone is convicted of a criminal offense.

Germany demonstrates that she continues to believe she is above the law and not subject to the usual consequences for defying a court order. The only sanction left is this Motion for Costs.

**C. An award of costs is not "clearly inappropriate"**

ICARA requires any court ordering the return of a child under the Hague Convention to award fees and costs to the successful party unless such order would be "clearly inappropriate." Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995). As set forth above, an award of costs is not "clearly inappropriate." Rather it is absolutely necessary to restore Father to his position prior to the abduction of the children and as a deterrent to Respondent's continuing defiance and refusal to accept reality. The children and the Father deserve a chance to return to a normal life.

## IV. CONCLUSION

As set forth above costs and fees are necessary in the present case to restore Father to the financial position he would have been in had there been no removal of the children and to deter such future removal.

Respectfully submitted,

May 11, 2007

Charles A. Tamuleviz, Esq. (Fed. Bar #6115)
TAMULEVIZ, HULTQUIST, & DIANCHI
144 Westminster Street
Providence, Rhode Island 02903
401.490.2939
401.490.2940 (fax)

/s/ Bradford N. Martin
Bradford N. Martin (Federal Bar #3310)
BRADFORD NEAL MARTIN & ASSOCIATES, PA
75 Beattie Place, Ste. 910
Post Office Box 10410
Greenville, South Carolina 29603
864.552.9990
864.552.9992 (fax)

Gerald Nissenbaum, Esq.
NISSENBAUM LAW OFFICES
The Landmark
160 Federal Street, 24th Floor
Boston, Massachusetts 02110
Phone: 617-330-9090
Fax: 617-330-6909

ATTORNEYS FOR PETITIONER

Certification of Service

On this 11th day of May, 2007, I caused the within document to be filed electronically and it is available for viewing and downloading from the ECF system to the registered participants and as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Bradford N. Martin
Bradford N. Martin (Federal Bar #3310)
BRADFORD NEAL MARTIN & ASSOCIATES, PA
75 Beattie Place, Ste. 910
Post Office Box 10410
Greenville, South Carolina 29603
864.552.9990
864.552.9992 (fax)